IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

**FILED**

**OCT 1 0 2012**

Clerk, U.S. District Court
District Of Montana
Helena

| | |
|---|---|
| DOUG LAIR, STEVE DOGIAKOS, ) <br> AMERICAN TRADITION ) <br> PARTNERSHIP, AMERICAN ) <br> TRADITION PARTNERSHIP PAC, ) <br> MONTANA RIGHT TO LIFE ) <br> ASSOCIATION PAC, SWEET GRASS ) <br> COUNCIL FOR COMMUNITY ) <br> INTEGRITY, LAKE COUNTY ) <br> REPUBLICAN CENTRAL ) <br> COMMITTEE, BEAVERHEAD ) <br> COUNTY REPUBLICAN CENTRAL ) <br> COMMITTEE, JAKE OIL LLC, JL ) <br> OIL LLC, CHAMPION PAINTING INC, ) <br> and JOHN MILANOVICH, ) <br> ) <br> Plaintiffs, ) <br> ) <br> vs. ) <br> ) <br> JAMES MURRY, in his official capacity ) <br> as Commissioner of Political Practices; ) <br> STEVE BULLOCK, in his official capacity ) <br> as Attorney General of the State of ) <br> Montana; and LEO GALLAGHER, in his ) <br> official capacity as Lewis and Clark ) <br> County Attorney; ) <br> ) <br> Defendants. ) <br> _____ ) | CV 12-12-H-CCL <br><br><br><br><br><br><br><br> FINDINGS OF FACT <br> CONCLUSIONS OF LAW <br> OPINION AND ORDER |

1

The remainder of this case—the constitutionality of Montana's contribution limits in Montana Code Annotated § 13–37–216—came before the Court in a bench trial held from September 12, 2012, to September 14, 2012. The plaintiffs were represented by James Bopp, Jr., and the defendants were represented by Michael Black and Andrew Huff. The plaintiffs argue that the contribution limits are unconstitutional under the First Amendment. For the reasons below, the Court declares those limits unconstitutional and permanently enjoins the defendants from enforcing them.

### JURISDICTION, VENUE, AND PARTIES

The plaintiffs seek injunctive and declaratory relief under 42 U.S.C. §1983. Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343(a). Venue is proper under 28 U.S.C. § 1391(b).

Plaintiffs American Tradition Partnership PAC, Montana Right to Life Association PAC, Lake County Republican Central Committee, and Beaverhead County Republican Central Committee each constitute a "political committee" as defined by Mont. Code Ann. § 13–1–101(22). Plaintiffs Lake County Republican Central Committee and Beaverhead County Republican Central Committee further qualify as "political party organizations" within the meaning of Mont. Code Ann. § 13–37–216(3). Plaintiffs Doug Lair and Steve Dogiakos both want to make

2

contributions above the contribution limits to candidates for various Montana elected offices. They would do so but for Montana's contribution limits. Plaintiff John Milanovich has run for State House in the past and intends to run again in the future.

As Commissioner of Political Practices, Defendant Jim Murry has authority to investigate violations of, enforce the provisions of, and hire attorneys to prosecute violations of, Montana Code Chapters 35 and 37 and the rules adopted to carry out these provisions. The Commissioner acts under color of state law and is sued in his official capacity. As Montana Attorney General, Defendant Steve Bullock has power to investigate and prosecute violations of Montana Code Chapters 35 and 37 by and through the county attorneys under his supervision. The Attorney General acts under color of state law and is sued in his official capacity. As Lewis and Clark County Attorney, Defendant Leo Gallagher has power to investigate and prosecute violations of Montana Code Chapters 35 and 37. The County Attorney acts under color of state law and is sued in his official capacity.

## BACKGROUND

The plaintiffs filed this lawsuit in the Billings Division for the District of Montana on September 6, 2011. They claim that several of Montana's campaign

3

finance and election laws are unconstitutional under the First Amendment. The

statutes that they challenge are:

> Montana Code Annotated § 13–35–225(3)(a), which requires authors of
> political election materials to disclose another candidate's voting record;

> Montana Code Annotated § 13–37–131, which makes it unlawful for a
> person to misrepresent a candidate's public voting record or any other
> matter relevant to the issues of the campaign with knowledge that the
> assertion is false or with a reckless disregard of whether it is false;

> Montana Code Annotated § 13–37–216(1), (5), which limits
> contributions that individuals and political committees may make to
> candidates;

> Montana Code Annotated § 13–37–216(3), (5), which imposes an
> aggregate contribution limit on all political parties; and

> Montana Code Annotated § 13–35–227, which prevents corporations
> from making either direct contributions to candidates or independent
> expenditures on behalf of a candidate.

The plaintiffs moved for a preliminary injunction on September 7, 2011,

seeking to enjoin the defendants from enforcing each of these statutes. Before any

action was taken on the motion, the defendants moved to change venue that Court

granted that motion on January 31, 2012, and the case was transferred to the

Helena Division assigned by lot to the undersigned.

On February 16, 2012, the Court held a hearing on the motion for a

preliminary injunction and enjoined enforcement of Montana's vote-reporting

4

requirement and political-civil libel statute (*See* doc. 66); Mont. Code Ann. §§ 13–35–225(3)(a), 13–37–131. The Court denied the motion as to the remaining statutes. (*Id.*)

The Court issued its scheduling order on March 9, 2012. The parties agreed that all of the issues regarding the contribution limits in Montana Code Annotated § 13–37–216(1), (3), and (5) would be resolved through a bench trial and that all other matters would be adjudicated by summary judgment. (*See* doc. 73.) The Court and the parties all agreed to place this matter on an expedited schedule so that it will be resolved prior to this year's election.

