Anita Y. Milanovich (Mt. No. 12176)     James Bopp, Jr. (Ind. No. 2838-84)*
THE BOPP LAW FIRM, PC                       Jeffrey Gallant (Va. No. 46876)**
1627 West Main Street, Suite 294       Courtney E. Turner (Ind. No. 32178-29)***
Bozeman, MT 59715                            THE BOPP LAW FIRM, PC
Phone: (406) 589-6856                             The National Building
Email: aymilanovich@bopplaw.com                    1 South Sixth Street
*Local Counsel for Plaintiffs*                       Terre Haute, Ind. 47807
                                                Phone: (812) 232-2434
                                                  Fax: (812) 235-3685
                                             Email: jboppjr@aol.com
                                                jgallant@bopplaw.com
                                                 cturner@bopplaw.com
                                                *Counsel for Plaintiffs*

                                    *Motion pro hac vice granted 9/9/11.
                                   **Motion pro hac vice granted 6/11/12.
                                  ***Motion pro hac vice granted 2/1/16.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| **Lair,** et al., | |
| *Plaintiffs*, | Case No. 6:12-cv-00012-CCL |
| v. | |
| **Jonathan Motl**, et al., | **Plaintiffs' Summary Judgment Memorandum** |
| *Defendants*. | |

# Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Quid Pro Quo Corruption Must Be Narrowly Defined To Avoid
       Unconstitutional First Amendment Chill In Elections.  . . . . . . . . . . . 3

       A. Quid Pro Quo Corruption Has An Established Meaning Under U.S.
       Supreme Court Precedent.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

              1.     Quid Pro Quo Arrangements Must Be Explicit.  . . . . . . 3

              2.     Quid Pro Quo Arrangements Require A Direct
                     Exchange. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

              3.     Quid Pro Quo Corruption Requires An Improper Promise
                     Or Commitment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

              4.     Quid Pro Quo Corruption Requires That Promised
                     Conduct Be Contrary to The Obligations of Office.  . . . 7

              5.     Quid Pro Quo Corruption Requires An Effort to Control
                     A Specific Official, Sovereign Act.  . . . . . . . . . . . . . . . 8

       B. This Court's Established Meaning Of Quid Pro Quo Corruption Is
       Constitutionally Necessary Under *Buckley, Citizens United* and
       *McCutcheon.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       C. Failure to Follow This Court's Quid Pro Quo Corruption Definition
       Will Criminalize Not Only Politics, But Elections. . . . . . . . . . . . . . 14

III. Montana's Limits Are Not Tailored to a Quid Pro Quo Corruption Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    A. The Base Contribution Limits Are Unconstitutional. . . . . . . 17

        1. No Quid Pro Quo Evidence Supported Lowering the Base Contribution Limits. . . . . . . . . . . . . . . . . . . . . . . 17

        2. No Quid Pro Quo Evidence Supports the Limits Today. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        3. The Limits Are Not Closely Drawn to Prevent Quid Pro Quo Corruption. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    B. The Aggregate Political Party Contribution Limits Are Not Tailored to a Quid Pro Quo Interest . . . . . . . . . . . . . . . . . . . 27

        1. No Quid Pro Quo Evidence Supports the Limits . . . . . 27

        2. The Limits Are Not Tailored to a Cognizable State Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

IV. The Limits Restrict the Ability of Candidates to Effectively Run a Campaign . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Local Rule 7.1(d)(2)(E) Word Verification Certification . . . . . . . . . . . . . . . . . . . 32

# Table of Authorities

## Cases

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett*,
131 S. Ct. 2806 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Brown v. Hartlage*,
456 U.S. 45 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7

*Buckley v. Ill. Jud. Inquiry Bd.*,
997 F.2d 224 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Buckley v. Valeo*,
424 U.S. 1(1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley*,
454 U.S. 290 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Citizens United v. FEC*,
558 U.S. 310 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 11, 12, 22

*Colorado Republican Fed. Campaign Comm. v. FEC*,
518 U.S. 604 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Evans v. U.S.*,
504 U.S. 255 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8, 9

*FEC v. Nat'l Conservative Political Action Committee*,
470 U.S. 480 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*FEC v. Wisconsin Right to Life*,
551 U.S. 449 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Lair v. Bullock*,
798 F.3d 736 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*McCormick v. U.S.,*
     500 U.S. 257 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 9, 17

*McCutcheon v. FEC,*
     134 S.Ct. 1434 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Montana Right to Life Ass'n. v. Eddleman,*
     343 F.3d 1085 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Nixon v. Shrink Missouri Gov't PAC,*
     528 U.S. 377 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Republican Party of Minnesota v. White,*
     536 U.S. 765 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*U.S. v. Allen,*
     10 F.3d 405 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*U.S. v. Birdsall,*
     233 U.S. 223 (1914) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*U.S. v. Davis,*
     30 F.3d 108 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*U.S. v. Martinez,*
     14 F.3d 545 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 10

*U.S. v. Sun-Diamond Growers of California,*
     526 U.S. 398 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 16

**Constitution, Statutes, Regulations & Rules**

18 U.S.C. § 201(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Fed. R. Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

H.R. Report No. 87-748 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

MCA § 13-37-225 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Other Authorities*

Albert W. Alschuler, *Limiting Political Contributions After McCutcheon, Citizens United, and Speechnow*, 67 Fla. L. Rev. 389, 462 (2015)  . . . . . . . . . . . . . . . 14, 15

# Introduction

On September 6, 2015, Plaintiffs filed their Verified Complaint challenging Montana Code Chapters 35 and 37, which imposed base contribution limits on individuals and aggregate contribution limits on political parties. (SoF ¶¶ 32-33.) This Court found the limits unconstitutional, determining that "contribution limits prevent candidates from amassing the resources necessary for effective campaign advocacy." (SoF ¶ 67.)

