TIMOTHY C. FOX
Montana Attorney General
DALE SCHOWENGERDT
Solicitor General
MATTHEW T. COCHENOUR
PATRICK M. RISKEN
Assistant Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: 406-444-2026
Fax: 406-444-3549
dales@mt.gov
mcochenour2@mt.gov
prisken@mt.gov

COUNSEL FOR DEFENDANTS

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| DOUG LAIR, STEVE DOGIAKOS, AMERICAN TRADITION PARTNERSHIP, AMERICAN TRADITION PARTNERSHIP PAC, MONTANA RIGHT TO LIFE ASSOCIATION PAC, SWEETGRASS COUNCIL FOR COMMUNITY INTEGRITY, LAKE COUNTY REPUBLICAN CENTRAL COMMITTEE, BEAVERHEAD COUNTY REPUBLICAN CENTRAL COMMITTEE, JAKE OIL, LLC, JL OIL, LLC, CHAMPION PAINTING, INC., and JOHN MILANOVICH, <br><br> Plaintiffs, <br><br> v. <br><br> JONATHAN MOTL, in his official capacity as Commissioner of Political Practices; TIM FOX, in his official capacity as Attorney General of the State of Montana; and LEO GALLAGHER, in his official capacity as Lewis and Clark County Attorney, <br><br> Defendants. | CV 12-12-H-CCL <br><br><br> **DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................. i

TABLE OF AUTHORITIES .................................................................... ii

INTRODUCTION ..................................................................................1

FACTS ...................................................................................................1

SUMMARY JUDGMENT STANDARDS ................................................5

ARGUMENT .........................................................................................6

MONTANA'S CONTRIBUTION LIMITS SERVE THE SUFFICIENTLY
IMPORTANT INTEREST OF PREVENTING CORRUPTION AND THEY
ARE APPROPRIATELY TAILORED ....................................................6

    A.    Montana's Limits Serve the Sufficiently Important Interest of
        Preventing Quid Pro Quo Corruption and its Appearance...................7

        1.    As a matter of law, Montana has a constitutionally
              sufficiently interest.......................................................7

        2.    Montana has presented evidence to justify its interest .............11

    B.    Montana's Contribution Limits are Closely Drawn............................16

        1.    The limits focus narrowly on the state's interest ......................16

        2.    The limits leave contributors free to affiliate with a
              candidate ....................................................................19

        3.    The limits do not prevent candidates from amassing
              sufficient resources ................................................21

CONCLUSION.....................................................................................28

CERTIFICATE OF SERVICE ..............................................................29

CERTIFICATE OF COMPLIANCE.......................................................29

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby,*
    477 U.S. 242 (1986)............................................................................5

*Buckley v. Valeo*,
    424 U.S. 1 (1976).................................................................... passim

*Citizens for Clean Government v. City of San Diego*,
    474 F.3d 647 (9th Cir. 2007) .............................................................12

*Commissioner of Political Practices v. Boniek*,
    XADV-2014-202 ............................................................................4, 15

*Commissioner of Political Practices v. Prouse*,
    DDV-2014-250 ................................................................................5, 15

*Federal Election Commn. v. Beaumont*,
    539 U.S. 146 (2003)............................................................................6

*Federal Election Commn. v. Colorado Republican Fed. Campaign Comm.,*
    (*Colorado II*),
    533 U.S. 431 (2001)............................................................ 10, 11, 19

*Lair v. Bullock* (*Lair* II),
    798 F.3d 736 (9th Cir. 2015) ........................................... 1, 6, 11, 16

*McCutcheon v. Federal Election Commn.*,
    134 S. Ct. 1434 (2014).............................................................. passim

*Molnar v. Fox*,
    301 P.3d 824 (Mont. 2013).............................................................5, 14

*Montana Right to Life Assn. v. Eddleman*,
    343 F.3d 1085 (9th Cir. 2003) ................................................. Passim

*Nixon v. Shrink Mo. Govt. PAC*,
    528 U.S. 377 (2000)..........................................................................12

*Ognibene v. Parkes*,
    671 F.3d 174 (2d Cir. 2011) ..............................................................9

# TABLE OF AUTHORITIES
### Cont.

## OTHER AUTHORITIES

Federal Rules of Civil Procedure
Rule 56(a)............................................................................................5

Montana Code Annotated
§ 2-2-103.........................................................................................15
§ 13-37-216(5) ...................................................................................2
§ 13-37-218.....................................................................................27

Revised Codes of Montana 1947
§ 23-4795 ...........................................................................................2

United States Constitution
Amend I...........................................................................................21

## INTRODUCTION

The Ninth Circuit remanded for this Court to apply the *Eddleman* framework to Montana's contribution limits in light of the narrowed corruption interest set forth in *Citizens United v. Federal Election Commn.*, 558 U.S. 310 (2010) and *McCutcheon v. Federal Election Commn.*, 134 S. Ct. 1434 (2014) (plurality). *Lair v. Bullock*, 798 F.3d 736, 748 (9th Cir. 2015) (*Lair II*).

Montana's contribution limits serve the well-recognized interest of preventing quid pro quo corruption and its appearance. They are aimed at the recognized problem of large, direct contributions. They do not prevent a contributor from associating with a candidate. Nor do they prevent a candidate from amassing resources to engage in effective advocacy. Montana's limits are constitutional, and this Court should grant summary judgment in Montana's favor.

