Anita Y. Milanovich (Mt. No. 12176)
THE BOPP LAW FIRM, PC
1627 West Main Street, Suite 294
Bozeman, MT 59715
Phone: (406) 589-6856
Email: aymilanovich@bopplaw.com
*Local Counsel for Plaintiffs*

James Bopp, Jr. (Ind. No. 2838-84)*
Jeffrey Gallant (Va. No. 46876)**
Courtney E. Turner (Ind. No. 32178-29)***
THE BOPP LAW FIRM, PC
The National Building
1 South Sixth Street
Terre Haute, Ind. 47807
Phone: (812) 232-2434
Fax: (812) 235-3685
Email: jboppjr@aol.com
jgallant@bopplaw.com
cturner@bopplaw.com
*Counsel for Plaintiffs*

*Motion pro hac vice granted 9/9/11.
**Motion pro hac vice granted 6/11/12.
***Motion pro hac vice granted 2/1/16.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### HELENA DIVISION

| | |
|---|---|
| **Lair,** et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> **Jonathan Motl**, et al., <br><br> *Defendants*. | Case No. 6:12-cv-00012-CCL <br><br><br> **Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment** |

# Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   I.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   II.   Montana's Contribution Limits Are Not Closely Drawn to An Anti-Quid Pro Quo Corruption Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       A.   Quid Pro Quo Corruption Has An Established Meaning Under U.S. Supreme Court Precedent. . . . . . . . . . . . . . . . . . . . . . . . 2

       B.   Montana's Base Contribution Limits Are Not Tailored to Quid Pro Quo Corruption. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          1.   No Quid Pro Quo Evidence Supported Lowering the Limits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          2.   No Quid Pro Quo Evidence Justifies The Current Base Contribution Limits.. . . . . . . . . . . . . . . . . . . . . . . . . . 7

             a.   The Commission Provides No Testimony For This Court to Consider.. . . . . . . . . . . . . . . . . . . . . . . . 8

             b.   Designating Commissioner Motl As An Expert Witness Is Improper.. . . . . . . . . . . . . . . . . . . . . . 9

             c.   The Commissioner's Intended Testimony and Report Improperly Attempts To Supplant This Court's Role As Finder of Fact and Law. . . . . . 11

             d.   Commissioner Motl's Intended Opinion Testimony Is Contrary to Direct Evidence. . . . . . . . . . . . . 13

3.     The Base Contribution Limits Are Not Closely Drawn to Prevent Quid Pro Quo Corruption. . . . . . . . . . . . . . . . 18

C.     Montana's Aggregate Political Party Contribution Limits Are Not Tailored to Quid Pro Quo Corruption.  . . . . . . . . . . . . . . 20

1.     No Quid Pro Quo Evidence Supports the Aggregate Political Party Contribution Limits. . . . . . . . . . . . . . . 21

2.     The Aggregate Political Party Contribution Limits Are Not Tailored to a Cognizable State Interest. .  . . . . . . . 23

D.     Montana's Contribution Limits Interfere With Political Committee and Political Party Associations with Candidates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

E.     Montana's Limits Restrict the Ability of Candidates to Run an Effective Campaign. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Local Rule 7.1(d)(2)(E) Word Verification Certification . . . . . . . . . . . . . . . . . . . 36

-iii-

# Table of Authorities

**Cases**

*Buckley v. Valeo*,
        424 U.S. at 1(1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 18, 19

*Citizens United v. FEC*,
        558 U.S. 310 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19

*Colorado Republican Fed. Campaign Comm. v. FEC*,
        518 U.S. 604 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 16

*Daubert v. Merrell Dow Pharms., Inc.*,
        509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Evans v. U.S.*,
        504 U.S. 255 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 17

*FEC v. Nat'l Conservative Political Action Committee*,
        470 U.S. 480 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*,
        984 F. Supp. 2d 1021 (C.D. Cal. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Lair v. Bullock*,
        798 F.3d 736 (9th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 13

*McCormick v. U.S.*,
        500 U.S. 257 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*McCutcheon v. FEC*,
        134 S.Ct. 1434 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Mont. Right to Life Ass'n v. Eddleman*,
        343 F.3d 1085 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Stencel v. Fairchild Corp.*,
    174 F. Supp. 2d 1080 (C.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*U.S. v. Sun-Diamond Growers of California*,
    526 U.S. 398 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 17

***Constitution, Statutes, Regulations & Rules***

ARM 44.11.401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Fed. R. Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

# Introduction

On March 4, 2016, Defendants ("The Commission") filed its *Motion for Summary Judgment.* (Doc. 240.) The Commission "has [not] carried its burden in showing the contribution limits further[ ]" quid pro quo corruption. (SoF ¶ 47.) The Commission's summary judgment motion should be denied.

# Argument

## I. Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For contribution limit challenges, "the Government bears the burden of proving the constitutionality of its actions." *McCutcheon v. FEC,* 134 S.Ct. 1434, 1452 (2014). It must prove that (1) "there is adequate evidence that the limitation furthers a sufficiently important state interest" and (2) that the limits are "closely drawn." *Lair v. Bullock*, 798 F.3d 736, 748 (9th Cir. 2015). To satisfy the "closely drawn" prong, the government must prove that the limits "(a) focus narrowly on the state's interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign." *Id*.

Here, there is no genuine dispute as to any material fact, but the Commission

is not entitled to summary judgment as a matter of law.