The parties cross-moved for summary judgment, and the Court held a hearing on May 12, 2012. The Court granted both motions in part and denied them in part. (*See* doc. 90.) The Court permanently enjoined Montana's vote-reporting requirement, political-civil libel statute, and ban on corporate contributions to political committees that the committees use for independent expenditures. *See* Mont. Code Ann. §§ 13–35–225(3)(a), 13–37–131,13–35–227. The Court, however, concluded that Montana's ban on direct and indirect corporate contributions to candidates and political parties is constitutional. *Id.* at § 13–35–227. The parties cross-appealed that order but then voluntarily dismissed the appeals on July 23, 2012.

5

On June 20, 2012, the defendants—without leave of the Court—moved for summary judgment on the plaintiffs' claims concerning Montana's contribution limits. The Court denied the motion because, as explained in the scheduling order, the parties agreed that those claims would be resolved only through a bench trial. Moreover, the defendants' motion was untimely.

The Court held a bench trial from September 12, 2012, to September 14, 2012, in order to resolve the plaintiffs' claims related to Montana's campaign contribution limits in Montana Code Annotated § 13–37–216(1), (3), and (5). At the final pretrial conference immediately preceding the trial, the plaintiffs renewed their motion for summary judgment, and the Court took that motion under advisement.

## TESTIMONY AT THE BENCH TRIAL

James Bopp, Jr. argued the plaintiffs' case.[1] Michael Black and Andrew Huff argued the defendants' case. Having considered the testimony of both the plaintiffs' and the defendants' witnesses, the Court finds the plaintiffs' witnesses more persuasive and that the facts weigh in favor of the plaintiffs.

---

[1] James E. Brown initially appeared on behalf of the plaintiffs, but he was called as the plaintiffs' first witness and was therefore barred from subsequently arguing the plaintiffs' case at the trial. *See* Mont. R. Prof. Conduct 3.7.

6

## I.      Plaintiffs' expert witness: Clark Bensen

The plaintiffs presented an expert, Clark Bensen, who analyzed the effect of

Montana's contribution limits. Bensen analyzed "competitive" races in Montana,

which he defined as elections where the margin of victory was 10% or less.

Bensen studied 112 campaigns. Those campaigns were for either Public Service

Commission offices or the Legislature. Most of these elections were for the 2008

or 2010 elections, but there were some for the 2004 and 2006 elections. Bensen

considered only "itemized contributions," which are contributions over $35.

Bensen concluded that these campaigns relied substantially on "maxed-out

donors" for campaign revenue. Bensen calculated that, on average, 29% of the

contributors in the campaigns had donated to the maximum level (26% for

Democrats, and 34% for Republicans). Roughly 37% of the contributors were at a

"near-max" level. On average, the campaigns that Bensen analyzed receive 86% of

their itemized contributions from individuals (generating 74% of their overall

revenue), 9% of their itemized contributions from political committees (generating

10% of their overall revenue), and 2% of their itemized contributions from

political parties (generating 6% of their overall revenue). Many campaigns are

self-financed to some degree.

Bensen found that the reliance on maxed-out donors is substantial: On

average, 44% of the aggregate amount of funds raised by itemized contributions

7

from individuals and political committees are generated by maxed-out donors. This percentage rises to 54% when considering "near-max" donors.

Of the 112 campaigns at issue (excepting one candidate from the Constitution Party), Bensen determined that 40% of the candidates received the maximum aggregate contribution limit from their political parties.

Of particular note and relevance here, the average campaign spends more than it raises, by about 7%. Bensen therefore concluded that campaigns struggle "to meet their perceived needs for operations and communication with voters."

## II.   Testimony from other witnesses for the plaintiffs

The Lake County Republican Central Committee ("Lake County Republicans") is the local Republican Party for Lake County. It has a history of making contributions to Republican candidates, including in the last election. Darren Breckenridge testified on behalf of the Lake County Republicans.

The Lake County Republicans plans to make contributions to candidates in the 2012 election. Specific planned contributions include a contribution to Joe Reed, who will be running for election in House District 15, and a contribution to whichever Republican runs for election in Senate District 6. It plans to contribute up to the limits allowed by law. The Lake County Republicans wants to make its planned contributions, including a $2,000 contribution to Reed, even if other political parties also make contributions to their chosen candidates. If other

8

political parties contribute to its chosen candidates, the Lake County Republicans would make its planned contributions, but for the aggregate limits imposed by Montana Code Annotated § 13–37–216(3), (5), and the penalties imposed on those who violate them. Montana's law, however, limits its contributions to $800 for State House candidates. The Lake County Republicans would have made a contribution of more than $400 to House District candidate Jenna Taylor except she had already received $400 and so could only legally accept $400 more.

The Beaverhead County Republican Central Committee ("Beaverhead County Republicans") is the local Republican Party for Beaverhead County. It has a history of making contributions to Republican candidates, including in the last election. James E. Brown testified at trial on behalf of the Beaverhead County Republicans.[2] The Beaverhead County Republicans plans to make contributions to candidates in the 2012 election. The Beaverhead County Republicans plans to make a contribution to Joe Reed, who will be running for election in House District 15, a contribution to Debby Barrett, who will be running for re-election in Senate District 36, and a contribution to Rick Hill. It plans to contribute up to the limits allowed by law.

The Beaverhead County Republicans wants to make its planned contributions, even if other political parties also make contributions to its chosen

---

[2] *See* note 1, *supra.*

9

candidates. If other political parties contribute to its chosen candidates, the Beaverhead County Republicans would still make its planned contributions, but for the aggregate limits imposed by Montana Code Annotated § 13–37–216(3), (5), and the penalties imposed on those who violate them. The Beaverhead County Republicans attempted to make contributions to several candidates for State House and State Senate during the 2010 election. Because of the aggregate party contribution limits, five of those candidates were forced to return the Beaverhead County Republicans' contributions.