On appeal, the Ninth Circuit reversed and remanded, instructing this Court either "(1) to decide whether Montana has carried its burden in showing the contribution limits furthered a valid 'important state interest' or, if the district court again assumes the state has carried its burden, (2) to identify expressly what interest the district court assumes exists." (SoF ¶¶ 68-69.)

Plaintiffs now move for summary judgment on their claims that these contribution limits are unconstitutional.

# Argument

## I. Standard of Review.

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a). For contribution limit challenges, "the Government bears the burden of proving the constitutionality of its actions." *McCutcheon v. FEC,* 134 S.Ct. 1434, 1452 (2014). They must prove that (1) "there is adequate evidence that the limitation furthers a sufficiently important state interest" and (2) that the limits are "closely drawn." *Lair v. Bullock*, 798 F.3d 736, 748 (9th Cir. 2015). To satisfy the "closely drawn" prong, they must prove that the limits "(a) focus narrowly on the state's interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign." *Id*.

Here, there is no genuine dispute as to any material fact and Plaintiffs are entitled as a matter of law. As shown below, the only cognizable state interest for contribution limits is quid pro quo corruption. *McCutcheon v. FEC,* 134 S.Ct. at 1441 (citing *Citizens United v. FEC,* 558 U.S. 310, 359 (2010)). The U.S. Supreme Court has an established definition of quid pro quo corruption. Under that definition, the State cannot meet its burden of demonstrating the base contribution limits or the aggregate political party limits are narrowly tailored. Nor can they show that the limitations "allow the candidate to amass sufficient resources to wage an effective campaign." This court should permanently enjoin those laws.

## II. Quid Pro Quo Corruption Must Be Narrowly Defined To Avoid Unconstitutional First Amendment Chill In Elections.

**A.**    **Quid Pro Quo Corruption Has An Established Meaning Under U.S. Supreme Court Precedent.**

The U.S. Supreme Court has defined quid pro quo corruption as **1)** an explicit arrangement **2)** for the direct exchange of something of value for **3)** a public official's improper promise or commitment that is **4)** contrary to the obligations of his or her office **5)** in an effort to control a specific official, sovereign act.

### 1.    Quid Pro Quo Arrangements Must Be Explicit.

In *McCormick v. U.S.*, 500 U.S. 257 (1991), the U.S. Supreme Court states that a quid pro quo arrangement must be explicit. Addressing political contributions and their use for quid pro quo arrangements, the Court observed that "[t]he receipt of [ ] contributions is also vulnerable under the Act as having been taken under color of official right, but only if the payments are made in return for an explicit promise or undertaking . . . ." *Id.* at 273.

Consistent with this requirement, federal appellate courts have required that any quid pro quo corruption evidence must show that the offer at issue was "made in exchange for an explicit promise to perform or not to perform an official act. Vague expectations of some future benefit should not be sufficient to make a payment a

bribe." *U.S. v. Allen*, 10 F.3d 405, 411 (7th Cir. 1993). *See also U.S. v. Martinez,* 14 F.3d 545, 552-553 (11th Cir. 1994) (addressing appellant's argument that "the government must prove the existence of an explicit promise . . ." to conclude that the district court erred in failing to give a jury instruction embodying the quid pro quo requirement of *McCormick*); *U.S. v. Davis*, 30 F.3d 108, 109 (11th Cir. 1994) ("an explicit promise by a public official to act or not act is an essential element . . . and the defendant is entitled to a reasonably clear jury instruction to that effect.").

## 2.   Quid Pro Quo Arrangements Require A Direct Exchange.

An explicit arrangement must also be a direct one: the hallmark of quid pro quo corruption is "a direct exchange of an official act for money." *McCutcheon*, 134 S.Ct. at 1441 (citing *McCormick,* 500 U.S. at 266). This is because "there is not the same risk of *quid pro quo* corruption or its appearance when money flows through independent actors to a candidate, as when a donor contributes to a candidate directly." *Id.* at 1441. "That an individual might 'contribute massive amounts of money to a particular candidate through the use of unearmarked contributions' to entities likely to support the candidate'" is inadequate grounds for quid pro quo corruption to be established because it is too speculative. *McCutcheon*, 134 S. Ct. at 1452 (quoting *Buckley v. Valeo,* 424 U.S. 1, 38 (1976)). The quid pro quo

-4-

arrangement must be made directly between the individual or group and the candidate or public official.

### 3. Quid Pro Quo Corruption Requires An Improper Promise Or Commitment.

For a quid pro quo arrangement to occur, the candidate or public official must make an improper promise or commitment. *See Colorado Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 615 (1996) (quoting *Buckley*, 424 U.S. at 47 (holding that for expenditures to be corrupt they must "be given as a *quid pro quo* for improper commitments from the candidate."). This promise or commitment need not be fulfilled for a quid pro quo to occur; rather, a quid pro quo is completed "at the time when the public official receives a payment in return for his agreement . . . ." *Evans v. U.S.*, 504 U.S. 255, 268 (1992).