## FACTS

In rejecting a constitutional challenge to federal contribution limits, the United States Supreme Court determined that preventing "the actuality and appearance of corruption resulting from large individual financial contributions" was a constitutionally sufficient justification for the limits. *Buckley v. Valeo*, 424 U.S. 1, 26 (1976). Following *Buckley*, several states moved to enact flat $100 limits, regardless of the race or the office sought. *Eddleman*, Tr. vol. 3

at 495.  (Decl. Matthew T. Cochenour, Ex. A).[1]  Montana did not follow the trend,

and instead sought to amend existing contribution limits consistent with *Buckley*.

*Id*. at 490-93.[2]  Montana focused on larger contributions, and the limits enacted

affected only the top 10 percent of contributions.  *Id*. at 511; *Montana Right to Life*

*Assn. v. Eddleman*, 343 F.3d 1085 (9th Cir. 2003).

The limits Plaintiffs challenge were enacted by citizens' initiative in 1994.

The limits are adjusted for inflation, and cap the amounts an individual or political

committee can donate.  A current Contribution Limits Summary is attached.  *See*

Cochenour Decl., Ex. B.  The limits apply to each election, so when a primary is

contested, the limits double; thus, a $170 limit for a House race becomes a

$340 limit.  *See* Mont. Code Ann. § 13-37-216(5).

Montana campaigns are relatively inexpensive, particularly when compared

to campaigns in other states or in the federal system.  *See* Cochenour Decl., Ex. C.

(Bender Suppl.), Charts 5-1, 5-2.  Montana's limits apply only to direct

contributions to candidates.  There are no limits on how much candidates can

contribute to their own campaigns; there are no limits on how much an individual

can give to political party committees or PACs; and there are no limits on how

---

[1] Cited portions of the *Eddleman* and *Lair* trial transcripts are attached to the declaration.  Throughout the brief, the transcripts are cited as "*Eddleman*, Tr." and "*Lair*, Tr."

[2] Montana has had contribution limits since 1975.  *See* Rev. Codes Mont. 1947 § 23-4795.

much a political committee can give to political party committees or PACs. *See* Contribution Limits Summary.

While Montana's limits cap direct donations, contributors can affiliate with candidates in other ways, such as volunteering, writing letters, and maintaining a blog. *Lair*, Tr. vol. 2 at 57 (Cochenour Decl., Ex. D). Effective campaigns are not just about raising money, but about developing a network of supporters, door-to-door campaigning, and "boots on the ground." *Id*. vol. 1, 49-50 (Jim Brown); vol. 2, 37-39 (Mike Miller); vol. 2, 137-39 (Jim Murry); vol. 2, 188 (Mary Baker); vol. 3, 20 (Ed Bender).

Political parties also help candidates by hosting training seminars, developing campaign messages, organizing volunteers, scheduling events, and identifying known donors to streamline fundraising efforts. *Id*. vol. 1, 93 (John Milanovich); vol. 3, 40-42 (Ed Bender). Additionally, political parties have higher contribution limits, and they can provide paid staffers, whose salaries are not subject to the limits. Cochenour Decl., Ex. E. (COPP Welch Opinion); Mont. Code Ann. § 13-37-216(2); Contribution Limits Summary.

*Eddleman* witnesses testified that the limits resulted in spending more time raising money and talking to more people to raise the same amounts. *E.g.*, *Eddleman*, Tr. vol. 2, 312 (Mike Cooney); vol. 2, 359 (Hal Harper); vol. 2, 218

(Larry Grinde). Nonetheless, candidates were able to mount effective campaigns. *Eddleman*, 343 F.3d at 1095.

In *Lair*, only Mike Miller testified that the contribution limits impeded his communication with voters. Nonetheless, Miller ran for office four times and won every time. Bender Suppl. at 2. And, in all his races combined, only seven out of the hundreds of contributors reached the limit. *Id*., Chart 6-3. Miller could have sought additional contributions from the pool of known donors who had given below the maximum. *Id*. at 3. Even Plaintiffs' expert Clark Bensen agreed that known contributors are more likely to give again compared with someone who has not donated. *Lair*, Tr. vol. 1, 147. Additionally, Miller never received the maximum contribution from a political party, and he never asked a political party for assistance from paid staffers. *Id*., vol. 2, 30, 42-43; Bender Suppl., Chart 6-4.

In *Eddleman*, Montana presented evidence of quid pro quo corruption. Representative Harper testified that that groups funneled money into campaigns before a vote "because it gets results." *Eddleman*, Tr. vol. 2, 362. Additionally, a senator sent a confidential letter urging colleagues to vote for a bill because it was "important" to a PAC, and he wanted to keep PAC money coming to the party. *Id*. vol. 4, 589. The letter suggested there would be more PAC money if they voted for the bill. *Id*., 593.

More recently, Montana courts have determined that legislative candidates engaged in quid pro quo corruption.  *See Commissioner of Political Practices v. Boniek*, XADV-2014-202; *Commissioner of Political Practices v. Prouse*, DDV-2014-250.  Cochenour Decl., Exs. F, G.  And the Montana Supreme Court has found quid pro quo arrangements in the context of "gifts" and elected officials.  *Molnar v. Fox*, 301 P.3d 824 (Mont. 2013).  The Commissioner of Political Practices has also opined that several 2010 legislative candidates engaged in quid pro quo arrangements.  Cochenour Decl., Ex. H (Motl Report).  Further, though the offer was rejected, a national group offered to make $100,000 available to elect Republican majorities in exchange for Republican legislators introducing and voting on a particular bill.  Decl. Bruce Tutvedt.