## II. Montana's Contribution Limits Are Not Closely Drawn to An Anti-Quid Pro Quo Corruption Interest.

Montana, like all other states, has an interest in preventing corruption. (SoF ¶ 39.) However, for that interest to be a cognizable one, corruption must mean quid pro quo corruption. *Lair, 798 F.3d at 740; McCutcheon* 134 S. Ct. at 1450*; Citizens United,* 558 U.S. 310, 359 (2010)*.* And so here, the base contribution limits and the aggregate political party contribution limits must be closely drawn to serve a cognizable interest in preventing either quid pro quo corruption or the circumvention of otherwise constitutional laws targeting quid pro quo corruption. *Lair*, 798 F.3d at 742*; McCutcheon,* 134 S. Ct. at 1441, 1450. As shown below, they are not.

### A.   Quid Pro Quo Corruption Has An Established Meaning Under U.S. Supreme Court Precedent.

While the Commission argues that quid pro quo corruption has no defined boundaries, (Defs. Mem. SJ, Doc. 241, at 12), U.S. Supreme Court decisions demonstrate this is not the case.

The U.S. Supreme Court has defined quid pro quo corruption as **1)** an explicit arrangement **2)** for the direct exchange of something of value for **3)** a public official's improper promise or commitment that is **4)** contrary to the

obligations of his or her office **5)** in an effort to control a specific official, sovereign act.[1]

First, in *McCormick v. U.S.*, 500 U.S. 257 (1991), the U.S. Supreme Court states that a quid pro quo arrangement must be explicit. Addressing political contributions and their use for quid pro quo arrangements, the Court observed that "[t]he receipt of [ ] contributions is also vulnerable under the Act as having been taken under color of official right, but only if the payments are made in return for an explicit promise or undertaking . . . ." *Id.* at 273.

Second, an explicit arrangement must also be a direct one: the hallmark of quid pro quo corruption is "a direct exchange of an official act for money." *McCutcheon*, 134 S.Ct. at 1441 (citing *McCormick,* 500 U.S. at 266). This is because "there is not the same risk of *quid pro quo* corruption or its appearance when money flows through independent actors to a candidate, as when a donor contributes to a candidate directly." *Id.* at 1441.

Third, for a quid pro quo arrangement to occur, the candidate or public official must make an improper promise or commitment. *See Colorado Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 615 (1996) (quoting *Buckley v.*

---

[1]This analysis is more fully laid out in Plaintiffs' memorandum supporting their summary judgment motion. (*See* Doc. 237 at 9-16.)

*Valeo*, 424 U.S. at 1, 47 (1976) (holding that for expenditures to be corrupt they must "be given as a *quid pro quo* for improper commitments from the candidate.")). Not all promises or commitments are improper. Indeed, that a candidate or public official alters his positions on issues or affirms a position or action he either already has or intends to take because of a contribution or makes a promise or commitment is not, in and of itself, evidence of quid pro quo corruption. *FEC v. Nat'l Conservative Political Action Committee*, 470 U.S. 480, 498 (1985).

Fourth, a quid pro quo arrangement cannot occur where the obligations of public office are not thwarted. This is because:

> [c]orruption is a subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns.

*NPAC,* 470 U.S. at 497. Likewise, promises to vote in a way that is consistent with a candidate's or political party's platform, or in favor of or against an issue do not subvert the political process because they are not contrary to the obligations of office.

And last, for quid pro quo corruption to be implicated, the arrangement at issue must also be an effort to control a specific official act. *U.S. v. Sun-Diamond Growers of California*, 526 U.S. 398, 404-05 (1999) ("there must be a *quid pro*

*quo*—a specific intent to give or receive something of value in exchange for an official act.") (emphasis omitted). It is not enough that the act in question "pertain[s] to the office," it must pertain to *particular* official acts." *Id.* at 409. *See also Evans v. U.S.*, 504 U.S. 255, 268 (1992) (holding that quid pro quo corruption occurs when a "public official receives a payment in return for his agreement to perform specific official acts.").

Applying this proper framework, the Commission cannot meet its burden of showing that Montana has closely drawn either the base contribution limits or the aggregate political party contribution limits to quid pro quo corruption.

**B.    Montana's Base Contribution Limits Are Not Tailored to Quid Pro Quo Corruption.**

**1.    No Quid Pro Quo Evidence Supported Lowering the Limits.**

A brief study of the history of contribution limits in Montana shows that quid pro quo corruption concerns was not the purpose for lowering the base contribution limits. (SoF ¶¶ 48-54.)

As discussed more fully in Plaintiffs' Summary Judgment Memorandum, (Doc. 237 at 24-29), Montana's contribution limits were lowered in 1994 "to solve the problem" of "way too much money in Montana politics." (SoF ¶ 48.) They were designed to equalize influence and level the playing field by making contributions "fair," (SoF ¶¶ 49, 50, 53), and to lower the amount of money in

Montana politics, (SoF ¶¶ 48, 52, 53). The *Eddleman* district court identified these interests as "improper influence." (SoF ¶ 55.) These are not cognizable interests. *McCutcheon*, 134 S.Ct. at 1441; *id.* at 1550.

Preventing quid pro quo corruption—the only applicable cognizable interest—was not even a tacit, secondary purpose of the lowered limits. The *Eddleman* district court adopted the parties' stipulation that they were unaware of any quid pro quo convictions in the 20 years preceding 1994. (SoF ¶ 56.)