Plaintiff Doug Lair is a Big Timber area rancher and investor. Plaintiff Steve Dogiakos is a political activist and small businessman who owns a company offering web design services. Both Lair and Dogiakos have previously made contributions to candidates running for office in Montana. Lair and Dogiakos intend to make contributions to candidates running for office in 2012.

Lair has already contributed the maximum to candidates Ken Miller, Debra Lamm, Bob Faw, and Tim Fox in the 2012 primary and plans to contribute the maximum amount to Republican candidates like Ed Walker, Dan Kennedy, Rick Hill, and Dan Skattum. He would give more if allowed by law.

Dogiakos intends to make contributions to Republican candidates for the Public Service Commission and the State House. Dogiakos would give $500 to Christy Clark, 2012 candidate for the State House from House District 17; $1,000

to Bob Lake, a Public Service Commissioner candidate; $500 to Wylie Galt, a candidate for House District 83; and Liz Bangerter, a candidate for House District 80, except he is prohibited from giving that much by law.

Plaintiff John Milanovich resides in Bozeman. Milanovich ran unsuccessfully for the State House in 2008. He appeared on the ballot for the Republican primary in 2010, but decided to endorse one of his primary opponents in that race. Milanovich intended to run for the State House again in 2012 from House District 69, but after filing his candidacy, withdrew due to growing obligations with his growing business. Milanovich filed his "Statement of Candidate" Form C-1 with the Office of the Commissioner of Montana Political Practices. Form C-1 must be filed within five days after a candidate for office receives or spends money, appoints a campaign treasurer, or files for office, whichever occurs first. The statutory authority for Form C-1 is contained in Montana Code Annotated §§ 13–37–201, 13–37–202, 13–37–205. Because Milanovich filed his Form C-1, he was allowed to solicit and accept contributions for his campaign. Milanovich began doing so.

Milanovich would have solicited and accepted contributions above the $160 contribution limit if the law did not prohibit and penalize him for doing so. Moreover, Milanovich would have solicited and accepted contributions from the Montana Republican Party above the $800 contribution limit. He also would have

11

solicited and accepted contributions from various county Republican parties above the $800 contribution limit if the law had permitted him to do so.

Richard Mike Miller was first elected as the House District 84 Representative in 2008. Representative Miller is a Republican. He ran successfully in 2010 and is now a candidate for the same seat in the 2012 election. House District 84 is primarily rural and is approximately 2,500 square miles in size. Approximately 9,500 people live in Representative Miller's House District 84.

Representative Miller ran an opposed campaign in 2008 and 2010, and his current campaign is opposed. In the 2008 election, Representative Miller raised between $8,000 and $9,000 for his campaign. In 2010, he raised between $5,000 and $6,000. In the current election, Representative Miller has raised approximately $3,500. Between 5% and 10% of Representative Miller's donors have made donations up to the contribution limits.

In 2008, Representative Miller received the contribution limit from political committees, but he did not receive the contribution limit from his political party. Since Representative Miller received the maximum aggregate contribution from political committees in 2008, he was not able to accept additional money from political committees after reaching that limit and he was not able to identify additional political committees as contributors. In 2010, Representative Miller came within $10 of reaching the aggregate contribution limit for political

committees and then stopped accepting contributions from political committees. For his 2012 campaign, Representative Miller has received the aggregate contribution limit for political committees. During his 2008, 2010, and 2012 campaigns, Representative Miller received contributions from political committees after reaching the aggregate limit, and he has been forced to return those contributions.

A significant aspect of Representative Miller's campaign involves mailing information to potential voters. He believes that roughly $12,000 would be necessary to effectively reach potential voters through mailings. Representative Miller testified that the cost of running a campaign has increased while he has been in office. For example, in 2008, 1,000 pencils cost Representative Miller $170. They now cost $195, a 15% increase. In 2008, 100 yard signs cost $320. They are now $345, an 8% increase. Postage has increased from 41 to 45 cents, a 10% increase. Perhaps most significantly, Representative Miller testified that his cost of gasoline has increased from $2.25 a gallon to $3.75 a gallon, a 67% increase. Representative Miller testified that these are essential items that he needs to run a campaign. Representative Miller testified that, but for Montana's contribution limits, he believes he could raise the necessary funds to run an effective campaign.

13

**III.   Defendants' expert witness: Edwin Bender**

The defendants presented an expert, Edwin Bender, who analyzed the

effects of Montana's contribution limits. Bender's analysis, unlike Bensen's, is

based on all campaigns, not just "competitive" campaigns. And, unlike Bensen, he

analyzed campaigns for all statewide races, legislative races, and the gubernatorial

race.

Bender's analysis shows that, between 2004 and 2010, legislative

candidates raised between 56% and 70% of their itemized campaign funds from

individuals, between 9% and 11% from political committees, between 3% and 4%

from political parties, and between 7% and 11% from unitemized contributions

(contributions less than $35). Between 11% and 18% of the contributions were

self-financed contributions. For statewide campaigns, those statistics are: between

52% and 71% from individual contributors, between 0% and 3% from political

committees, between 2% and 4% from political parties, and between 7% and 9%

from unitemized contributions. Between 17% and 38% of the contributions were

self-financed contributions. For the 2004 and 2008 gubernatorial campaigns, those

statistics are: between 89% and 96% from individuals, 0% from political

committees, between 0% and 2% from political parties, and 1% from unitemized

contributions. Between 1% and 10% of the contributions were self-financed

contributions.

14

Bender also analyzed the number of individuals and political committees

that donated at the maximum levels for the 2004 to 2010 elections. In State House

races where the primary was not contested, between 15% and 29% of individual

contributors donated at the maximum level. Between 45% and 49% of the political

committees donated at the maximum level. In State Senate races, where the

primary was not contested, Bender found that between 18% and 33% of individual

contributors donated at the maximum level. Between 48% and 64% of the political

committees donated at the maximum level. In statewide office races, where the

primary was not contested, Bender found that between 0% and 19% of individual

contributors donated at the maximum level. Between 0% and 58% of the political

committees donated at the maximum level. In the 2004 and 2008 gubernatorial

races, 2% of the individual contributors donated at the maximum level. Virtually

none of the political committees made maximum contributions. For each of these

campaigns, when the primary was contested, a much smaller percentage of

individuals and political committees made maximum contributions during both the

primary and general elections.