Not all promises or commitments are improper:

> [T]here are constitutional limits on the State's power to prohibit candidates from making promises in the course of an election campaign. Some promises are universally acknowledged as legitimate, indeed "indispensable to decisionmaking in a democracy . . . . Candidate commitments enhance the accountability of government officials to the people whom they represent, and assist the voters in predicting the effect of their vote.

*Brown v. Hartlage*, 456 U.S. 45, 55-56 (1982). Indeed, that a candidate or public official alters his positions on issues or affirms a position or action he either already

has or intends to take because of a contribution or makes a promise or commitment

is not, in and of itself, evidence of quid pro quo corruption. *FEC v. Nat'l Conservative*

*Political Action Committee*, 470 U.S. 480, 498 (1985). So commitments such as "a

promise to lower taxes, to increase efficiency in government, or . . . to increase taxes

in order to provide some group with a desired public benefit or public service" are

fully within the permissible scope of campaign promises protected under the First

Amendment" and are not "considered as inviting the kind of corrupt arrangement the

appearance of which a State may have a compelling interest in avoiding." *Brown*, 456

U.S. at 58. And the promise must be for something the candidate or public official

would not already do: corruption cannot occur when a position is reaffirmed. *Brown,*

456 U.S. at 55-56.

Additionally, promises or commitments to an individual that serve that

individual's self-interest are not inherently improper:

> The fact that some voters may find their self-interest reflected in a candidate's commitment does not place that commitment beyond the reach of the First Amendment. We have never insisted that the franchise be exercised without taint of individual benefit; indeed, our tradition of political pluralism is partly predicated on the expectation that voters will pursue their individual good through the political process, and that the summation of these individual pursuits will further the collective welfare.

*Id.* at 56.

Whether the promise is made as a private arrangement bears on its propriety: "So long as the hoped-for personal benefit is to be achieved through the normal processes of government, and not through some private arrangement, it has always been, and remains, a reputable basis upon which to cast one's ballot." *Id.* at 56.

### 4. Quid Pro Quo Corruption Requires That Promised Conduct Be Contrary to The Obligations of Office.

A quid pro quo arrangement cannot occur where the obligations of public office are not thwarted. This is because:

> [c]orruption is a subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns.

*NPAC,* 470 U.S. at 497. For this reason, the U.S. Supreme Court found no quid pro quo arrangement where a candidate promised not to take a salary if elected: "the commitment was fully in accord with our basic understanding of legitimate activity by a government body." *Brown*, 456 U.S. at 57.

Likewise, promises to vote in a way that is consistent with a candidate's or political party's platform, or in favor of or against an issue do not subvert the political process because they are not contrary to the obligations of office. Indeed, in *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002), the Court held that the

government "may constitutionally prohibit judicial candidates from pledging or promising certain results." *Id.* at 813. It held this because such promises contravened the judge's obligations in office: "Pledges or promises of conduct in office, however commonplace in races for the political branches, are inconsistent 'with the judge's obligation to decide cases in accordance with his or her role.'" *Id.* at 813. And for this reason, too, it tailored the judicial promise that can be constitutionally proscribed narrowly. It does not encompass *all* promises. That is because not all promises contravene the obligations of office. *See Buckley v. Ill. Jud. Inquiry Bd.,* 997 F.2d 224, 229 (7th Cir. 1993). Only promises of conduct contrary to the obligations of office can implicate quid pro quo corruption.

## 5.  Quid Pro Quo Corruption Requires An Effort to Control A Specific Official, Sovereign Act.

For quid pro quo corruption to be implicated, the arrangement at issue must also be an effort to control a specific official act. *U.S. v. Sun-Diamond Growers of California*, 526 U.S. 398, 404-05 (1999) ("there must be a *quid pro quo*—a specific intent to give or receive something of value in exchange for an official act.") (emphasis omitted). It is not enough that the act in question "pertain[s] to the office," it must pertain to *particular* official acts." *Id.* at 409. *See also Evans*, 504 U.S. at 268

(holding that quid pro quo corruption occurs when a "public official receives a payment in return for his agreement to perform specific official acts."). "In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking." *McCormick*, 500 U.S. at 273.

The U.S. Supreme Court in *U.S. v. Birdsall*, 233 U.S. 223 (1914), an early corruption case, defined "official act" as "duties" or "requirements of office":

> To constitute it official action, it was not necessary that it should be prescribed by statute; it was sufficient that it was governed by a *lawful requirement* of the Department under whose authority the officer was acting . . . . Nor was it necessary that the requirement should be prescribed by a written rule or regulation. It might also be found in an established usage which constituted the common law of the Department and fixed *the duties of those engaged in its activities*. . . . duties not completely defined by written rules are clearly established by settled practice; and action taken in the course of their performance must be regarded as within the provisions of the above-mentioned statutes against bribery.

*Id*. at 230-31  (emphasis added). And under federal law, the relevant duties and requirements constituting "official acts" are further restricted to "'any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.'." *Id.* at 407 (quoting 18 U.S.C. § 201(a)(3)). An official act, then, must be an act on behalf of

-9-

the sovereign, an act that is for the government. (*See* H.R. Report No. 87-748, at 18 (1961) (affirming that § 201 would retain "[t]he definition of 'official act . . . to include any activity that a public official undertakes *for the Government*.")) (emphasis added).