Corruption has not gone away in the 40 years since *Buckley*.  Montana still has a sufficiently important interest in preventing corruption and its limits are appropriately tailored.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is proper if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it could "affect the outcome" of a lawsuit, and an issue is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

## <u>ARGUMENT</u>

**MONTANA'S CONTRIBUTION LIMITS SERVE THE SUFFICIENTLY IMPORTANT INTEREST OF PREVENTING CORRUPTION AND THEY ARE APPROPRIATELY TAILORED.**

Unlike expenditure limits, a contribution limit "entails only a marginal restriction upon the contributor's ability to engage in free communication." *Buckley*, 424 U.S. at 20-21. Contributions constitute symbolic expressions of support and involve "little direct restraint" on political communication. *Id.* at 21. Contributions "lie closer to the edges than to the core of political expression." *Federal Election Commn. v. Beaumont*, 539 U.S. 146, 161 (2003). The "overall effect" of contribution limits is that candidates must get contributions from more donors, and donors desiring to contribute more must engage in other political expression. *Buckley*, 424 U.S. at 21-22.

The Court applies a "relatively complaisant" review to contribution limits. *See Beaumont*, 539 U.S. at 161. Contribution limits are constitutional if they further a sufficiently important state interest and if they are closely drawn. *Buckley*, 424 U.S. at 25; *McCutcheon*, 134 S. Ct. at 1444. *Eddleman* upheld Montana's limits; however, *Lair II* determined that the meaning of corruption--the "sufficiently important state interest"--had been narrowed such that *Eddleman*'s "ultimate holding" affirming the limits had been abrogated. *Lair II*, 798 F.3d at 747-48.

Nonetheless, the Court reaffirmed *Eddleman*'s framework. Contribution limits are constitutional if:

> (1) there is adequate evidence that the limitation furthers a sufficiently important state interest, and (2) if the limits are "closely drawn"-*i.e.*, if they (a) focus narrowly on the state's interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign.

*Id*. at 748. Montana's contribution limits meet this standard.

## A. Montana's Limits Serve the Sufficiently Important Interest of Preventing Quid Pro Quo Corruption and its Appearance.

### 1. As a matter of law, Montana has a constitutionally sufficiently interest.

Preventing corruption and the appearance of corruption constitute "constitutionally sufficient justification[s]" to uphold contribution limits. *Buckley*, 424 U.S. at 26. *Buckley* recognized that "large contributions" "given to secure political quid pro quo's from current and potential office holders" undermined the integrity of representative democracy. *Buckley*, 424 U.S. at 26-27. *Buckley* did not limit its view of corruption to *actual* quid pro quo corruption. Rather, "[o]f almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse *inherent* in a regime of large individual financial contributions." *Id*. at 27 (emphasis added). Further, "Congress could legitimately conclude that the avoidance of the appearance of improper influence 'is also

critical . . . if confidence in the system of representative Government is not to be eroded to a disastrous extent.'"  *Id*. at 27 (citation omitted).

Relying on *Buckley*, the Court has made clear that regulations aimed at preventing corruption must target "'quid pro quo' corruption or its appearance." *McCutcheon*, 134 S. Ct. at 1441.  While quid pro quo's boundaries have not been defined, both *Citizens United* and *McCutcheon* expressly relied on *Buckley* for their understanding of corruption.  *See Citizens United*, 558 U.S. at 359; *McCutcheon*, 134 S. Ct. at 1451.  Accordingly, those cases must be interpreted in a way that follows *Buckley*, not in a way that overrules it.  *McCutcheon* recognized that *Buckley* "upheld base contribution limits because they targeted 'the danger of actual quid pro quo arrangements' *and* 'the impact of the appearance of corruption stemming from public awareness' of such a system of unchecked direct contributions."  *Id*. (emphasis added) (quoting *Buckley*, 424 U.S. at 27).  Thus, *McCutcheon* establishes that, while a "financial quid pro quo:  dollars for political favors" may be the "hallmark of corruption," it is not the extent of corruption. Rather, quid pro quo corruption includes "the appearance of opportunities for abuse" inherent with large contributions.  *McCutcheon*, 134 S. Ct. at 1450.

The Court's rejection of "generic favoritism" or "mere influence" as theories of corruption, *see McCutcheon*, 134 S. Ct. at 1441, is not at odds with this understanding of quid pro quo corruption.  Certainly the Court has not condoned

*improper* influence.  Both law and common sense distinguish "generic influence" from "improper influence."  As the Second Circuit explained:

> [t]he distinction between mere influence or access, as addressed by *Citizens United*, and improper influence or access goes to the very heart of representative democracy.  It is one thing to gain access to a legislator in order to influence him or her with a policy argument.  Indeed, we presume that legislators are influenced by the ideological views of their constituents.  It is entirely different to seek to influence a legislator with money in the hope of receiving a contract; such influence is de facto improper and corrupting.