Senator Anderson seeking to influence other senators on an annuity bill–over a decade before the lower limits were adopted–was offered in *Eddleman* as proof of "undue influence." (SoF ¶ 57.) 343 F.3d 1085, 1093 (9th Cir. 2003). In that situation, the Senator alleged that he could "keep the contributions [from the Life Underwriters Association] coming our way" if other republicans were to vote for a bill. (SoF ¶ 42.) This is not evidence of quid pro quo corruption for at least two reasons.

First, quid pro quo corruption requires evidence of an explicit arrangement. There is no evidence that any legislator agreed to take the offer. Without even the apparent acceptance of an offer, quid pro quo corruption cannot even appear to have occurred.

Second, quid pro quo corruption also requires evidence of improper

promises and commitments contrary to the obligations of office. No evidence shows that, even if an explicit agreement was made, the agreement was to vote contrary to the legislators' publicly known positions, promises, or commitments on the issues contained in the bill.

No evidence of quid pro quo corruption or its appearance existed in *Eddleman*. Indeed, the *Eddleman* record shows that the base contribution limits were not lowered to prevent quid pro quo corruption or its appearance but were motivated by interests expressly rejected by the U.S. Supreme Court. (SoF ¶¶ 48-54.) *McCutcheon,* 134 S. Ct. at 1441. The Commission cannot meet its burden of showing that the base contribution limits were tailored to a cognizable interest. The base contribution limits are unconstitutional.

### 2. No Quid Pro Quo Evidence Justifies The Current Base Contribution Limits.

Notwithstanding stipulations and admissions by the *Eddleman* defendants that they were unaware of any quid pro quo corruption and that the purpose of lowering the limits was to solve the problem of "way too much money in Montana politics"—Defendants in this case—attempt to minimize those stipulations and admissions with subsequent evidence of quid pro quo corruption, occurring after the base contribution limits passage. (SoF ¶¶ 48, 56.) But any such evidence of quid pro quo corruption would need to be of corrupting contribution amounts

ranging between the prior limits and the current limits. The Commission cannot meet this burden.

The Commission first offers as evidence the conduct of nine candidates Commissioner Motl has "opined" engaged in quid pro quo corruption by pledging 100% support to particular groups' legislative agendas. (Defs. Mem. SJ, Doc. 241, at 19.) In order to do this, the Government relies on the "expert report" of Commissioner Motl as an "expert witness." (*See Motl Report,* Doc. 243-8.) This evidence fails for numerous significant reasons.

### a.     The Commission Provides No Testimony For This Court to Consider.

Commissioner Motl's "testimony," offered as Exhibit H to the Commission's Summary Judgment memorandum, is not testimony at all, but rather unsworn statements of what Commissioner Motl apparently intends to testify about. The Commission characterizes the intended testimony as a "report," but that does nothing to make it admissible testimony for this Court's consideration.

Particularly distressing is that all counsel in this matter agreed with this Court at the November 10, 2015, status conference in this matter that trial would be highly unlikely in this matter and that it could be resolved with summary judgment. (*See* Doc. 219 ("parties hope matter can be resolve on summary judgment.")) The Commission knew at the time that it would be offering Mr. Motl's testimony, as

Mr. Cochenour expressed as much to Plaintiffs' counsel Ms. Milanovich while conferring on deadlines to offer to this Court. Failing to now provide the requisite testimony effectively forces a trial (and expense) that is completely avoidable. Mr. Motl's report, along with "intended testimony," should be disregarded altogether and the matter resolved as expected through summary judgment.

### b. Designating Commissioner Motl As An Expert Witness Is Improper.

Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"In applying Rule 702, the Court functions as a gatekeeper, determining whether proffered expert testimony meets the requirements of Rule 702 by a preponderance of the evidence." *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig*., 984 F. Supp. 2d 1021, 1025-26 (C.D. Cal. 2013) (citing *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592 & n. 10 (1993)). "The Rule 702 inquiry requires the Court to determine that the witness is qualified by special knowledge as an

-9-

expert in the relevant area of expertise," to "scrutinize the proffered expert testimony in order to assure that the expert had sufficient data, used reliable scientific methods, and applied those methods to the data in a reliable way," and that "the proffered expert testimony is helpful to the trier of fact." *In Re Countrywide,* 984 F. Supp. 2d at 1026. "The party proffering the expert testimony bears the burden of establishing by a preponderance of the evidence that the testimony meets the requirements of Rule 702." *Id.*

Expert witnesses do not advocate but instead "are employed to assist the parties in their pretrial preparation, and if called to testify, to give their unbiased opinion in order to assist the trier of fact in understanding the relevant evidence." *Stencel v. Fairchild Corp.*, 174 F. Supp. 2d 1080, 1085-86 (C.D. Cal. 2001). An expert witness is "a witness with additional knowledge beyond the ken of the layman, who helps the trier of fact understand scientific, technical or other specialized topics." *Id.* at 1086. To advocate, in contrast, "does not mean to offer facts; it means to characterize and sculpt the facts. This may involve emphasizing certain facts, drawing attention away from others and keeping confidential additional facts." *Id.* at 1086.