From 2000 to 2010, Montana candidates received an average of 3.8% of

their contributions from political parties. Challengers generally received more

money from political parties than incumbents. In legislative races between 2004

and 2010, where the primary was not contested, Bender found that between 22%

15

and 32% of the candidates accepted the maximum aggregate contribution from

political parties. In statewide races between 2004 and 2010, where the primary

was not contested, between 0% and 18% of the candidates accepted the maximum

aggregate contribution from political parties. In the 2004 and 2008 gubernatorial

races, none of the candidates received the maximum aggregate contribution from

political parties. Again, for each of these campaigns, when the primary was

contested, a much smaller percentage of individuals and political committees made

maximum contributions during both the primary and general elections

## IV. Testimony from other witnesses for the defendants

Defendant Jim Murry is the Commissioner of Political Practices.

Commissioner Murry testified that "effective" campaigns require more than

monetary contributions. They require volunteers to help deliver a candidate's

message to the voters.

On May 15, 2012, the Deputy Commissioner of Political Practices, Jay

Dufrechou, issued a Commissioner's Opinion stating that services provided to a

campaign by volunteers do not constitute contributions. *See In re Bullock*,

(Commr. of Politcal Pracs. May 15, 2012) (Ex. 8). Political parties and political

action committees, therefore, may provide unlimited volunteer services to

candidates.

Mary Ellen Baker is the Program Supervisor for the Office of Political

16

Practices. She has a number of responsibilities with the Office, including ensuring

that candidates comply with Montana's laws and regulations. According to Baker,

many candidates utilize volunteer services that are provided by political parties.

Baker testified that there are 141 or 142 current and active political

committees registered in the State of Montana. There are approximately 123

political party committees in the State, approximately 50 of which are Republican

party committees. Baker testified that she believed a contribution of up to $1,000

would not have a corruptive effect.

## ANALYSIS

### I.    Montana's contribution limits

Montana Code Annotated § 13–37–216(1), (3), (5) provides:

(1)(a) Subject to adjustment as provided for in subsection (4),[3] aggregate contributions for each election in a campaign by a political committee or by an individual, other than the candidate, to a candidate are limited as follows:

_____

[3] Subsection 4 provides:

(a) The commissioner shall adjust the limitations in subsections (1) and (3) by multiplying each limit by an inflation factor, which is determined by dividing the consumer price index for June of the year prior to the year in which a general election is held by the consumer price index for June 2002.

(b) The resulting figure must be rounded up or down to the nearest:

(i) $10 increment for the limits established in subsection (1); and

(ii) $50 increment for the limits established in subsection (3).

(c) The commissioner shall publish the revised limitations as a rule.

17

(i) for candidates filed jointly for the office of governor and lieutenant governor, not to exceed $500;

(ii) for a candidate to be elected for state office in a statewide election, other than the candidates for governor and lieutenant governor, not to exceed $250;

(iii) for a candidate for any other public office, not to exceed $130.

(b) A contribution to a candidate includes contributions made to the candidate's committee and to any political committee organized on the candidate's behalf.

.   .   .

(3) All political committees except those of political party organizations are subject to the provisions of subsections (1) and (2). For purposes of this subsection, "political party organization" means any political organization that was represented on the official ballot at the most recent gubernatorial election. Political party organizations may form political committees that are subject to the following aggregate limitations, adjusted as provided for in subsection (4), from all political party committees:

(a) for candidates filed jointly for the offices of governor and lieutenant governor, not to exceed $18,000;

(b) for a candidate to be elected for state office in a statewide election, other than the candidates for governor and lieutenant governor, not to exceed $6,500;

© for a candidate for public service commissioner, not to exceed $2,000;

(d) for a candidate for the state senate, not to exceed $1,050;

(e) for a candidate for any other public office, not to exceed $650.

18

.   .   .

(5) A candidate may not accept any contributions, including in-kind contributions, in excess of the limits in this section.

Montana law also limits the total aggregate contributions that state

legislative candidates may receive from political committees:

A candidate for the state senate may receive no more than $2,150 in total combined monetary contributions from all political committees contributing to the candidate's campaign, and a candidate for the state house of representatives may receive no more than $1,300 in total combined monetary contributions from all political committees contributing to the candidate's campaign. The limitations in this section must be multiplied by an inflation factor, which is determined by dividing the consumer price index for June of the year prior to the year in which a general election is held by the consumer price index for June 2003. The resulting figure must be rounded up or down to the nearest $50 increment. The commissioner shall publish the revised limitations as a rule. In-kind contributions must be included in computing these limitation totals. The limitation provided in this section does not apply to contributions made by a political party eligible for a primary election under 13-10-601.

Mont. Code Ann. § 13–37–218.

The aggregate limit in Montana Code Annotated § 13–37–218 applies only

to state legislative campaigns. *Id.* The limits do not apply to other offices. So, for

example, candidates in the governor election may accept unlimited total

contributions from political committees, but those committees are limited to

contributing $500 apiece (adjusted for inflation). *See* Mont. Code Ann §

13–37–216(1)(a)(i). The plaintiffs do not challenge the constitutionality of

19

Montana Code Annotated § 13–37–218. The Court, therefore, makes no

determination as to the constitutionality of this statute, and this decision does not

impact the defendants' ability to enforce Montana Code Annotated § 13–37–218.