And so, when properly understood as the exercise of duties or requirements of office on behalf of a sovereign, not everything an elected official does qualifies as an official act. For example, "the official acts of receiving the sports teams at the White House, visiting the high school, and speaking to the farmers about USDA policy . . . —while they are assuredly 'official acts' in some sense—are not 'official acts' within the meaning of the statute." *Sun-Diamond Growers of California,* 526 U.S. at 407.

## B. This Court's Established Meaning Of Quid Pro Quo Corruption Is Constitutionally Necessary Under *Buckley, Citizens United* and *McCutcheon*.

Failure to follow the U.S. Supreme Court's definition of quid pro quo corruption "would have the effect of criminalizing conduct traditionally within the law and unavoidable under this country's present system of elected politics." *Martinez*, 14 F.3d at 553. This is because quid pro quo corruption has particular significance in campaign finance jurisprudence.

In the seminal campaign finance decision *Buckley v. Valeo*, the Court assessed

-10-

cognizable state interests to justify contribution limits and found that quid pro quo corruption is such an interest. 424 U.S. at 25-26. It affirmed this interest in *Citizens United v. FEC,* 558 U.S. 310 (2010), where it found that a ban on corporate independent expenditures did not serve a quid pro quo corruption interest because such expenditures are inherently without prearrangement and coordination with a candidate. *Id.* at 357. The Court observed that "the practices *Buckley* noted would be covered by bribery laws" such as the honest-services fraud statute, and that in consequence, "restrictions on contributions are preventative, because few if any contributions to candidates will involved quid pro quo arrangements." *Id.* at 456-57. And in *McCutcheon v FEC,* 134 S.Ct. 1434 (2015), the Court again recognized quid pro quo corruption as a cognizable state interest. It concluded that federal aggregate contribution limits were not tailored to quid pro quo concerns because individual contribution limits were already in place to address "the problem of *large* contributions." *Id.* at 1445 (emphasis added). And it concluded that unearmarked contributions to entities supporting candidates ceded control to those entities and so had little likelihood of creating the necessary "direct exchange of an official act for money, " *id.* at 1441, that are the hallmark of quid pro quo corruption. *Id.* at 1452.

Significantly, the *McCutcheon* Court addressed and dismissed numerous other

interests the government has offered to justify contribution and other restrictions. Among them are preventing ingratiation, *id.* at 1441, preventing access, *id.* at 1441, "ad hoc balancing of relative social costs and benefits," *id.* at 1449, leveling the playing field, *id.* at 1450, leveling electoral opportunities, *id.* at 1450, equalizing campaign financial resources, *id.* at 1451, and garnering influence, *id.* at 1451. The Court has been adamant in its rejection of these other interests, firmly concluding, for example, that "because the Government's interest in preventing the appearance of corruption is equally confined to the appearance of *quid pro quo* corruption, the Government may not seek to limit the appearance of mere influence or access," *id.* at 1451 (citing *Citizens United*, 558 U.S. at 360), and "that government regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford." *Id.* at 1441. *See also Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley*, 454 U.S. 290, 295 (1981) ("*Buckley* . . . made clear that contributors cannot be protected from the possibility that others will make larger contributions.").

The definition of quid pro quo corruption that the U.S. Supreme Court has established, *see supra* Part II.A, ensures that the corruption interest in the campaign finance context—presently the only cognizable interest this Court has recognized for

campaign finance limits and bans—remains the only interest.

Limiting quid pro quo corruption to specific official acts contrary to the obligations of office ensures that the government does not improperly regulate candidates who respond to supporters in gratitude with access to them as an elected official or to other political allies. *See McCutcheon,* 134 S.Ct. at 1451. Limiting quid pro quo corruption to only improper commitments and promises contrary to the obligations of the office ensures unfettered interchange of ideas and that candidates, when elected, can be responsive to the concerns of constituents with whom they share beliefs and interests. *Id.* at 1441. And limiting quid pro quo corruption to direct exchanges and explicit arrangements ensures the government is not supplanting the voters' right to assess the strengths of a candidate with its own, and that the government does not regulate election-related spending and speech based on conjecture or speculation about re-routed funds and other implausabilities. *Id.* at 1452 (quoting *Nixon v. Shrink Missouri Gov't PAC,* 528 U.S. 377, 392 (2000)).

In short, the Court's carefully crafted quid pro quo definition prevents the government from pursuing other objectives this Court has expressly rejected and that "impermissibly inject [the government] 'into the debate over who should govern,'" the last place a government should be. *Id.* at 1441-42 (quoting *Arizona Free*

-13-

*Enterprise Club's Freedom Club PAC v. Bennett*, 131 S.Ct., 2806, 2826 (2011)). The

definition "'err[s] on the side of protecting political speech rather than suppressing

it.'" *Id.* at 1451 (quoting *FEC v. Wisconsin Right to Life,* 551 U.S. 449, 457 (2007)

(opinion of Roberts, C.J.)).

## C. Failure to Follow This Court's Quid Pro Quo Corruption Definition Will Criminalize Not Only Politics, But Elections.

Without this Court's definition of quid pro quo corruption strictly adhered to, chill

of political campaign speech and association is inevitable.