*Ognibene v. Parkes*, 671 F.3d 174, 187 n.14 (2d Cir. 2011).  This distinction is evident in the "deeply disturbing" examples of corruption that *Buckley* confronted.  *See Buckley*, 424 U.S. at 27 n.28.  One example cited by the court of appeals described the dairy organizations' relationship to President Nixon's fundraisers; the court noted that, after meeting with industry representatives, the President overruled a decision by the Secretary of Agriculture in a way favorable to the industry.  *Buckley v. Valeo*, 519 F.2d 821, 839-40 n.36 (D.C. Cir. 1975).  Before the public announcement, the White House informed the dairymen that it wanted the group to reaffirm a $2 million pledge.  *Id*.  The court found it immaterial "whether the President's decision was in fact, or was represented to be conditioned upon or 'linked' to, the reaffirmation of the pledge."  *Id*.

Regardless of corruption's changing boundaries, Montana has articulated a sufficiently important interest throughout these proceedings:  preventing quid pro quo corruption or the appearance of corruption constitutes a sufficiently important

state interest that justifies contribution limits. *McCutcheon*, 134 S. Ct. at 1441.

That is sufficient as a matter of law. *Id*. ("Our cases have held that Congress may

regulate campaign contributions to protect against corruption or the appearance of

corruption.") In fact, the appearance of corruption is "*inherent* in a regime of large

individual financial contributions." *Buckley*, 424 U.S. at 27 (emphasis added).[3]

Moreover, Plaintiffs have conceded that Montana has an interest in

preventing corruption. For example, on appeal, Plaintiffs admitted that they "do

not dispute that such an anticorruption interest exists as a general matter in

Montana." Appellees' Resp. Br., *Lair v. Motl*, No. 12-35809 at 42 (July 24, 2014).

During trial, Plaintiffs stated that a $1,000 limit would "be definitely

presumptively constitutional." *Lair*, Tr. vol. 3, 147. And Plaintiffs requested

dispositive motions to determine whether Montana's limits were tailored to prevent

quid pro quo corruption. *See* Doc. 206 at 2. Plaintiffs' statements and admissions

show that they challenge tailoring but not Montana's interest.

---

[3] The corruption interest applies equally to political parties. *See Federal Election Commn. v. Colorado Republican Federal Campaign Committee* (*Colorado II*), 533 U.S. 431, 455 (2001) (party is "in the same position as some individuals and PACs, as to whom coordinated spending limits have already been held valid . . . ."). Additionally, because there are no limits on how much individuals and PACs can donate to a political party, the aggregate limits on political parties' contributions to a candidate serve to prevent circumvention, which is a well-recognized theory of corruption. *Id*. at 456.

In fact, this Court already accepted that the state's interest was valid. While *Lair II* faulted this Court for assuming, without identifying, the validity of Montana's interest, the interest assumed was the prevention of quid pro quo corruption. First, this Court had previously recounted *Eddleman*'s determination that "the State of Montana has an anti-corruption interest that justifies the contribution limits[.]" D.C. Doc. 66 at 17. Second, Montana explained at trial that its interest was "the fear of actual or quid pro quo corruption, or the appearance of it." *Lair*, Tr. vol. 3, 148-49. When this Court accepted Montana's sufficiently important state interest, that interest was preventing quid pro quo corruption or its appearance. Doc. 168 at 27. This Court can again accept the validity of Montana's interest, so long as the interest is identified. *Lair II*, 789 F.3d at 748.

## 2. Montana has presented evidence to justify its interest.

The challenged limits have been effective since 1994, and the Supreme Court has recognized the difficulty of gathering evidence to support longstanding statutes. *See Colorado II*, 533 U.S. at 457. "[N]o data can be marshaled to capture perfectly the counterfactual world in which" an existing campaign finance law does not exist. *McCutcheon*, 134 S. Ct. at 1457. Thus, the question is "whether experiences under the present law confirms a serious threat of abuse." *Id*. (quoting *Colorado II*, 533 U.S. at 457).

Further, the amount of evidence required depends on the "novelty and plausibility of the justification raised." *Citizens for Clean Government v. City of San Diego*, 474 F.3d 647, 652-53 (9th Cir. 2007) (quoting Nixon v. *Shrink Mo. Govt. PAC*, 528 U.S. 377, 391 (2000)). Preventing corruption in the context of direct contributions to candidates is "neither novel nor implausible"; rather it is the "paradigmatic sufficient state interest . . . ." *Id.*, 474 F.3d at 652-53. Notably, the federal government and most states have enacted contribution limits. *See* Bender Suppl., Chart 5-1. In addition to evidence, a state may rely on decisions addressing the same issues. *Citizens for Clean Government*, 474 F.3d at 654.

To the extent additional proof is required, the evidentiary burden is low. Nonetheless, ample evidence exists. For example, in *Eddleman*, Representative Harper testified that groups "funnel[] more money into campaigns when certain special interests know an issue is coming up, because it gets results." *Eddleman*, Tr. vol. 2, 362. Harper did not say money gets "access" or "influence"; he said it gets "results." Harper testified that "people that make substantial donations to campaigns feel--I think they know--that there's a connection between support and between outcome and bills." *Id.* Harper was describing quid pro quo corruption or, at the least, its appearance.