Commissioner Motl does not meet the criteria for an expert. First, he is biased on the issues to be decided by this Court. As the *Eddleman* record shows,

-10-

Mr. Motl was one of the proponents for the initiative that lowered the contribution limits. (SoF ¶ 48.) He has an interest in preserving these limits. This interest is exemplified in the nine lawsuits he says demonstrate quid pro quo corruption. In each case, quid pro quo allegations were never part of any complaints, Commissioner findings, or civil complaints, and only became part of those matters after the Ninth Circuit remanded this matter for quid pro quo corruption analysis in May 2015. (*See Boniek Default Judgment,* Doc. 237-21, at 1, 24 (hearing the matter on June 2, 2015, and entering judgment on August 13, 2015); *Prouse Default Judgment*, Doc. 237-22, at 1, 15 (hearing the matter on October 29, 2015 and entering judgment on January 5, 2016); SoF ¶¶ 43, 96.) These nine lawsuits seem more a vehicle of convenience than any actual credible claim that quid pro quo arrangements are occurring in Montana.

Additionally, Commissioner Motl is a party of interest in this matter that has chosen to defend Montana's contribution limits. To expect he can dispassionately offer unbiased expertise when he is advocating for the limits' constitutionality strains credulity. Commissioner Motl cannot be properly designated an expert witness in this case.

-11-

### c.    The Commissioner's Intended Testimony and Report Improperly Attempts To Supplant This Court's Role As Finder of Fact and Law.

In attaching Commissioner Motl's "Expert Report" of purported testimony, the Commission furnishes no direct evidence to establish the underlying facts to support his opinion. The documents that the Commissioner "used" and "read" to prepare testimony he does not in fact offer claim, in part, to have authentication testimony supporting them, but no such testimony is offered to the Court. (*Motl Report*, Doc. 243-8 at 7-8.) Other documents, derived from "individuals or corporations," assert no authentication at all other than that he has determined them to be trustworthy. (*Id.* at 8-9.) Lacking such support, Plaintiffs object to the Commissioner's testimony based on such documents.

Plaintiffs also object to Commissioner Motl's intended testimony because there is no evidence that Commissioner Motl is applying the proper legal definition of "quid pro quo corruption" to arrive at his opinion that such corruption exists in these nine instances. Indeed, not only does it appear that the Commissioner seeks to simply inform rather than present to this Court the facts relevant to his opinion, he seeks to opine on the legal significance of those facts without any demonstrated regard for the legal parameters within which his opinion must operate.

This renders his "expert" opinion wholly unnecessary and improper. Properly introduced, the documents Commissioner Motl contends establish evidence of "quid pro quo corruption" (however he defines it) can be offered into evidence for this Court to decide whether they demonstrate the existence of a quid pro quo arrangement (properly defined) between the nine candidates and third party groups. Specialized knowledge is not required to understand whether a quid pro quo arrangement occurred or whether the documents demonstrate that it occurred. This Court has no need for an expert witness to inform it of what the facts are and what constitutes quid pro quo corruption under the law.

Commissioner Motl's intended testimony, if presented as offered to this Court, would subjugate this Court's obligation to find the applicable facts in this case and apply them to the relevant law. *Lair*, 798 F.3d at 745, 748 n. 8. The Commission has the ability, through counsel in this lawsuit, to present the facts and law as they understand them. Commissioner Motl's testimony, as presented, is neither needed nor proper.

### d.   Commissioner Motl's Intended Opinion Testimony Is Contrary to Direct Evidence.

Notwithstanding the fact that it is the Commission's burden, not Plaintiffs, to establish quid pro quo corruption exists to justify Montana's base contribution limits, to facilitate resolution of this matter through summary judgment, Plaintiffs

-13-

respond to Commissioner Motl's intended opinion testimony by submitting in the form of direct evidence declarations from each of the nine candidates at issue expressly asserting that no quid pro quo corruption (properly defined) occurred between them and third party groups during their 2010 primary campaigns. (SoF ¶¶ 77-86.) Plaintiffs also provide the declaration of Mr. Christian LeFer, a former employee of Montana Right to Work who has direct, personal knowledge of what all transpired in 2010, and who asserts that he at no time made an offer to any of these nine candidates that could trigger even the appearance of quid pro quo corruption. (SoF ¶¶ 98, 103.)[2] Mr. LeFer—whom the Office of the Commissioner of Political Practices has never, to his knowledge, even attempted to contact, (SoF ¶ 104)—also identifies the likely meaning of "on board" and "the works," (SoF ¶¶ 101-102)—phrases the Commissioner has chosen to ascribe his own meaning based on documents such as a spreadsheet attached to an email Mr. LeFer sent to his wife. (SoF ¶ 97.) (*See also* SoF ¶ 105 (quoting Commissioner Motl as testifying that "I know, from looking at these documents that 'the works' means that this

---

[2] Notwithstanding that federal statute authorizes that un-notarized declarations can be filed in federal court, out of respect for the note to a recent amendment to this Court's local rules expressing concerned about the legitimacy of such declarations, Plaintiffs informs this Court that their counsel Ms. Milanovich either met or spoke on the phone with each declarant personally and separately, often with their attorney present, to secure these declarations.

candidate is agreeing to let the conglomeration of corporations that are supporting the one candidate or attacking another apply 'the works' to that Senate District 23 race. And 'the works' means that they are applying maximum support they can to Wesley Prouse and applying the maximum attack they can to the opposing candidate.")[3]

Analyzing this direct evidence under the U.S. Supreme Court's definition of quid pro quo corruption, these nine candidates' conduct does not represent evidence of quid pro quo corruption or its appearance.