After adjusting the limits above for inflation, *see* Mont. Code Ann. §§

13–37–216(5), 13–37–218, Montana's contribution limits are:

**Contribution limits for individuals and political committees**
(Admin. R. Mont. 44.10.338(1))

| Office | Contribution limit |
|---|---|
| Governor | $630 |
| Other statewide offices | $310 |
| All other public offices | $160 |

**Aggregate contribution limits for political parties**
(Admin. R. Mont. 44.10.338(2))

| Office | Contribution limit |
|---|---|
| Governor | $22,600 |
| Other statewide offices | $8,150 |
| Public Service Commission | $3,260 |
| Senate | $1,300 |
| All other public offices | $800 |

**Aggregate contribution limits for political committees**
(Admin. R. Mont. 44.10.331(1))

| Office | Contribution limit |
|---|---|
| Senate | $2,650 |
| House Representative | $1,600 |

## II.   Standard of review

While laws limiting campaign expenditures are subject to strict scrutiny, restrictions on contributions are subject to a "lesser standard." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1117 (9th Cir. 2011) (citing *Buckley v. Valeo*, 424 U.S. 1, 20 (1976)). "Contribution limits need only be 'closely drawn' to match a sufficiently important interest to survive a constitutional challenge." *Id.* (quoting *Randall v. Sorrell*, 548 U.S. 230, 247 (2006) (plurality opinion)). Under this standard, a contribution limit is constitutional as long as the limit is "closely drawn" to match "a sufficiently important interest." *See id.*; *Nixon v. Shrink Mo. Govt. PAC*, 528 U.S. 377, 387–88 (2000); *Buckley*, 424 U.S. at 25.

The Ninth Circuit held that, after *Buckley* and *Shrink Missouri*, state campaign contribution limits will be upheld if:

(1) there is adequate evidence that the limitation furthers a sufficiently important state interest, and

(2) if the limits are "closely drawn"—i.e., if they (a) focus narrowly on the state's interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign.

21

*Mont. Right to Life Assn. v. Eddleman*, 343 F.3d 1085, 1092 (9th Cir. 2003), *cert.*

*denied*, 125 S. Ct. 47 (2004).

> Similarly, the U.S. Supreme Court later explained in *Randall*:

> Following *Buckley*, we must determine whether . . . contribution limits prevent candidates from "amassing the resources necessary for effective [campaign] advocacy"; whether they magnify the advantages of incumbency to the point where they put challengers to a significant disadvantage; in a word, whether they are too low and too strict to survive First Amendment scrutiny.

548 U.S. at 248. (quoting *Buckley*, 424 U.S. at 21).

As the *Randall* plurality noted, courts have "no scalpel to probe" each

possible contribution level. 548 U.S. at 249. Courts cannot "determine with any

degree of exactitude the precise restriction necessary to carry out [a] statute's

legitimate objectives." *Id.* That task is better left to state legislatures. *Id.* That

being said, there are lower bounds to contribution limits. *Id.* at 248.

The *Randall* plurality articulated a two-step framework for analyzing the

question of whether a contribution limit is "closely drawn." First, a court must

look for "danger signs" as to whether the contribution limit at issue is too low. 548

U.S. at 249–53. A court, for instance, should compare the limit at issue with limits

that have been previously upheld or declared constitutional and compare the limit

to other limits across the country. *Id.* If "danger signs" are present, then a court

must move to the second step—"examin[ing] the record independently and

carefully . . . determin[ing] whether [the] contribution limits are 'closely drawn' to

match the State's interest." *Id.* at 253.

In *Randall*, the plurality discussed five factors when it examined the record

to determine whether the contribution limit in that case was closely drawn:

1.  whether the record suggests that the contribution limit "will significantly restrict the amount of funding available for challengers to run competitive campaigns," *id.* at 253–56;

2.  whether political parties must abide by the same limits that apply to other contributors, *id.* at 256–59;

3.  whether volunteer services are treated as contributions for purposes of the contribution limit, *id.* at 259–60;

4.  whether the contribution limit is adjusted for inflation, *id.* at 260; and

5.  if the contribution limit is "so low or so restrictive to bring about . . . serious associational and expressive problems," whether there is "any special justification" that warrants such a limit, *id.* at 261–62.

Nothing in the *Randall* opinion suggests that this list of five factors is exhaustive

or that each factor must weigh against a limit in order for it to be unconstitutional.

**III.    *Montana Right to Life Association v. Eddleman*, 343 F.3d 1085 (9th Cir. 2003)**

This case is not the first time that a court has examined Montana's

contribution limits. In 2000, the Billings Division for the District of Montana held

a four-day bench trial to determine the constitutionality of the same statutes. *See*

23

*Mont. Right to Life Assn. v. Eddleman*, CV 96–165–BLG–JDS (D. Mont. Sept. 19, 2000) (Ex. 11). The Court upheld the limits, and the Ninth Circuit affirmed that decision in 2003. *See Mont. Right to Life Assn.*, 343 F. 3d 1085.

In affirming the district court, the Ninth Circuit relied on both *Buckley* and *Shrink Missouri* and concluded that the contribution limits are closely drawn. *Mont. Right to Life Assn.*, 343 F.3d at 1094. It held that the evidence showed that the limits do not prevent candidates in Montana from raising the funds necessary to mount effective campaigns. *Id.* at 1094–95. That decision is not binding on this Court because the U.S. Supreme Court's intervening decision in *Randall* compels a different outcome. *See Kilgore v. KeyBank, Nat. Assn.*, 673 F.3d 947, 959 (9th Cir. 2012).

## IV. *Randall v. Sorrell*, 548 U.S. 230 (2006)

In *Randall*, which was decided after the Ninth Circuit's decision in *Montana Right to Life Assn.*, the U.S. Supreme Court examined Vermont's contribution limits and held, for the first time, that a contribution limit violated the First Amendment by failing the closely-drawn scrutiny standard of review. 548 U.S. 230; *see Thalheimer*, 343 F.3d at 1127 (discussing *Randall*, 548 U.S. 230).