Without an explicit arrangement requirement, constituents will be forced to

choose between their right to support and associate with a like-minded candidate on

one hand, and their right to voice their opinion and attempt to influence that

candidate's vote as a public official on the other. If they do both, they run the risk of

an agreement being inferred between them and jeopardizing their candidate or public

official's seat:

> Whenever an elected official adheres to the positions that prompted voters and
> contributors to support him, he exhibits a pattern of favoritism for these
> supporters. This pattern may bespeak conviction, not corruption. Ambitious
> prosecutors and cynical jurors, however, can easily infer a corrupt agreement
> from the common pattern. When an official has supported widget subsidies
> after accepting large contributions from widget manufacturers, for example,
> prosecutors and jurors may infer that there must have been an implicit
> understanding. Allowing inferences of this sort whenever officials have acted

-14-

to benefit contributors could make public life intolerable.

Albert W. Alschuler, *Limiting Political Contributions After Mccutcheon, Citizens United, and Speechnow*, 67 Fla. L. Rev. 389, 462 (2015).

To avoid the possibility of such inferences, candidates will be inclined to seek out-of-state donors to fund their campaigns so that elected officials are free to talk with their constituents without quid pro quo allegations lurking. Indeed, without an explicit arrangement required, quid pro quo allegations become readily abused and can be turned into a weapon wielded by a political opponent.

Such ready abuse and threat of civil or criminal penalties would deter any good candidate from running from office:

> If an official were subject to lengthy imprisonment whenever a jury could be persuaded that he had acted deliberately to benefit a campaign contributor or other benefactor rather than the public, only a fool would take the job.

*Id.* at 464. Only those who can independently fund their campaigns would remain undeterred.

The resulting chill on constituent participation and deterrence of good candidates would only be exacerbated without a direct exchange requirement. With the government free to infer arrangements through contributions to and spending by third party contributors, the chill on financial participation in elections at any level would

be complete.

Permitting *any* promise or commitment to establish the basis for quid pro quo corruption will also chill robust political campaign participation and support. This is especially true where such promises or commitments simply affirm a candidate's position on an issue or intentions if elected, and are not contrary to the obligations of the office. The commonplace practice *White* recognized of making promises about legislative intentions or commitments to address issues of great import to voters during campaigns will be replaced with abstract discussions about what a candidate thinks and perpetual disclaimers that no promises are being made. Voters will be unable to hold public officials accountable for behaving inconsistent with their campaign positions; indeed, candidates will ensure such positions are largely unknown to avoid investigation and prosecution.

Last, if quid pro quo corruption is not tied to a specific official, sovereign act, a public official becomes immobilized from acting in conjunction with a constituent who also financially supported his campaign. When "no particular 'official act' need be identified, and the giving of gifts by reason of the recipient's mere tenure in office constitutes a violation, nothing but the Government's discretion prevents . . . prosecut[ion]." *Sun-Diamond Growers of California,* 526 U.S. at 408. Indeed, as the

*McCormick* Court warned, if campaign contributions can be quid pro quo corruption without being "proven to have been given in return for the performance of or abstaining from an official act . . . any campaign contribution might constitute a violation." *McCormick*, 500 U.S. at 273.

Unless U.S. Supreme Court precedent is followed, quid pro quo corruption would criminalize not only politics but elections, casting a vast, unconstitutional chill on protected political speech and association.

### III. Montana's Limits Are Not Tailored to a Quid Pro Quo Corruption Interest.

To be upheld, contribution limits must be closely drawn to serve a cognizable interest in preventing either quid pro quo corruption or circumvention of laws targeting quid pro quo corruption. *McCutcheon,* 134 S. Ct. at 1441, 1450.

### A.  The Base Contribution Limits Are Unconstitutional.

### 1.  No Quid Pro Quo Evidence Supported Lowering The Base Contribution Limits.

The prior base contribution limits were $1,500 for contributions to candidates for Governor and Lieutenant Governor, $750 for other statewide offices, $400 for public service commissioner, district court and senate, and $300 for other all other candidates. (SoF ¶ 2.) In 1994, they were lowered to $400 for contributions to

candidates for Governor and Lieutenant Governor, $200 for other statewide offices, and $100 for other all other candidates (SoF ¶ 3.) All the evidence surrounding lowering the base contribution limits—the language and supporting documents of I-118, testimony from its drafter and its campaign manager, and studies assessing its effect—show that the purpose of the limits is "to solve the problem" of "way too much money in Montana politics." (SoF ¶ 18.) They were designed to equalize influence and level the playing field by making contributions "fair," (SoF ¶¶ 17, 19, 23, 24), and to lower the amount of money in Montana politics, (SoF ¶¶ 18, 23). Indeed, "[t]he whole idea is that [lowering contribution limits] will increase the number of contributors, in other words, those who are buying into the democratic process . . . ." (SoF ¶ 20.) Mr. Pearson, I-118's campaign manager, confirmed that one of the motivating factors of I-118 was "way to much money":

> 'Just the enormous sums of money that have been coming into the legislative processes for races. We've continued to see an escalating of the high end of what it takes to run for Senate, what it takes to run for the House of Representatives, seeing an overall trend in the increase of money that's needed, that's been raised, for an example. . . . So we've just seen a continual trend about the escalation of money in politics just, you know, enormous sums of money by Montana standards, enormous sums of money.'