Montana also presented a senator's confidential letter that urged colleagues to vote for a bill so that PAC money would flow to the party. The letter stated:

> Dear Fellow Republicans.  Please destroy this after reading.  Why?
> Because the Life Underwriters Association in Montana is one of the
> larger Political Action Committees in the state, and I don't want the
> Demo's to know about it!  In the last election they gave $8,000 to
> state candidates. . . .  Of this $8,000--Republicans got $7,000--you
> probably got something from them.  This bill is important to the
> underwriters and I have been able to keep the contributions coming
> our way.  In 1983, the PAC will be $15,000.  Let's keep it in our
> camp.

*Eddleman*, Tr. vol. 4, 589; *see also Eddleman*, 343 F.3d at 1093.  The senator was

trying to get a bill passed when he sent the letter.  *Eddleman*, Tr. vol. 3, 567.

A fellow senator testified that the letter was "unconscionable":

> It was not the way to pass bills.  You passed bills on their merit, on
> convincing your fellow Senators that there's a reason to pass it, and
> let it go at that.  But to remind people that they received money and
> therefore should pass it, and even to suggest that if they vote for it
> they'll get more money, it just tainted the bill.  It was totally
> unacceptable.

*Eddleman*, Tr. vol. 4, 593.  When the letter became public, he sent another, stating:

"May I only suggest to each one of you that you have an active base of support in

your community with the Life Underwriters Association.  Your support of Senate

Bill 331 would make sense from all aspects of your next campaign, and I am sure a

positive vote on this matter would be most appreciated by your local life

underwriter."  *Id*. at 596.  Multiple investigations followed.  *Eddleman*, 343 F.3d

at 1093.

That *Eddleman* found these examples sufficient to satisfy a broader

understanding of corruption does not alter that they are also examples of quid pro

quo corruption. Significantly, the dissent agreed that Montana's limits were tailored to "the significant interest of preventing improper influence, *and quid pro quo arrangements* arising from large contributions." *Id*. 343 F.3d at 1099 (Teilborg, J., dissenting in part) (emphasis added).

There are more recent examples. In 2009, Republican senators were informed that if they introduced and voted on a right-to-work bill, then National Right To Work would make at least one hundred thousand dollars available to elect Republican majorities. Tutvedt Decl. The offer was rejected. *Id*. However, it illustrates the "serious threat of abuse" that exists even under present law. *McCutcheon*, 134 S. Ct. at 1457. Additionally, Commissioner of Political Practices Motl has opined that several 2010 candidates engaged in quid pro quo arrangements by pledging "100% support" for particular corporate groups' legislative agendas in exchange for the corporate groups orchestrating a large scale campaign plan on the candidates' behalves. Motl. Report at 5-8.

Montana courts have also found examples of quid pro quo corruption. For example, in *Molnar*, the Montana Supreme Court held that a Public Service Commissioner unlawfully accepted a $1,000 gift from NorthWestern Energy and a $1,000 gift from PPL Montana because the gifts "would tend to improperly influence a reasonable person in Molnar's position." *Molnar*, ¶ 30. The Court's inquiry was "not whether the gifts, in fact, influenced Molnar to depart from the

faithful and impartial discharge of his public duties (a subjective standard), but, rather whether the gifts would tend to improperly influence a 'reasonable person' in Molnar's position (an objective standard)." *Molnar*, ¶ 29. While *Molnar* was not a contribution-limits case, it demonstrates that quid pro quo corruption and its appearance are alive and well in Montana.

Two state district courts have also determined that 2010 legislative candidates engaged in quid pro quo corruption. *See Boniek*; *Prouse*. The courts determined that the candidates exhibited quid pro quo corruption by accepting large corporate contributions in return for promising 100 percent support for the corporations' agenda: "What Candidate Boniek received, then, (the quid) was the appearance of a grass roots campaign created by direct mail for which he did not pay, report or disclose. What Candidate Boniek promised in return (the pro quo) for that benefit was unswerving fealty to the corporations carrying out the direct mail campaign[.]" *Boniek*, at 22; *accord Prouse*, at 13-14. Under Mont. Code. Ann. § 2-2-103, holding public office is a public trust, and officeholders must perform their duties for the "benefit of the people of the state." These courts determined that pledging loyalty to the corporations corrupted the public trust. *Boniek*, at 23; *Prouse*, at 14-15.

There is nothing novel about large contributions posing a threat of corruption; rather, it is inherent. Thus, there is no stringent evidentiary burden on

Montana to show evidence of corruption. The corruption examples discussed above are not illustrations of "mere influence" or democracy in action; rather, they fall much closer to the "disturbing" examples identified in *Buckley*. And they illustrate that, even under existing law, there is a "serious threat of abuse." The federal and state court decisions, the evidence presented in *Eddleman*, the testimony of Commissioner Motl, and the testimony of Senator Tutvedt establish that Montana has a sufficiently important state interest in preventing quid pro quo corruption and its appearance.

### B.    Montana's Contribution Limits are Closely Drawn.

Contribution limits are "closely drawn" if they "(a) focus narrowly on the state's interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign." *Lair II*, 798 F.3d at 748. While *Lair II* determined that the corruption interest had been narrowed, it explicitly upheld the "'closely drawn' analysis" from *Eddleman*. *Lair II*, 798 F.3d at 747. *Eddleman*'s fact findings have not been disturbed and its tailoring analysis remains valid when applied to the narrower corruption interest.