Quid pro quo corruption requires evidence of an explicit arrangement. All nine candidates state that such an arrangement did not exist nor would they be willing to enter into such an agreement with anyone. (SoF ¶¶ 76, 79). The evidence Mr. Motl has relied on and offers to the courts is third party mailers alleging that candidates gave pledges to support certain issues. (SoF ¶¶ 106-108.) This is circumstantial evidence that as far as Plaintiffs can tell, has never been confirmed as true. Given that these candidates did not know about the mailers, (SoF ¶¶ 91),

---

[3]Rather than direct evidence from Mr. LeFer, Commissioner Motl instead relies on, for example, deposition testimony of Dennis Fasaro, a former National Right to Work employee, for his testimony. (*Motl Report,* Doc. 243-8, at 2.) Mr. Fasaro has no direct, personal knowledge of what actually occurred in Montana's 2010 Republican primaries and was not even in Montana in 2010. (SoF ¶¶ 106-110.)

and some even were shocked or surprised at the content, (SoF ¶¶ 92-93), to simply assume the mailers are true ought to be insufficient evidence for this Court to establish an explicit arrangement.

Quid pro quo corruption requires evidence of an exchange. *McCutcheon*, 134 S.Ct. at 1441. All of these candidates paid for the services provided by Direct Mail, with several of them disappointed by the product and unwilling to use them again. (SoF ¶¶ 94-95.) And none of them authorized or approved third party spending in their districts. (SoF ¶¶ 77.) The only exchange that was made was payment for contracted campaign literature.

Quid pro quo corruption requires evidence of an improper promise or commitment. *See Colorado Republican Fed. Campaign Comm.*, 518 U.S. at 615 (citations omitted). Commissioner Motl testified in the *Boniek* hearing that candidate Boniek engaged in quid pro quo corruption by "accepting [Direct Mail's] creation of a grassroots presence through their direct mail. And in return . . .  he gave them 100 percent support of the Western Tradition Partnership agenda . . . . (SoF ¶ 111.)

He testified to the same corruption theory as to "attack" letters sent by Western Tradition Partnership and "attack" flyers. (*Id.*) At the *Prouse* hearing, Commissioner Motl testified that quid pro quo corruption existed because the

-16-

corporate entity supporting Candidate Prouse expected 100% loyalty in exchange for that support. (SoF ¶ 112.)

But many of these candidates—including Mr. Boniek and Mr. Prouse—already held strong positions on right-to-work, abortion, guns, government, and the like. (SoF ¶¶ 87-90.) If they had made a promise or commitment on any of those issues, it was not improper, as it was consistent with their positions.

Indeed, the only evidence that the Commissioner presented during the *Prouse* hearing (which often relied on *Boniek* facts to infer liability to Mr. Prouse) that might implicate quid pro quo corruption was statements on third party mailers indicating either 100% support or opposition on an issue such as unionism, gun rights, and abortion. (SoF ¶ 113.) At best, this suggests a promise on an issue. But, assuming they occurred, these promises or commitments are not improper and so do not establish quid pro quo corruption.

Quid pro quo corruption requires evidence the exchange to be for a specific, official, government act. *Sun-Diamond Growers of California*, 526 U.S. at 404-05; s*ee also Evans*, 504 U.S. at 268. To Plaintiffs' knowledge, Commissioner Motl's only evidence of that among all nine candidates is Mr. Wittich's right to work bill which he abandoned before it even got past drafting because it did not reflect his

stance on the issue. (SoF ¶ 88.). Mr. Kennedy made a point of avoiding lobbyists and focusing on doing his constituents' work. (SoF ¶ 82.) And Mr. Sales' desired office of County Commissioner had nothing to do with right-to-work, gun, abortion, or limited government issues—he had nothing to trade. (SoF ¶ 62.) Evidence of a specific, official government act being traded for campaign spending simply doesn't exist.

The nine examples to which the Commissioner intends to opine do not involve quid pro quo corruption and no quid pro quo evidence exists to justify the lowered base contribution limits.

### 3.     The Base Contribution Limits Are Not Closely Drawn to Prevent Quid Pro Quo Corruption.

Even if evidence of quid pro quo corruption existed to justify the base contribution limits, they must still be tailored to that evidence. They are not.

Preliminarily, the *Eddleman* record makes clear that the limits were lowered by simply (and arbitrarily) eliminating the top 10 percent of contributions. This is improper tailoring. In order to pass constitutional muster, the limits must not simply target "the largest contributions," (*Mont. Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1092 (9th Cir. 2003)), but instead must be *large contributions targeting quid pro quo corruption. Buckley*, 424 U.S. at 25-27. The lowered base contribution limits were not determined by what large contributions would result in

quid pro quo corruption or its appearance, as *Buckley, McCutcheon,* and *Citizens United* all require. *McCutcheon,* 134 S.Ct. at 1450 (*quoting Buckley,* 424 U.S. at 26; *Citizens United,* 558 U.S. at 901 (*citing Buckley,* 424 U.S. at 25). Instead, as the *Eddleman* trial court found, the lower limits sought to prohibit amounts beyond the financial reach of the average contributor and thereby assumed to be subjectively "large" to the voter. (SoF ¶ 54.) But it is not simply "large contributions" that can be regulated—they must be large contributions that could result or appear to result in quid pro quo corruption. *McCutcheon*, 134 S. Ct. at 1450.