Prior to *Randall*, Vermont limited single, individual contributions to a campaign during a two-year general election cycle as follows: governor, lieutenant governor, and other statewide offices, $400; state senator, $300; and state

24

representative, $200. *Randall*, 548 U.S. at 239. Political committees and political parties were subject to the same limits. *Id.* "Volunteer services" did not qualify as contributions under Vermont's law prior to *Randall*. *Id.*

When it analyzed the constitutionality of Vermont's contribution limits, the *Randall* Court applied the familiar *Buckley* and *Shrink Missouri* test described above—i.e., contribution limits are unconstitutional under the First Amendment if they "prevent candidates from 'amassing the resources necessary for effective [campaign] advocacy.'" *Randall*, 548 U.S. at 248 (quoting *Buckley*, 424 U.S. at 21).

A majority of justices in *Randall* concluded that Vermont's contribution limits were unconstitutional. Three justices—Justices Kennedy, Thomas, and Scalia—opposed contribution limits as a matter of principle and concluded that they violate the First Amendment. 548 U.S. at 264–73. Three other justices—Justices Breyer and Alito and Chief Justice Roberts—opposed the Vermont contribution limits based on the five factors discussed in Justice Breyer's plurality opinion. *Id.* at 253–64. These six justices are a strong majority of the Court, and their judgment is binding on this Court, even if Justice Breyer's plurality opinion is only persuasive. *See Thalheimer*, 645 F.3d at 1127 n.5.

The *Randall* plurality first observed that Vermont's contribution limits showed "danger signs" by comparing those limits to the much higher limits that

the Court had previously upheld. 548 U.S. at 249–53. Prior to *Randall*, the lowest

limit the Court had upheld was Missouri's limit of $1,075 per election (adjusted

for inflation) to candidates for Missouri state auditor. *Id.* at 251 (citing *Shrink Mo.*,

528 U.S. 377). Of particular importance here, the *Randall* plurality also observed

that Vermont's contribution limits—along with Montana's limits and the limits of

six other states—were among the lowest in the country. *Id.* 548 U.S. at 251.

After discussing these "danger signs," the *Randall* plurality examined the

record independently and carefully to determine whether Vermont's contribution

limits were "closely drawn" to match Vermont's interests. *Id.* at 253. In doing so,

the plurality pointed to five specific factors that led it to conclude that Vermont's

contribution limits were unconstitutionally low:

1. the record suggested that Vermont's contribution limits significantly restricted the amount of funding available for challengers to run competitive campaigns, *id.* at 253–56;

2. Vermont's insistence that political parties abide by exactly the same contribution limits that applied to other contributors threatened the political parties' associational rights, *id.* at 256–59;

3. while Vermont's law did not count "volunteer services" as contributions, the law appeared to count the expenses of volunteers (e.g., the volunteers' travel expenses) as contributions, *id.* at 259–60;

4. Vermont's contribution limits were not adjusted for inflation, *id.* at 260; and

26

5.      there was no special justification that supported the contribution limits, *id.* at 261–62.

The *Randall* opinion is directly on point here. The *Randall* decision undeniably paints a new gloss on the law and provides important insight into the lower bound for contribution limits. *Randall* is intervening law that obviates *Montana Right to Life*'s precedential value, particularly in light of the *Randall* plurality's expressed suspicion of Montana's contribution limits. *See Randall*, 548 U.S. at 251.

## V.    The constitutionality of Montana's contribution limits after *Randall*

*Randall* compels the Court to conclude that Montana's contribution limits are unconstitutionally low. Montana's contribution limits are, in part, lower than those declared unconstitutional in *Randall*.[4] But, more fundamentally, the same "danger signs" are present here as in *Randall*, and the same five *Randall* factors demonstrate that Montana's limits are unconstitutional. Even assuming that the State of Montana has a "sufficiently important interest" in setting contribution limits, the limits in Montana Code Annotated § 13–37–216 are not "closely drawn" to match that interest. *See Randall*, 548 U.S. at 247.

---

[4] In *Randall*, the U.S. Supreme Court found unconstitutional Vermont's contribution limit of $200 for state representative elections and $300 for state senate elections. 548 U.S. at 239, 249–62. By comparison, Montana's limits for these same elections is $160. Admin. R. Mont. 44.10.338(1).

27

## A.    "Danger signs"

The Court does not need to look far to see the same "danger signs" present here that were present in *Randall*. Montana's contribution limits are far lower than any limits that the U.S. Supreme Court has previously upheld. *See Randall*, 548 U.S. at 249–52; *See Shrink Mo.*, 528 U.S. 377 (upholding a $1,075 contribution limit); *Buckley*, 424 U.S. 1 (upholding a $1,000 contribution limit). Indeed, Montana's limits are lower, in part, than limits that the Supreme Court declared unconstitutional in *Randall*. Moreover, the U.S. Supreme Court has previously observed that Montana's limits, like Vermont's former limits, are among the lowest in the country. *Id.* at 251. Given these "danger signs," the Court "must examine the record independently and carefully to determine whether [Montana's contribution limits] are 'closely drawn' to match the State's interests." *Id.* at 253.

## B.    The five *Randall* factors

The five *Randall* factors listed above are not exhaustive. Nor must all of the factors weigh against the constitutionality of a limit in order for that limit to be unconstitutional. In other words, the *Randall* "factors" do not constitute a "test." They are merely considerations. That being said, the Court concludes that the *Randall* factors compel the Court to conclude that Montana's contribution limits are unconstitutional.

28

**1. Significant restriction of available funds**

As in *Randall*, the record here suggests that Montana's contribution limits

significantly restrict the amount of funds available for candidates to run

competitive campaigns. 548 U.S. at 256.