(SoF ¶¶ 15, 22.) So the *Eddleman* district court identified these interests as

"improper influence." (SoF ¶ 29.) These are not cognizable interests. *McCutcheon*,

134 S.Ct. at 1441; *id.* at 1550.

Preventing quid pro quo corruption—the only applicable cognizable

interest—was not even a tacit, secondary purpose of the lowered base contribution

limits. The *Eddleman* district court adopted the parties' stipulation that:

> The parties are unaware of any convictions of individuals or political action
> committees for violating the law prohibiting the offering of a bribe to
> a Montana public office holder in the form of a campaign contribution, during
> the 20 years preceding November 1994. . . . [and] unaware of any convictions
> of a Montana . . . public official secured during the 20 years prior to
> November 1994, for accepting a campaign contribution in a quid pro quo
> exchange for voting contrary to his obligations of office.

(SoF ¶ 16.) In their proposed facts, Montana acknowledged that the closest

evidence it had of quid pro quo corruption occurred over a decade before the lower

limits were adopted, when insurance salesman Senator Anderson sought to

influence other senators to vote in favor of an annuity bill to retain financial

support of an insurance PAC. (SoF ¶ 26.) This was discussed in *Montana Right to*

*Life Ass'n. v. Eddleman*, as proof of "undue influence." 343 F.3d 1085, 1093 (9th

Cir. 2003).

In that situation, the Senator alleged that he could "keep the contributions [from the Life Underwriters Association] coming our way" if other republicans were to vote for a bill. (SoF ¶ 27.) However, no legislator agreed to take the deal. Additionally, there is no indication that there was 1) an explicit arrangement 2) for the direct exchange of something of value for 3) a public official's improper promise or commitment that is 4) contrary to the obligations of his or her office 5) in an effort to control a specific official act. In fact, there is no evidence of any communication from the underwriters. This is not quid pro quo corruption. This is further evidenced by the fact that, although the Senator was investigated by five different agencies, no corruption was ever found. (*Id.*)

Long-time Representatives Harper and Grinde (*Eddleman* witnesses for defendants and plaintiffs, respectively) confirmed they knew of no quid pro corruption occurring before or after the adoption of the limits. (SoF ¶ 28.) And Ms. Baker, Program Supervisor for the Office of Political Practices, (SoF ¶ 63), testified that quid pro quo corruption is not likely to occur even now for a $1000 contribution. (*Id.*) The base contribution limits, which are well below $1000, do not target quid pro quo corruption.

Nor do they target the appearance of quid pro quo corruption. The *Eddleman* trial court held that the public's perception was "that contribution limits were necessary to combat improper influence, or the appearance thereof." (SoF ¶ 29.) And Montana's evidence of the public's perception of corruption, derived from a 1982 poll studying Montanans' public support for public financing, (SoF ¶ 25), addressed "the influence of special interests—such as labor unions and business corporations—over lawmaking because of their members' campaign contributions to legislative candidates." (*Id*.) It found that "29.9 percent 'strongly' subscribed to the sentiment that campaign contributions buy an inordinate amount of influence over legislators and 48.4 percent of those surveyed were in agreement with this position." (*Id*.) The public perceived improper influence, not quid pro quo corruption.

Perhaps most telling are studies heralding the base contribution limits' successful effects. Their touted success was not in mitigating quid pro quo corruption or even the public's perception of it, but the limits' success laid in their successfully targeting "special interests" and the wealthy and lowering the perceived influence of such contributors. (SoF ¶ 24.) The effects have nothing to

do with quid pro quo corruption and indeed, exposes an unconstitutional objective of speech regulation based solely on the speaker:

> quite apart from the purpose or effect of regulating content, moreover, the Government may commit a constitutional wrong when by law it identifies certain preferred speakers. . . . The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each.

*Citizens United,* 558 U.S. 310, 340 (2010).

*Eddleman*'s trial court findings and exhaustive record, supplemented in this case, show that the base contribution limits were not adopted to prevent and so do not prevent quid pro quo corruption or its appearance. The Commission bears the burden of showing a cognizable interest motivates the base contribution limits, *McCutcheon*, 134 S. Ct. at 1452, and will be unable to show, whether to this Court or to a lower court, that the current, lowered limits serve a cognizable interest as required under *McCutcheon* and *Citizens United*.

The lowered amounts were not determined by what "large contributions would result in quid pro quo corruption or its appearance," as *Buckley, McCutcheon,* and *Citizens United* all require. *McCutcheon,* 134 S.Ct. at 1450 (*quoting Buckley v. Valeo,* 424 U.S. 1, 26 (1976); *Citizens United,* 558 U.S. at 901 (*citing Buckley,* 424

U.S. at 25). Instead, as the *Eddleman* trial court found, the lower limits sought to prohibit amounts beyond the financial reach of the average contributor and thereby assumed to be subjectively "large" to the voter. (SoF ¶ 21.) While perhaps a method to effectuate subjective equality, fairness, or even influence (which are not cognizable interests), such criteria do not address quid pro quo concerns. It is not simply "large contributions" that can be regulated—they must be large contributions that could result or appear to result in quid pro quo corruption. *McCutcheon*, 134 S. Ct. at 1450.