### 1.    The limits focus narrowly on the state's interest.

In upholding contribution limits, *Buckley* stated that the limits "focus[] precisely on the problem of large campaign contributions--the narrow aspect of

political association where the actuality and potential for corruption have been identified . . . ." *Buckley*, 424 U.S. at 28. *McCutcheon* recognized the base limits were constitutional because "they targeted 'the danger of actual quid pro quo arrangements' and 'the impact of the appearance of corruption stemming from public awareness' of such a system of unchecked direct contributions." *McCutcheon*, 134 S. Ct. at 1451 (quoting *Buckley*, 424 U.S. at 27). *McCutcheon* observed that "the risk of quid pro quo corruption is generally applicable only to 'the narrow category of money gifts that are directed, in some manner, to a candidate or officeholder.'" *McCutcheon*, 134 S. Ct. at 1452 (citation omitted). The Court is deferential regarding dollar amounts and, if a limit is justified, the Court will not invalidate it for lack of "fine tuning[.]" *See Buckley*, 424 U.S. at 30.

Montana's contribution limits are narrowly focused because they limit only large, direct contributions to candidates. The courts have already found that the limits reach only large contributions. *Eddleman*, 343 F.3d at 1094 (agreeing with district court that Montana's contribution limits affect only the largest contributions). And the evidence confirms it. Jonathan Motl testified that the limits were set based on historical data and targeted only the top 10 percent of contributions. *Eddleman*, Tr. vol. 3, 509-510, 522. CB Pearson's expert report (Ex. 12 in this case) detailed how the limits affected only large contributions. Motl testified that whether a contribution is "large" is relative to the office sought.

*Id.* at 522.  And Hal Harper highlighted that "$100 is a contribution that you want to write a thank-you for right away."  *Id.*, vol. 2, 369.

Percentage-wise, Montana's contribution limits are much higher than comparable federal limits, which have been upheld.  In 2010, for example, the average cost of a federal House seat in Montana was $858,848 and the contribution limit was $4,800 per election cycle.  Bender Suppl., Chart 5-2.  As a percentage, the federal limit was .56 percent of the average raised for a federal House seat.  *Id.* By contrast, the average cost of a state House seat was $8,231 and the contribution limit was $320 per election cycle.  *Id.*, Chart 5-1.  As a percentage, the state contribution limit was 3.89 percent of the average raised for a state House seat.  *Id.* Contrasting the percentages, Montana's contribution limits are nearly seven times higher than federal limits.  Thus, relative to Montana's elections, the limits affect only large contributions.

Montana's limits apply only to direct contributions to candidates.  The limits do not affect how much candidates can contribute to their own campaigns.  They do not limit how much individuals or political committees can contribute to a political committee or to a political party.  They do not limit independent spending.  Because there are no limits on contributions to political party committees, the limits on party contributions to a candidate also serve to prevent circumvention of

individual contribution limits, which is a well-recognized type of corruption.

*Colorado II*, 533 U.S. at 456.

> ### 2. The limits leave contributors free to affiliate with a candidate.

*Buckley* recognized that contribution limits focused on the problem of large contributions but left "persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources." *Buckley*, 424 U.S. at 28. *Eddleman* similarly recognized that limits "in no way prevent[] PACs from affiliating with their chosen candidates in ways other than direct contributions, such as donating money to a candidate's political party, volunteering individual members' services, sending direct mail to their supporters, or taking out independent newspaper, radio, or television ads to convey their support." *Eddleman*, 343 F.3d at 1094. These observations remain true. Additionally, while no PAC testified, Miller testified that candidates could list PAC endorsements online even if they did not financially contribute, though he did not. *Lair*, Tr. vol. 2, 34-36.

The contribution limits do not prevent individuals from affiliating with a candidate. Individuals can put bumper stickers on their cars and signs in their yards; they can go door to door, participate in phone drives, or do any number of activities. Plaintiff Doug Lair's testimony illustrates the opportunities available:

in addition to contributing, Lair volunteered hundreds of hours, wrote letters to the editor, helped others write letters, reviewed candidates' letters, maintained an active blog, put up signs, went door to door, held fundraisers, placed ads in the local paper, and participated in strategy meetings. *Id.*, vol. 2, 50, 57. Twelve of fourteen candidates that Lair supported were successful, and Lair observed that "Our volunteer efforts have been rewarded, yes." *Id.* at 58.

Political parties can engage in the same activities. Further, parties can provide paid personal staff that is not subject to contribution limits. COPP Welch Opinion. Parties have done this for decades. *Id.* Jim Brown, the Beaverhead County Republican Committee representative, agreed that paying someone to help a candidate was an option, but he didn't view it as practical and didn't want the possible tax consequences. *Lair*, Tr. vol. 1, 50, 63. Darren Breckenridge, the Lake County Republican Committee representative, didn't know the party could provide paid personal services and he thought candidates knew better about running their campaigns. *Id.*, vol. 2, 72-73. The fact that Plaintiffs' political party witnesses were unaware of relevant campaign finance law or chose not to pay staffers because of potential tax headaches does not alter that political parties can affiliate with candidates.

Here, as in *Buckley*, the contribution limits do not prevent a contributor--whether an individual, a political committee, or a political party--from affiliating with a candidate in numerous ways other than by making direct contributions.