Additionally, even if Commissioner Motl's intended opinion testimony regarding the 2010 candidates engaging in quid pro quo corruption were true, those facts would not justify the lowered base contribution limits. The relevant evidence is not simply that of quid pro quo corruption, but of quid pro quo corruption within the range between the prior limits and the current limits. To date, alleged quid pro quo corruption findings are for amounts between \$9,000 and 20,000. (SoF ¶ 114.) These amounts vastly exceed even the prior limits, and so cannot justify lowering those limits.

The *Eddleman* record also undermines claims of quid pro quo tailoring. The Commission's predecessors admitted that "the disclosure of contributions required

-19-

by Mont. Code Ann. §§13-37-225, 226(1) and (3), 229, lessen the risk that individuals or political committees will spend money to support a candidate as a *quid pro quo* for special treatment after the candidate is in office." (SoF ¶ 115.) So the lowered base contribution limits are not necessary to combat quid pro quo corruption, especially when disclosure requirements are a reasonable, more narrowly tailored approach that achieve the desired objective. *McCutcheon*, 134 S.Ct. at 1459-1460. The Commission has not demonstrated that alternatives such as disclosure are inadequate, nor that the base contribution limits at their current, lowered levels are the most reasonable fit. For this reason, the base contribution limits fail the "closely drawn" test—and therefore constitutional scrutiny—as a matter of law.

**C.      Montana's Aggregate Political Party Contribution Limits Are Not Tailored to Quid Pro Quo Corruption.**

In addition to an interest in preventing quid pro quo corruption, Montana, like all other states has an anti-circumvention interest, so long as the law being circumvented is an otherwise constitutional law. *See generally McCutcheon,* 134 S.Ct. at 1452-60.

1.    **No Quid Pro Quo Evidence Supports the Aggregate Political Party Contribution Limits.**

The aggregate contribution limits do not prevent quid pro quo corruption. As in *McCutcheon,* once the aggregate limits are reached, "they ban all contributions of *any* amount." *Id.* at 1452. It is difficult to understand how, for example, a state house representative could be bribable if she receives $851 from one political party (a dollar more than the present inflation-adjusted rate for that seat) and also be bribable if given a penny by a second political party. *See id.* at 1452. As was concluded in *McCutcheon,* the aggregate limits serve no corruption interest. *Id.* at 1452.

The aggregate political party contribution limits are also not designed to prevent circumvention of the base contribution limits. An anti-circumvention interest requires that the law being circumvented be an otherwise constitutional law. *See generally McCutcheon,* 134 S.Ct. at 1452-60. As shown above, Part II.B, the base contribution limits are unconstitutional. So Montana has no circumvention interest to justify the aggregate political party limits. They are unconstitutional.

But assuming the base contribution limits are constitutional, large earmarked contributions to a candidate through a political party could be a legitimate anti-circumvention concern, assuming a political party would even accept them.

-21-

*McCutcheon,* 134 S.Ct. at 1452-1453. The evidence, however, shows this is not legitimate problem in Montana.

The evidence presented at trial to this Court shows that an average of 1 in 4 legislative candidates and 1 in 10 statewide candidates max out on political party contributions, with their receipts comprising under 5% of all contributions they receive. (SoF ¶ 126.) With so little of campaign dollars deriving from political parties, a circumvention problem cannot credibly be asserted.

Instead, as expert witness Edwin Bender's exhibits show, the political party's voice has been reduced to a whisper. Political parties never contributed greater than 4% of a candidate's campaign in any legislative or statewide races between the years 2004-2014. (SoF ¶ 130.) In the 2008 gubernatorial races, political parties contributions were 2% of all contributions.[4] (SoF ¶ 131.) Yet in 2010, 22% of legislative candidates maxed out on political party contributions. (SoF ¶ 132.) And in 2008, 18% of statewide candidates maxed out on political party contributions. (SoF ¶ 133.)

Additionally, ARM 44.11.401 excludes from political party aggregate limits a party's payment for campaign staff of candidates. (SoF ¶ 135.) This directly

---

[4] In 2012, they rose to 11% because of a $500,000 political party contribution made when this court lifted the limits. (SoF ¶ 134.)

contradicts Montana's purported fear of quid pro quo corruption. While political parties are prevented from giving money above the current limits, they are able to give thousands, even millions so long as that money is used to pay for staffing. Political parties can give unlimited amounts to campaigns. This exception shows that quid pro quo corruption nor circumvention are an issue with political parties in Montana.

### 2. The Aggregate Political Party Contribution Limits Are Not Tailored to a Cognizable State Interest.

Assuming any cognizable interest justifies them, "the aggregate limits constitute an outright ban on further contributions . . . . At that point, the limits deny the [political party] all ability to exercise [its] expressive and associational rights by contributing to someone who will advocate for [the party's] policy preferences." *McCutcheon,* 134 S. Ct. at 1448. More reasonable alternatives exist.