By way of comparison, Montana's contribution limit for individuals and

political committees contributing to state legislative candidates is significantly

lower than Vermont's contribution limits that were declared unconstitutional in

*Randall*. Vermont's limits were $300 for State Senate and $200 for State House,

*see Randall*, 548 U.S. at 239, but Montana's current limit for those candidates is

$160, Admin. R. Mont. 44.10.338(1).

Generally speaking, candidates in Montana spend more money on their

campaigns than they raise. According to Clark Bensen, the plaintiffs' expert

witness, the average competitive campaign spends 7% more money than it raises.

This suggests that most competitive campaigns are not adequately funded. The

record shows, though, that more funding would be available to candidates if

Montana's contribution limits are raised. Bensen testified that, on average, 29% of

the contributors in the competitive campaigns that he analyzed had donated at the

maximum level permitted by Montana law. The contributions that candidates

receive from maxed-out contributors are substantial, constituting approximately

44% of the funds raised through itemized contributions.

29

The analysis from Edwin Bender, the defendants' expert, is largely consistent with these statistics. Bender additionally determined that across all Montana races (excluding the gubernatorial races) between 45% and 58% of contributing political committees make the maximum contribution permitted by Montana law. But only 9% to 11% of legislative candidates' funds come from political committees, and only 0% to 3% of statewide candidates' funds come from political committees.

Consistent with the testimony of Plaintiffs Doug Lair and Steve Dogiakos, many, if not most, of these maxed out contributors might have donated beyond the contribution limit if Montana law had permitted them to do so. Moreover, Bender determined that between 22% and 32% of all Montana candidates accepted the maximum aggregate contribution from their political party. According to Bensen, this percentage is higher—at 40%—for candidates in competitive campaigns.

The number of contributors making contributions at the maximum level is significant. And significantly greater funds would be available to candidates if the contribution limits are raised. The defendants do not dispute this proposition. The record shows that those additional funds are needed because most campaigns are insufficiently funded. This factor "counts against the constitutional validity of the contribution limits." *Id.* at 256.

30

## 2.   Uniformity of contribution limits

In *Randall*, the fact that Vermont's law required political parties to abide by the same contribution limits as other contributors weighed against the constitutionality of those limits. 548 U.S. at 256. The *Randall* Court held that the uniform contribution limit "threaten[ed] harm to a particularly important political right, the right to associate in a political party." *Id.* (citations omitted).

Here, the contribution limits for political parties are 5 to 36 times greater than the limits for individuals and political committees, depending on office. But those limits are deceptive. Suppose there is a competitive State House race and all of the approximately 50 Republican party committees in the State would like to contribute to that candidate's campaign. The aggregate limit for political party contributions to State House races is $800. Admin. R. Mont. 44.10.338(2). That means that each Republican party committee would be permitted to contribute only $16 to the campaign if all committees contributed. This is an extreme and perhaps unlikely example. Nevertheless, this example shows that relatively higher, aggregate contribution limits for political parties do not always protect associational rights for political parties.

Even assuming that the aggregate limit for political parties is constitutional, Montana's contribution limits still raise associational concerns because the same contribution limits apply to both individuals and political committees.

31

As the Ninth Circuit recently acknowledged, "voters in Montana" are

constitutionally entitled to a "full and robust exchange of views." *Sanders Co.*

*Republican. C. Comm. v. Bullock*, ___ F.3d ___, 2012 WL 4070122 at *1 (9th Cir.

Aug. 31, 2012). The Supreme Court explained in *Buckley* that "[e]ffective

advocacy of both public and private points of view, particularly controversial

ones, is undeniably enhanced by group association." 424 U.S. at 15 (citations and

internal quotation marks omitted). A political committee's campaign contribution

is political speech, protected by the First Amendment, that fosters a full and robust

exchange of views. *See generally Citizens United*, 130 S. Ct. 876; *Buckley*, 424

U.S. 1.

By holding political committees to the same contribution limits as

individuals, Montana's contribution limits inhibit the associational rights of

political committees and, consequently, a "full and robust exchange of views."

*Sanders Co. Republican C. Comm.*, 2012 WL 4070122 at *1.

This conclusion can be illustrated by a hypothetical that the U.S. Supreme

Court employed in *Randall*. Suppose that thousands of voters in Montana support

the agenda advanced by a particular political committee. Suppose also that the

voters do not know which elections in the State are most critical to advancing that

agenda. Those voters may simply donate their money to the political committee

instead of a particular candidate and then let the committee determine the elections

32

to which those funds should be contributed. If the political committee has, as a result, thousands of dollars available to contribute but targets only a handful of races, the committee will quickly reach its contribution limits without being able to deploy all of the money it received. Consequently, the aims of thousands of donors will be thwarted. *Cf. Randall*, 548 U.S. at 257–58 (applying the same hypothetical to political parties).

By holding political committees to the same contribution limits as individuals, Montana has "reduce[d] the voice of political [committees] to a whisper." *Randall*, 548 U.S. at 259 (citations and internal quotation marks omitted). This inhibition is aggravated by the fact that Montana imposes an aggregate contribution limit on political committees, *see* Mont. Code Ann. § 13–37–218, although, as noted above, the constitutionality of that aggregate limitation is not at issue in this case.

Even the testimony of the defendants' expert supports this conclusion. Bender testified that, in legislative races, contributions from political committees accounted for only 9% to 11% of the total contributions from 2004 to 2010. For statewide races, the percentage was between 0% and 3%, and for the gubernatorial races it was 0%.

The potential harms to political committees' associational rights is an additional factor weighing against the constitutionality of Montana's contribution

33

limits.

### 3. Volunteer services

Montana, like Vermont prior to *Randall*, does not count the value of volunteer services as a contribution. *See In re Bullock* (Ex. 8).