While this Court has "no scalpel to probe," *Buckley*, 424 U.S. at 30, it is clear that Montana set the base contribution limits irrespective of any quid pro corruption interest. The Commission bears the evidentiary burden to prove tailoring, *McCutcheon,* 134 S.Ct. at 1450, and will not be able to show that the base contribution limits are closely drawn.

### 2.   No Quid Pro Quo Evidence Supports the Limits Today.

The current evidence provided to this Court at trial shows that quid pro quo corruption even under much higher limits is not a concern. As this Court found in its 2012 decision, Ms. Baker, testified that quid pro quo corruption is not an issue for Montana officials, and that even a "pretty big contribution" of $1000 would not

have a corruptive effect. (SoF ¶ 63.) The lowered base contribution limits are well below $1000.

Since the Ninth Circuit's decision to remand this case, two state court judgments have been issued that conclude quid pro quo corruption occurred: *Comm'r of Political Practices for the State of Mont. v. Boniek*, and *Comm'r of Political Practices for the State of Mont. v. Prouse.* (SoF ¶ 70.) In both cases, quid pro quo corruption was found but no definition of quid pro quo corruption established. (*Id.*) Indeed, no testimony or documents were offered to show that 1) an explicit arrangement 2) for the direct exchange of something of value for 3) a public official's improper promise or commitment that is 4) contrary to the obligations of his or her office 5) in an effort to control a specific official act, occurred. At best, it appears that circumstantial evidence and the opinion of the Commissioner were used, and that only to establish the underlying violations of failure to report, illegal contributions, and coordination. (*Id.*) Relying on such weak evidence of quid pro quo corruption would turn First Amendment jurisprudence and campaign speech rights on their head. *See* supra Part II.B & C.

Moreover, the amount of the violations charged against Mssrs. Boniek and Prouse—$9,000 and $9,000, respectively—exceed even the prior limits established

under Montana law. (SoF ¶ 70.) So such evidence, even if it did amount to quid pro

quo corruption, does not justify lowering the limits to their current level.

### 3.   The Limits Are Not Closely Drawn to Prevent Quid Pro Quo Corruption.

Even if quid pro quo corruption were the impetus for the lowered base

contribution limits, the Commission cannot met its burden of showing that they are

closely drawn to serve an anti-quid pro quo corruption interest.

For a law to be closely drawn to such a corruption interest, a "reasonable fit"

must exist between the interest and regulation adopted.  *McCutcheon*, 134 S. Ct. at

1457. This reasonable fit, while "not necessarily the least restrictive means," must

still be "a means narrowly tailored to achieve the desired objective." *Id.* at 1457-58

(internal citations omitted). The availability of better, more reasonable alternatives

belie a "closely drawn" claim. *Id.* at 1458 (internal citations omitted). The "closely

drawn" test is applied especially rigorously where a limit is part of "prophylaxis-

on-prophylaxis" regulation, that is, layers of regulation ostensibly designed to

address the same corruption interest. *Id.* at 1458. If there is a substantial mismatch

between the interest and the regulation, it is unconstitutional. *Id.* at 1446. The

government bears the burden of proving both that a cognizable interest motivates the law and that the law is closely drawn. *Id.* at 1451, 1452-53, 1457.

Here, the government has not satisfied this burden. No quid pro quo evidence supported lowering the limits and no quid pro quo supports the limits today. *See supra* Part III.A. & B. Further, the *Eddleman* Defendants admitted that "the disclosure of contributions required by Mont. Code Ann. §§13-37-225, 226(1) and (3), 229, lessen the risk that individuals or political committees will spend money to support a candidate as a *quid pro quo* for special treatment after the candidate is in office." (SoF ¶ 14.) So the lowered base contribution limits are not necessary to combat quid pro quo corruption, especially when disclosure requirements are a reasonable, more narrowly tailored approach that achieve the desired objective. *McCutcheon*, 134 S.Ct. at 1459-1460. The Commission has not demonstrated than alternatives such as disclosure are inadequate, nor that the base contribution limits are the most reasonable fit. For this reason, the base contribution limits fail the "closely drawn" test—and therefore constitutional scrutiny—as a matter of law.

**B.   The Aggregate Political Party Contribution Limits Are Not Tailored to a Quid Pro Quo Interest.**

**1. No Quid Pro Quo Evidence Supports the Limits.**

The aggregate contribution limits do not prevent quid pro quo corruption. As in *McCutcheon,* once the aggregate limits are reached, "they ban all contributions of *any* amount." *Id.* at 1452. It is difficult to understand how, for example, a state house representative could be bribable if she receives $851 from one political party (a dollar more than the present inflation-adjusted rate for that seat) and also be bribable if given a penny by a second political party. *See id.* at 1452. As was concluded in *McCutcheon,* the aggregate limits serve no corruption interest. *Id.* at 1452.

Neither are the aggregate political party contribution limits designed to prevent circumvention of the base contribution limits. A circumvention interest requires that the law being circumvented be an otherwise constitutional law. *See generally McCutcheon,* 134 S.Ct. at 1452-60. As shown above, Part II, the base contribution limits are unconstitutional. So Montana has no circumvention interest to justify the aggregate political party limits.  They are unconstitutional.

But assuming the base contribution limits are constitutional, although nowhere considered with the passage of I-118, large earmarked contributions to a candidate through a political party could be a legitimate circumvention concern, assuming a political party would even accept them. *McCutcheon,* 134 S.Ct. at 1452-1453. But the Commission's evidence presented at trial to this Court shows that expecting such effects is "divorced from reality" because an average of 1 in 4 legislative candidates and 1 in 10 statewide candidates max out on political party contributions, with their receipts comprising under 5% of all contributions they receive. (SoF ¶ 64.) With so little of campaign dollars deriving from political parties, it is clear such circumvention does not occur.

Instead, as expert witness Edwin Bender's exhibits show, the political party's voice has been reduced to a whisper. Political parties never contributed greater than 4.2% of all candidate contributions between the years 2000-2010. (SoF ¶ 64.) In 2008, gubernatorial races, political parties contributions were 2% of all contributions. (*Id.*) Yet in 2010, 22% of legislative candidates maxed out on political party contributions. (*Id.*) And in 2008, 18% of statewide candidates maxed out on political party contributions. (*Id.*)

Additionally, ARM 44.11.401 excludes from political party aggregate limits a party's payment for campaign staff of candidates. (SoF ¶ 37.) This directly contradicts Montana's purported fear of quid pro quo corruption. While political parties are prevented from giving money above the current limits, they are able to give thousands, even millions so long as that money is used to pay for staffing. Political parties can give unlimited amounts to campaigns. This exception shows that quid pro quo corruption is not an issue with political parties in Montana.

**2.   The Limits Are Not Tailored to a Cognizable State Interest.**

Assuming any cognizable interest justifies them, "the aggregate limits constitute an outright ban on further contributions . . . . At that point, the limits deny the [political party] all ability to exercise [its] expressive and associational rights by contributing to someone who will advocate for [the party's] policy preferences." *McCutcheon,* 134 S. Ct. at 1448. More reasonable alternatives exist.

If earmarked contributions funneled through political parties are the state's concern, then the state might consider banning earmarking contributions. *See id.* at 1459. Or Montana might impose base political party contribution limits for each candidate to avoid large contributions that signal behind-the-scenes efforts to bribe a candidate. And, as *McCutcheon* points out, disclosures of contributions, already

-29-

required by MCA § 13-37-225, are always a less restrictive alternative to bans. *Id.*
at 1460. With so many less restrictive, more reasonable alternatives, the aggregate
political party contribution limits fail the "closely drawn" test.

## IV. The Limits Restrict the Ability of Candidates to Effectively Run a Campaign.

As this Court determined in its 2012 decision, substantial evidence shows the
adverse effects of the limits on candidates, with candidates unable to send
information to their voters and be subject to substantially increasing expenses, like
gas. (SoF ¶¶ 65-67.) The limits substantially harm Montana's political election
process. Representative Miller testified that he would need about $12,000 to
effectively get a message out to all of the potential voters in his district. (SoF ¶ 65.)
However, he was only able to raise between $8,000 and $9,000 as a challenger in
2008. (*Id.*) Even with one of the smallest districts in Montana, Miller was unable to
raise a sufficient amount to reach all of his voters. (SoF ¶¶ 65-66.) Other, statewide
candidates have a "district" 58.16 times larger than Representative Miller's (147,
164 square miles vs. 2,530 square miles in HD 84) but only between 2.03 and 3.8
times larger contribution limits ($170 vs. $320 and $650). (SoF ¶ 66.)

# Conclusion

As shown above, the base contribution limit and the aggregate political party contribution limits are unconstitutional as a matter of law. This Court should grant Plaintiffs' *Motion for Summary Judgment*.


Dated: March 4, 2016

Respectfully Submitted,

/s/ Anita Y. Milanovich

| | |
|---|---|
| James Bopp, Jr. (Ind. No. 2838-84)* | Anita Y. Milanovich (Mt. No. 12176) |
| Jeffrey Gallant (Va. No. 46876)** | THE BOPP LAW FIRM, PC |
| Courtney E. Turner (Ind. No. 32178-29)*** | 1627 West Main Street, Suite 294 |
| THE BOPP LAW FIRM, PC | Bozeman, MT 59715 |
| The National Building | Phone: (406) 589-6856 |
| 1 South Sixth Street | Email: aymilanovich@bopplaw.com |
| Terre Haute, Ind. 47807 | *Local Counsel for Plaintiffs* |
| Phone: (812) 232-2434 | |
| Fax: (812) 235-3685 | |
| Email: jboppjr@aol.com | |
| jgallant@bopplaw.com | |
| cturner@bopplaw.com | |
| *Counsel for Plaintiffs* | |

*Motion pro hac vice granted 9/9/11.
**Motion pro hac vice granted 6/11/12.
***Motion pro hac vice granted 2/1/16.

**Certificate of Compliance**

This memorandum of law complies with Local Rule 7.1(d)(2)(A). It contains 6,491 words, as verified by the word count feature of WordPerfect X7, the word processor that created it.

**Certificate of Service**

I hereby certify that the foregoing document was served on March 4, 2016,

upon the following counsel via the United States District Court for the District of

Montana, Helena Division, electronic filing system:

TIMOTHY C. FOX
Montana Attorney General
DALE SCHOWENGERDT
State Solicitor
MATTHEW T. COCHENOUR
PATRICK RISKEN
Assistants Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: 406-444-2026
Fax: 406-444-3549
dales@mt.gov
mcochenour2@mt.gov
prisken@mt.gov
*Attorneys for Defendants*

/s/ Anita Y. Milanovich
Anita Y. Milanovich

-33-