### 3. The limits do not prevent candidates from amassing sufficient resources.

*Buckley* observed that contribution limits could severely impact political discourse if they prevented a candidate from "amassing the resources necessary for effective advocacy." *Buckley*, 424 U.S. at 21; *accord Eddleman*, 343 F.3d at 1091. Requiring candidates to raise funds from more sources, however, does not violate the First Amendment. *Eddleman*, 343 F.3d at 1091 (quoting *Buckley*, 424 U.S. at 21-22) ("If a candidate is merely required 'to raise funds from a greater number of persons and to compel people who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression,' the candidate's freedom of speech is not impugned by limits on contributions.")

The evidence in *Eddleman* and here establishes that candidates may have to raise money from more sources than if no limits existed but that candidates can nonetheless run effective campaigns. For example, Mike Cooney testified that the "biggest impact" of contribution limits was that he had "to go out and talk to a lot more people, and I'm chasing probably more, smaller contributions[.]" *Eddleman*, Tr. vol. 2, 312. Cooney acknowledged that candidates must spend significant time raising money, but he viewed the time as valuable: "I think as you're out there

talking to people, and they're people that can probably write you a check for $10 or $15, that's good contact to make. And so I guess I figure if I can talk to more of those people, that would be beneficial to my campaign." *Id*. at 313. Cooney turned the time spent raising money "into an advantage as in going out and making greater contact with the people." *Id*. at 327. Cooney didn't feel the contribution limits had harmed his candidacy. *Id*. at 313. Hal Harper similarly testified that the contribution limits had "negligible effects" on the ability to raise money. *Id*. at 359. The limits weren't a "big issue"; they just required talking "to more people to raise the same amount of money." *Id*.

Even the *Eddleman* plaintiffs' witnesses' primary complaints related to the time spent raising money. For example, Larry Grinde thought it was harder to get startup money, and he had to "go to twice as many people in order to raise that same amount of money." *Id*. at 218. At one point, Grinde stated that he won elections even though his campaigns were ineffective. *Id*. at 264. But he later clarified: "I didn't mean that they were ineffective. I mean I did what I had to to win. If my opponents would have been tougher and I felt that I needed to, I would have raised more money, gone out and done the work that I needed to to run that effective campaign against the opponent." *Id*. at 268. Though Ric Holden claimed it was harder to get his message out, he admitted to actually raising more money under the new limits. *Id*., vol. 1, 114, 131. The Ninth Circuit agreed with the

district court's finding that candidates were able to mount effective campaigns, notwithstanding the limits. *Eddleman*, 343 F.3d at 1095. That Montana's dollar amounts were lower than other states was not surprising because Montana is one of the least expensive states for campaigns. *Id*.

Additional evidence confirms that candidates can amass the resources needed. Ed Bender testified that Montana's electoral process is healthy, meaning there is significant participation in elections, campaigns are competitive, there is an absence of corruption or the appearance of corruption, and candidates can amass the necessary resources to mount an effective campaign. *Lair*, Tr. vol. 3, 45-46, 74-75. Bender compared current data with that presented in *Eddleman* and determined that no significant changes had occurred. *Id*. at 6. Numerous witnesses testified that effective campaigns are not solely about money, but about developing a network of supporters and volunteers, door-to-door campaigning, and "boots on the ground." *E.g.*, *id*., vol. 1, 49-50 (Jim Brown); vol. 2, 37-39 (Mike Miller); vol. 2, 137-139 (Jim Murry); vol. 2, 188 (Mary Baker); vol. 3, 20 (Ed Bender).

Data that tracks contributions to candidates also supports that limits do not prevent candidates from amassing necessary resources. For example, in the 2010 elections for the Montana House, 4,469 individuals gave below the maximum but above the $35 reporting threshold, and 1,402 individuals contributed the

maximum to candidates who ran in a single election. Bender Suppl., Chart 2-1. Plaintiffs' and Defendants' experts agreed that individuals who contribute once are more likely to contribute again. *Lair*, Tr. vol. 1, 147 (Clark Bensen); vol. 2, 263 (Ed Bender). Thus, the 4,469 individuals who gave below the maximum represent a significant potential source for additional contributions.

Additionally, candidates need not itemize or report contributions below $35. In the races just discussed, the amount of unitemized contributions was $75,366. Bender Suppl., Chart 2-1. Assuming an average $20 contribution, there were 3,768 below-threshold donors. Donors who contribute below the reporting threshold are another valuable source for repeat donations. *Lair*, Tr. vol. 2, 262-63. Thus, the 3,768 potential donors represented a significant source for additional contributions.

Political parties provide another source for candidates to amass resources. In the 2010 legislative races, political parties gave the maximum financial contribution to only 22 percent of the candidates. Bender Suppl., Chart 4-1. Most candidates could look to political parties for additional contributions. Moreover, political parties can provide additional resources; they can train candidates, help candidates develop their message, organize volunteers, develop issues, schedule events, and provide information about previous contributors to facilitate fundraising. *Lair*, Tr. vol. 1, 93 (John Milanovich); vol. 3, 40-42, 88-89

(Ed Bender).  Political parties can also provide assistance from paid staffers, whose wages are not subject to contribution limits.  COPP Welch Opinion.

Plaintiffs relied heavily on Mike Miller's testimony to claim that candidates could not raise the necessary resources.  In fact, when this Court asked "Plaintiff about any testimony where a candidate has indicated through testimony that the contribution limits prevented that individual from amassing the resources necessary for an effective campaign," Plaintiffs responded:  "To answer your specific question, Representative Miller."  *Lair*, Tr. vol. 3, 119-120.  Miller lamented that the contribution limits had stayed the same while the costs of pencils, postage stamps, yard signs, and gasoline had increased.  *Id*. vol. 2 at 24. Plaintiffs represented that Miller could not raise the amount of money necessary to send out as many mailings as he wanted and that he had a "significant number of maxed out donors" who would have given more if they could.  *Id*. vol. 3, at 121.

The Ninth Circuit gave little weight to Miller's testimony, characterizing it as "near anecdotal testimony . . . ."  *Lair v. Bullock*, 697 F.3d 1200, 1213 (9th Cir. 2012).  But in addition to being anecdotal, Miller's testimony is not credible.  A review of the contributions to Miller's campaigns establishes that, whatever problems Miller may have thought he had getting his message out, they weren't caused by contribution limits.  For example, in Miller's 2008 campaign, not one individual reached the contribution limit and only one PAC did.  Bender

Suppl., Chart 6-3.  Thirty individuals gave below the limit and were a potential

source for additional donations.  *Id*.  Further, Miller received $596 dollars in

unitemized donations, which translates into an additional 29 potential contributors

if a $20 average contribution is assumed.  *Id*.  Similarly, in Miller's 2010

campaign, only one individual maxed out, while 51 gave below the limit.  *Id*.

Miller received $500 in unitemized contributions, which represents another

25 potential donors, assuming a $20 average contribution.  *Id*.

In all four of Miller's successful campaigns combined, *only 7 individuals

maxed out*, while 140 gave below the limit and above the reporting threshold.  *Id*.

Additionally, Miller received $2,056 in unitemized contributions.  *Id*.  Assuming a

$20 average contribution, this number represents an additional 102 donors.

Notably, when Miller's contributors are tallied, they represent only about half of

one percent of the voting age population in Miller's district.  Bender Suppl.,

Chart 6-2.  But even that is an overstatement because nearly half the contributors

did not even live in Miller's district.  *Id*. at 3.  Regardless, the contributors who

gave below the limit and who gave unitemized contributions were sources that

Miller could look to for addition contributions if necessary.

Additionally, Miller never received the maximum contribution from a

political party, and he never asked for assistance from paid staffers.  Bender

Suppl., Chart 6-4; *Lair*, Tr. vol. 2, at 17, 30, 42.  Thus, the political party was

another source Miller could have looked to for contributions. Additionally, Miller received less than the maximum aggregate PAC contributions allowable under Mont. Code Ann. § 13-37-218 (a statute Plaintiffs have not challenged) in his 2010 and 2014 campaigns. *Id*. at 17. Thus, in these elections, PACs were another source for contributions.

In analyzing tailoring, courts must consider "all dollars likely to be forthcoming in a campaign" and whether a "candidate can look elsewhere for money[.]" *Eddleman*, 343 F.3d at 1094 (citing *Buckley*, 424 U.S. at 21-22). In light of all the untapped resources--the below-max donors, the unitemized donations, and the political parties--there can be no doubt that the contribution limits did not prevent Miller from engaging in effective advocacy. Miller had no shortage of financial sources available. But he didn't need them; Miller won every race, and he beat opponents who outraised and outspent him. *Lair*, Tr. vol. 2, at 31, 39-41. After reviewing Miller's testimony and data, Bender stated that the "contribution limits did not prevent Rep. Miller from raising additional funds from individual donors who had not already given the maximum, or from hundreds, if not thousands, of other voters in his district." Bender Suppl. at 3. Bender further opined that the limits "did not prevent Rep. Miller from raising sufficient funds to mount an effective campaign." *Id*. In short, the example of Miller's campaigns support upholding the contribution limits, not striking them down.

The evidence presented shows that contribution limits do not prevent candidates from amassing the resources necessary to engage in effective advocacy. Candidates may have to look to more sources for contributions, but this is the "overall effect" of contribution limits, and it does not amount to a constitutional infirmity. *Buckley*, 424 U.S. at 22.

## CONCLUSION

For the reasons provided above, this Court should grant summary judgment in favor of Defendants.

Respectfully submitted this 4th day of March, 2016.

TIMOTHY C. FOX
Montana Attorney General
DALE SCHOWENGERDT
Solicitor General
MATTHEW T. COCHENOUR
PATRICK M. RISKEN
Assistant Attorneys General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401

By:   */s/ Matthew T. Cochenour*
      MATTHEW T. COCHENOUR
      Assistant Attorney General
      Counsel for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the clerk of the court for the United States District Court for the District of Montana by using cm/ecf system. Participants in the case who are registered cm/ecf users will be served by the appellate cm/ecf system.

Dated:     March 4, 2016        */s/ Matthew T. Cochenour*
                                    MATTHEW T. COCHENOUR
                                    Assistant Attorney General
                                    Counsel for Defendants

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule Local Rule 7.1(d)(2), I certify that this brief is printed with a proportionately spaced Times New Roman text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 6,431 words, excluding certificate of service and certificate of compliance.

                                  */s/ Matthew T. Cochenour*
                                    MATTHEW T. COCHENOUR
                                    Assistant Attorney General
                                    Counsel for Defendants