If earmarked contributions funneled through political parties are the state's concern, then the state might consider banning earmarking contributions. *See id.* at 1459. Or Montana might impose base political party contribution limits for each candidate to avoid large contributions that signal behind-the-scenes efforts to bribe a candidate. And, as *McCutcheon* points out, disclosures of contributions, already required by MCA § 13-37-225, are always a less restrictive alternative to bans. *Id.*

at 1460. With so many less restrictive, more reasonable alternatives, the aggregate political party contribution limits fail the "closely drawn" test.

The Commission contends that quid pro quo corruption occurred in 2009 when an offer was made to Republican senators that if Republican legislators introduced and got a vote or record in both houses on a right-to-work bill, National Right to Work would make a $100,000 contribution to the Republican Legislative Campaign Committee for their use to elect Republican majorities in the 2012 election cycle. (Defs. Mem. SJ, Doc. 241, at 18; SOF ¶¶ 46, 139.) This is not evidence of quid pro quo corruption for at least three reasons.

First, quid pro quo corruption requires evidence of an explicit arrangement. Here, the legislators *rejected* the offer. (SoF ¶ 140.) With complete rejection of the offer, there is no explicit arrangement, so quid pro quo corruption cannot even appear to have occurred.

Second, quid pro quo corruption also requires evidence of the direct exchange of something of value. The quid pro quo arrangement must be made directly between the individual or group and the candidate or public official. But here, this offer was for an unearmarked contribution to the Republican Legislative Campaign Committee. There was no direct exchange with a pledging legislator.

Third, quid pro quo corruption requires evidence of improper promises and commitments contrary to the obligations of office. No evidence shows that, even if an explicit arrangement was made for a direct exchange of something of value, the arrangement sought actions—in this case, introducing and voting on a right-to-work bill—that is contrary to what those legislators would have done anyway based on their positions, promises, or commitments on the right-to-work issue. Instead, these legislators, even if they accepted the offer, could have been agreeing to official, government action that they would have done anyway.

No evidence of quid pro quo corruption or its appearance exists as a result of the 2009 offer. But even if this was determined to be an example of quid pro quo corruption, it *still* does not justify lowering the limits. Any example of quid pro corruption sufficient to justify lowering the limits must be between the current limits and the prior limits. The $100,000 offer vastly exceeds even the prior limits. It cannot form the basis for lowering those limits.

Moreover, there are no limits on contributions to political parties, which is what the $100,000 offer was. So even if this offer amounts to quid pro quo corruption, the base contribution limits and political party aggregate contribution limits would not prevent it. This evidence is irrelevant to the constitutionality of the limits challenged here.

**D.     Montana's Contribution Limits Interfere With Political Committee and Political Party Associations with Candidates.**

This Court previously held that Montana's contribution limits interfere with political committees' and political parties' ability to associate with candidates–having reduced the voice of political committees to a whisper. (SoF ¶ 117.) The Commission's supplemental expert testimony of Mr. Bender supports this Court's conclusion, showing that political committee contributions remain at around 10% for legislative races, between 0% and 4% for statewide races, and between 0% and 3% for gubernatorial candidates. (SoF ¶ 128.) Rep. Miller's testimony reinforces this as well, showing PAC money returned or declined in all of his four elections. (SoF ¶¶ 66-69.)

The same remains true for the aggregate political party contribution limits. This Court found, for example, that Plaintiff the Beaverhead Republican County Central Committee attempted to associate with five different candidates by "mak[ing] contributions to several candidates for State House and State Senate during the 2010 election. Because of the aggregate party contribution limits, five of those candidates were force to return the Beaverhead County Republicans' contributions." (SoF ¶ 118.) Rep. Miller supplements these findings with testimony that Republican central committees that contribute to candidates in districts that

cover several counties will lessen their contribution to ensure that other county political parties will be able to associate with those candidates. (SoF ¶ 71.)

That political committees and political parties can associate with candidates in other ways, as the Commission again argues, (Defs. Mem. SJ, Doc. 241, at 24), does not alleviate this harm. The government does not get to decide how its citizens (whether individually or collectively) associate with political candidates. *McCutcheon,* 134 S.Ct. at 1448. Political committees and political parties in Montana have demonstrably been denied their desired association with candidates because of Montana's contribution limits. Nothing has changed to negate this Court's findings on this issue. These limits should be struck down.

## E.   Montana's Limits Restrict the Ability of Candidates to Run an Effective Campaign.

As with the association issue, this Court has already made findings of fact and conclusions of law regarding the ability of Montana candidates to amass resources to mount an effective campaign.

For example, it previously found that a significant part of Rep. Miller's campaign "involves mailing information to potential voters" and that "[h]e believes that roughly $12,000 would be necessary to effectively reach potential voters through mailings." (SoF ¶ 119.) This Court also found that "but for Montana's

contribution limits, [Rep. Miller] believes he could raise the necessary funds to run an effective campaign." (SoF ¶ 120.)

This Court also observed that the Commission's expert, Edwin Bender, offered analysis that, "unlike [Plaintiffs' expert] Bensen's, is based on all campaigns, not just "competitive" campaigns, And, unlike Bensen, he analyzed campaigns for all statewide races, legislative races, and the gubernatorial race." (SoF ¶ 121.)

Yet, this Court relied on both experts' testimony to conclude that "[g]enerally speaking, candidates in Montana spend more money on their campaigns than they raise." (SoF ¶ 122.) It found that Mr. Bensen's analysis demonstrated that competitive races are not adequate funded, (SoF ¶ 123), and that both experts' analyses showed that almost half if not more than half of all contributions were maxed-out contributions. (*Id*.) Between 9% and 11% of legislative candidates received funds from political committees, and between 0% and 3% of state candidates received such funds. (SoF ¶ 124.) And an average of only 22-32% of all Montana candidates accepted maxed-out aggregate political party contributions, 40% among competitive campaigns. (SOF ¶ 125.)

The Court found that "[t]he number of contributors making contributions at the maximum level is significant. And significantly greater funds would be available to candidates if the contribution limits are raised. The defendants do not

dispute this proposition." (SoF ¶ 122.) And so the Court concluded that "[t]he record shows that those additional funds are needed because most campaigns are insufficiently funded." (*Id*.)

The Commission had an opportunity to refute Rep. Miller's testimony through Mr. Bender's testimony in 2012. (SoF ¶ 127.) It now seeks another chance to discredit Rep. Miller's testimony through supplemental expert testimony from Mr. Bender It fails.

As a preliminary matter, as shown above, this Court's conclusions were most directly premised on Mr. Bensen's and Mr. Bender's expert opinion testimony. Mr. Bender's supplemental testimony does not refute those findings and indeed, his supplemental testimony updates previously submitted charts with data that reinforces this Court's findings. There is a continued trend of maxed-out contributions comprising a substantial part of candidate contributions, (SoF ¶ 129), a continued trend of political committee donations comprising about 10% of contributions received, (*Id.*), and a sharp decline in maxed-out aggregate political party contributions to between 4% and 9% since 2012. (*Id*.)

Mr. Bender's opinion that Rep. Miller had sufficient funds to mount an effective campaign is based on the claim that Rep. Miller received few maxed-out base contributions: "none in 2008, 1 in 2010, 1 in 2014," which he opines is "an

-29-

indication that he could perhaps have raised more money simply by asking known donors for more support." (SoF ¶ 137.) These underlying facts are not accurate. According to Rep. Miller's testimony, he received 30 maxed out contributions—eight in 2008, eight in 2010, five in 2012, and nine in 2014. (SoF ¶¶ 66-69.) Assuming Mr. Bender's average of 37 donors per election is accurate, (SoF ¶ 138), this amounts to an average of 7.5 donors or just over 20% of donors each election maxing out for Rep. Miller.

Moreover, many of Rep. Miller's donors gave under the $35 reporting requirement. Mr. Bender states that these donors were at Rep. Miller's disposal as additional sources of contributions, opining that this "is another indication that [Rep. Miller] had sufficient funds to get his message out to voters." (SoF ¶ 136.) Mr. Bender fails to understand these donors. As Rep. Miller testifies, "most small donors want to remain anonymous so going back and asking for more money" is not possible. (SoF ¶ 72.) So while Rep. Miller was able to raise $2,612 in unitemized contributions from 112 donors over the course of his campaigns, (*id.* ¶ 70), those donors were not sources of additional funds.

Rep. Miller has testified, both in 2012 and again by declaration, that to run an effective campaign best suited to his district, he would need to raise over $12,000. (SoF ¶ 76.) Mr. Bender's opinion does nothing to change this fact.

This Court properly concluded that Montana's campaigns are insufficiently funded, depriving candidates of the ability to amass the necessary resources to mount an effective campaign. The Commission offers nothing to justify changing that conclusion. Montana's limits should be struck down.

## Conclusion

For the foregoing reasons, this Court should deny the Commission's motion for summary judgment.

Dated: April 4, 2016

Respectfully Submitted,

/s/ Anita Y. Milanovich

James Bopp, Jr. (Ind. No. 2838-84)*          Anita Y. Milanovich (Mt. No. 12176)
Jeffrey Gallant (Va. No. 46876)**            THE BOPP LAW FIRM, PC
Courtney E. Turner (Ind. No. 32178-29)***    1627 West Main Street, Suite 294
THE BOPP LAW FIRM, PC                          Bozeman, MT 59715
The National Building                        Phone: (406) 589-6856
1 South Sixth Street                         Email: aymilanovich@bopplaw.com
Terre Haute, Ind. 47807                      *Local Counsel for Plaintiffs*
Phone: (812) 232-2434
Fax: (812) 235-3685
Email: jboppjr@aol.com
jgallant@bopplaw.com
cturner@bopplaw.com
*Counsel for Plaintiffs*

*Motion pro hac vice granted 9/9/11.
**Motion pro hac vice granted 6/11/12.
***Motion pro hac vice granted 2/1/16.

**Certificate of Compliance**

This memorandum of law complies with Local Rule 7.1(d)(2)(A). It contains 6500 words, as verified by the word count feature of WordPerfect X7, the word processor that created it.

/s/ Anita Y. Milanovich
Anita Y. Milanovich

**Certificate of Service**

I hereby certify that the foregoing document was served on April 4, 2016,

upon the following counsel via the United States District Court for the District of

Montana, Helena Division, electronic filing system:

TIMOTHY C. FOX
Montana Attorney General
DALE SCHOWENGERDT
State Solicitor
MATTHEW T. COCHENOUR
PATRICK RISKEN
Assistants Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: 406-444-2026
Fax: 406-444-3549
dales@mt.gov
mcochenour2@mt.gov
prisken@mt.gov
*Attorneys for Defendants*

                                        /s/ Anita Y. Milanovich
                                        Anita Y. Milanovich

-33-