The decision from the Commissioner of Political Practices in *In re Bullock*, which recently affirmed this proposition, is consistent with Montana's statute defining "contributions." *See* Mont. Code Ann. § 13-1-101(7)(b)(i). That statute expressly excludes from the definition of "contribution": "services provided without compensation by individuals volunteering a portion or all of their time on behalf of a candidate or political committee . . . ." *Id.*; *see also* Admin. R. Mont. 44.10.321(2). But, just like Vermont's statute prior to *Randall*, Montana law "does not exclude the expenses those volunteers incur, such as travel expenses, in the course of campaign activities." *Randall*, 548 U.S. at 259.

The *Randall* Court observed that "[t]he absence of some such exception may matter . . . where contribution limits are very low." *Id.* at 260. It explained:

> That combination, low limits and no exceptions, means that a gubernatorial campaign volunteer who makes four or five round trips driving across the State performing volunteer activities coordinated with the campaign can find that he or she is near, or has surpassed, the contribution limit. . . . Such supporters will have to keep careful track of all miles driven, postage supplied (500 stamps equals $200), pencils and pads used, and so forth. And any carelessness in this respect can prove costly, perhaps generating a headline, "Campaign laws violated," that works serious harm to the candidate.

34

*Id.* As in *Randall*, then, this factor weighs against the constitutionality of Montana's contribution limits.

### 4.    Inflation adjustment

Montana's contribution limits, unlike Vermont's prior to *Randall*, are adjusted for inflation, Mont. Code Ann. § 13–37–216(4), although feebly so. So this factor does not necessarily weigh against the constitutionality of Montana's contribution limits.

Nevertheless, the Court notes that the testimony at the bench trial suggests that the inflationary adjustment, which is based on the Consumer Price Index, has not have kept pace with the actual increasing cost of running an effective campaign. As Bensen testified, the Consumer Price Index does not consider factors such as the increasing cost of advertising, hiring media consultants, and technology that may be needed to run an effective campaign. We are in a new age when it comes to campaign financing.

Even if Montana's inflationary adjustment adequately accounts for the increasing costs of running a campaign, the problem with Montana's limits is that the inflationary adjustment is added to a base limit that is simply too low to allow candidates to "amass[ ] the resources necessary for effective campaign advocacy." *Randall*, 548 U.S. at 249 (citations and internal quotation marks omitted).

35

## 5. Special justification

Finally, as in *Randall*, there is no evidence in the record of "any special justification that might warrant a contribution limit so low or so restrictive as to bring about the serious associational and expressive problems" described above. *Randall*, 548 U.S. at 261. The defendants have not presented any evidence showing that corruption in Montana is more rampant than in any other state where contribution limits are much higher. As Ms. Baker, of the office of the Commissioner of Political Practices, testified, larger contribution limits—such as $1,000—would not likely have a corruptive effect. While the Court has "no scalpel to probe each possible contribution level," *Randall*, 548 U.S. at 249, such a limit comes closer to the limits that the U.S. Supreme Court has previously upheld, *see Buckley*, 424 U.S. 1; *Shrink Mo.*, 528 U.S. 377.

## C. Severability

Apparently because of the large number of candidates and elections involved, plaintiffs have focused their efforts on attacking the lowest of Montana's contribution limits—e.g., the $160 limit for individual contributors to "other public office[s]," such as state house and senate races. They have not so seriously challenged, for instance, the contribution limits for gubernatorial candidates. Nevertheless, the Court will not sever some of the contribution limits from others that could conceivably be constitutional. *See Randall*, 548 U.S. at 262. As the *Randall* Court explained:

36

We add that we do not believe it possible to sever some of the Act's
contribution limit provisions from others that might remain fully
operative. *See Champlin Refining Co. v. Corporation Comm'n of Okla.*,
286 U.S. 210, 234, 52 S.Ct. 559, 76 L.Ed. 1062 (1932) ("invalid part
may be dropped if what is left is fully operative as a law"); *see also
Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191,
119 S.Ct. 1187, 143 L.Ed.2d 270 (1999) (severability "essentially an
inquiry into legislative intent"); Vt. Stat. Ann., Tit. 1, § 215 (2003)
(severability principles apply to Vermont statutes). To sever provisions
to avoid constitutional objection here would require us to write words
into the statute (inflation indexing), or to leave gaping loopholes (no
limits on party contributions), or to foresee which of many different
possible ways the legislature might respond to the constitutional
objections we have found. Given these difficulties, we believe the
Vermont Legislature would have intended us to set aside the statute's
contribution limits, leaving the legislature free to rewrite those
provisions in light of the constitutional difficulties we have identified.

*Randall*, 548 U.S. at 262. Indeed, as the U.S. Supreme Court presaged in *Randall*,

the Montana Legislature will have an opportunity to revisit the contribution limits

in three months when it convenes.

This court's October 3, 2012 Order and its October 9, 2012 Order Denying

Stay are hereby incorporated herein by reference.

As the Court stated in its order denying the defendants' motion to stay the

judgment in this case, much has been made of whether striking Montana's

contribution limits is good policy and good for Montana voters. This case, though,

is not about policy. It is about following the law that the United States Supreme

Court set out.

## CONCLUSION

Montana's contribution limits in Montana Code Annotated § 13–37–216

prevent candidates from "amassing the resources necessary for effective campaign

advocacy." *Randall*, 548 U.S. at 249 (citations and internal quotation marks omitted). They are therefore unconstitutional.

The 2013 Legislature will convene in less than three months, and it will probably consider whether to address the other statutes that the Court has already declared unconstitutional and for which the appeals have been dismissed. With entry of this order, the Legislature will have a clean canvas upon which to paint, should it choose to do so.

IT IS ORDERED that the Court's order declaring the contribution limits in Montana Code Annotated § 13-37-216 unconstitutional and permanently enjoining the defendants from enforcing those limits is hereby confirmed subject however to the Circuit's temporary stay order received only minutes ago.

Dated this 10th day of October 2012.

CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE