Anita Y. Milanovich (Mt. No. 12176)
THE BOPP LAW FIRM, PC
1627 West Main Street, Suite 294
Bozeman, MT 59715
Phone: (406) 589-6856
Email: aymilanovich@bopplaw.com
*Local Counsel for Plaintiffs*

James Bopp, Jr. (Ind. No. 2838-84)*
Jeffrey Gallant (Va. No. 46876)**
Courtney E. Turner (Ind. No. 32178-29)***
THE BOPP LAW FIRM, PC
The National Building
1 South Sixth Street
Terre Haute, Ind. 47807
Phone: (812) 232-2434
Fax: (812) 235-3685
Email: jboppjr@aol.com
jgallant@bopplaw.com
cturner@bopplaw.com
*Counsel for Plaintiffs*

*Motion pro hac vice granted 9/9/11.
**Motion pro hac vice granted 6/11/12.
***Motion pro hac vice granted 2/1/16.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### HELENA DIVISION

| | |
|---|---|
| **Lair,** et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> **Jonathan Motl**, et al., <br><br> *Defendants*. | Case No. 6:12-cv-00012-CCL <br><br><br> **Plaintiffs' Proposed Findings of Fact and Conclusions of Law** |

# Plaintiffs' Proposed Findings of Fact and Conclusions of Law

Pursuant to this Courts Order (Doc. 272), Plaintiffs propose the following findings of fact and conclusions of law to this Court[1]:

# Jurisdiction and Venue

1.      This case arises under 42 U.S.C. §1983 and the First and Fourteenth Amendments to the Constitution of the United States. (Findings, Conclusions, and Order, Doc. 168, at 2; Verified Compl., Doc. 1, ¶ 8.)

2.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a). (Findings, Conclusions, and Order, Doc. 168, at 2; Verified Compl., Doc. 1, ¶ 8.)

3.      This Court also has jurisdiction pursuant to the Declaratory Judgment Act, codified at 28 U.S.C. §§ 2201 and 2202. (Verified Compl., Doc. 1, ¶ 8.)

4.      Venue is proper under 28 U.S.C. § 1391(b). (Findings, Conclusions, and Order, Doc. 168, at 2.) Events giving rise to Plaintiffs' claims occurred, and Defendants reside, in this District. (Verified Compl., Doc. 1, ¶ 9.)

# Parties

5.      Plaintiff Doug Lair is a Big Timber area rancher and investor.

---

[1]Plaintiffs have made every effort to reconcile Defendants' disputes with the facts offered here.

(Findings, Conclusions, and Order, Doc. 168, at 10; Verified Compl., Doc. 1, ¶ 39.)

6.      Plaintiff Steve Dogiakos is a political activist and small businessman who owns a company offering web design services. (Findings, Conclusions, and Order, Doc. 168, at 10; Verified Compl., Doc. 1, ¶ 40.)

7.      Both Mr. Lair and Mr. Dogiakos have previously made contributions to candidates running for office in Montana. (Findings, Conclusions, and Order, Doc. 168, at 10; Verified Compl., Doc. 1, ¶ 41.)

8.      Mr. Lair and Mr. Dogiakos intended to make contributions in excess of the limits to candidates running for office in 2012. (Findings, Conclusions, and Order, Doc. 168, at 10; Verified Compl., Doc. 1, ¶¶ 42-45.) They intend to do so again in the future. (Verified Compl., Doc. 1, ¶ 101.) They would do so but for Montana's statutory prohibitions and penalties. (Findings, Conclusions, and Order, Doc. 168, at 3; Verified Compl., Doc. 1, ¶ 45.)

9.      Plaintiff Lake County Republican Central Committee (hereinafter "Lake County Republicans") is the local Republican Party for Lake County, Montana and qualifies as a "political party organization" within the meaning of Mont. Code Ann. § 13-37-216(2).[2] (Findings, Conclusions, and Order, Doc. 168,

---

[2] Plaintiffs challenge the prior law codified at Mont. Code Ann. § 13-37-216(3), that law was amended to move the relevant provisions to § 13-37-216(2).

at 2, 8-9; Verified Compl., Doc. 1, ¶¶ 15, 84.) It has a history of making contributions to Republican candidates. (Findings, Conclusions, and Order, Doc. 168, at 8; Verified Compl., Doc. 1, ¶ 84.)

**10.** Plaintiff Beaverhead County Republican Central Committee (hereinafter "Beaverhead County Republicans") is the local Republican Party for Beaverhead County, Montana, and qualifies as a "political party organization" within the meaning of Mont. Code Ann. § 13-37-216(2). (Findings, Conclusions, and Order, Doc. 168, at 2, 9; Verified Compl., Doc. 1, ¶¶ 16, 87.) It has a history of making contributions to Republican candidates. (Findings, Conclusions, and Order, Doc. 168, at 9; Verified Compl., Doc. 1, ¶ 87.)

**11.** Contributors Lake County Republicans and Beaverhead County Republicans intended to make contributions in excess of the limits to candidates running for office in 2012. (Findings, Conclusions, and Order, Doc. 168, at 8-10; Verified Compl., Doc. 1, ¶¶ 85-86, 88, 90.). They intend to do so again in the future. (Verified Compl., Doc. 1, ¶ 101.)

**12.** The Beaverhead County Republicans had first-hand experience with the deleterious effect the aggregate limits have on political speech and association. (Verified Compl., Doc. 1, ¶ 89.) It attempted to make contributions to several

---

The law was changed in 2015. *See* SB 289, available at http://leg.mt.gov/bills/2015/billpdf/SB0289.pdf, at 16-17.

candidates for state house and state senate during the 2010 election. (Findings, Conclusions, and Order, Doc. 168, at 10.) Because of the aggregate party contribution limits, five of those candidates were forced to return the Beaverhead County Republicans' contributions. (*Id*.)

13.     The Lake County Republicans and the Beaverhead County Republicans are separate and autonomous county central committees for the Republican Party. (Verified Compl., Doc. 1, ¶ 91.) Not only are they autonomous from each other and every other county Republican Party, they are autonomous from the Montana Republican Party. (*Id*.) The Lake County Republicans have different members and officers than the Beaverhead County Republicans. (*Id*.) They each make their own decisions about which candidates they will support. (*Id*.) One does not control the other, and while they are free to discuss their plans with one another they generally do not. (*Id*.)

14.     As Commissioner of Political Practices, Defendant Jonathan Motl[3] has authority to investigate violations of, enforce the provisions of, and hire attorneys to prosecute violations of, Montana Code Chapters 35 and 37 and the rules adopted to carry out these provisions. (Findings, Conclusions, and Order,

---

[3] Plaintiffs sued the prior commissioner, David Gallik, in 2011. (Verified Compl., Doc. 1, ¶ 21.) Governor Schweitzer appointed Jim Murry as Commissioner of Political Practices in 2012. Governor Bullock then appointed Jonathan Motl as Commissioner of Political Practices in 2013.

Doc. 168, at 3; Verified Compl., Doc. 1, at ¶ 21.) The Commissioner acts under color of state law and is sued in his official capacity. (*Id*.)

15.    As Montana Attorney General, Defendant Tim Fox[4] has power to investigate and prosecute violations of Montana Code Chapters 35 and 37 by and through the county attorneys under his supervision. (Findings, Conclusions, and Order, Doc. 168, at 3; Verified Compl., Doc. 1, at ¶ 22.) The Attorney General acts under color of state law and is sued in his official capacity. (*Id*.)

16.    As Lewis and Clark County Attorney, Defendant Leo Gallagher has power to investigate and prosecute violations of Montana Code Chapters 35 and 37. (Findings, Conclusions, and Order, Doc. 168, at 3; Verified Compl., Doc. 1, at ¶ 23.) The County Attorney acts under color of state law and is sued in his official capacity. (*Id*.)

## Facts

17.    In 1975, Montana adopted its first contribution limits. 23-4795 R.C.M. 1947, *available at* https://archive.org/stream/supp1975election laws00montrich#page/172/mode/2up. The "[a]ggregate contributions for all elections in a campaign by an individual to a candidate and political committees

---

[4] Plaintiffs sued the prior Montana Attorney General, Steve Bullock, in 2011. (Verified Compl., Doc. 1., at ¶ 22.) Defendant Tim Fox was elected Attorney General in November 2012.

organized on his behalf other than the candidate and his immediate family" were limited as follows: $1,500 for governor and lieutenant governor, $750 for other statewide office, $400 for public service commissioner, $300 for district court judge, $250 for legislative candidates, and $200 for city or county office. *Id*. at 4795(1). The "[a]ggregate [c]ontributions by an independent committee to a candidate and political committees organized on his behalf for all elections in a campaign were limited as follows": $8,000 for governor and lieutenant governor, $2,000 for other statewide office, $1,000 for public service commissioner, $250 for district court judge, $250 for legislative candidates, and $200 for city or county office. *Id*. at 4795(2). The statute also contains limits by a candidate and his immediate family. *Id*. at 4795(3).

**18.**     In 1979, the individual limits were revised. Mont. Code Ann. § 13-37-216 (1987), *available at* https://archive.org/stream/title13electionl00montrich #page/138/mode/2up. The "[a]ggregate contributions for all elections in a campaign by an individual, other than the candidate, to a candidate and political committees organized on his behalf" were limited as follows: $1,500 for governor and lieutenant governor; $750 for other statewide office; $400 for public service commissioner, district court judge, and senate; and $250 for all other offices. *Id*. at 13-37-216(1). "Aggregate contributions by an independent committee to a candidate and political committees organized on his behalf for all elections in a cam-

paign" were limited as follows: $8,000 for governor and lieutenant governor; $2,000 for other statewide office; $1,000 for public service commissioner and district court judge; $600 for senate; and $300 for all other offices. *Id*. at 13-37-216(2).

19.    In 1994, Initiative 118 ("I-118") reduced the individual contribution limits and increased aggregate political party limits *per election*. (*See* Ex. 71: *Preamble*, Eddleman Trial Ex. 22.) The individual limits were lowered to $400 for governor and lieutenant governor, $200 for other statewide office, and $100 for other offices. *Id*. The aggregate limits were increased to $15,000 for governor and lieutenant governor, $5,000 for most statewide offices, $800 for senate, and $500 for other offices. *Id*.

20.    In October 1996, the *Eddleman* lawsuit was filed, challenging, in relevant part, the newly-lowered base contribution limits. (Ex. 72: Eddleman Docket, Doc. 237-3, at 7.)

21.    During discovery, the *Eddleman* defendants stipulated to admissions. (Ex. 73: *Defendants' Responses to Plaintiffs' First Set of Requests for Admissions, Interrogatories, and Requests for Production of Documents*, Doc. 237-4.)

22.    Defendants admitted that they did not know of any individual that had been convicted of offering a bribe to a Montana public officeholder in the form of a campaign contribution, during the 20 years preceding November 1994. (*Id*. at 2.)

**23.** Defendants admitted that they did not know of any political action committee that had been convicted of offering a bribe to a Montana public officeholder in the form of a campaign contribution, during the 20 years preceding November 1994. (*Id*. at 3.)

**24.** Defendants admitted that they did not know of any Montana Governor or Lieutenant Governor that had been convicted, during the 20 years prior to November 1994, of accepting a campaign contribution in a *quid pro quo* exchange for voting contrary to his obligations of office. (*Id*. at 4.)

**25.** Defendants admitted that they did not know of any Montana state senator that had been convicted, during the 20 years prior to November 1994, of accepting a campaign contribution in a *quid pro quo* exchange for voting contrary to his obligations of office. (*Id*. at 5.)

**26.** Defendants admitted that they did not know of any Montana state representative that had been convicted, during the 20 years prior to November 1994, of accepting a campaign contribution in a *quid pro quo* exchange for voting contrary to his obligations of office. (*Id*. at 5.)

**27.** Defendants admitted that they did not know of any Montana public office holder (beyond the offices of Governor, Lieutenant Governor, state senator or state representative) that had been convicted, during the 20 years prior to November 1994, of accepting a campaign contribution in a *quid pro quo* exchange

for voting contrary to his obligations of office. (*Id*. at 6.)

28.     Defendants admitted that a contribution made with the expectation of gaining access to a candidate or officeholder, is *not* the same as a large campaign contribution offered in a *quid pro quo* exchange for a candidate or office holder's vote contrary to his obligations of office. (*Id*. at 7.)

29.     Defendants admitted that a contribution to a candidate for public office given simply as an expression of agreement with a voting position already taken by the candidate, is not *quid pro quo* corruption. (*Id*. at 9.)

30.     Defendants admitted that the disclosure of contributions required by Mont. Code Ann. §§13-37-225, 226(1) and (3), 229, lessen the risk that individuals or political committees will spend money to support a candidate as a *quid pro quo* for special treatment after the candidate is in office. (*Id*. at 15-16.)

31.     The *Eddleman* court held a four-day trial addressing the purposes, justifications, and effects of I-118, hearing testimony from I-118's drafter Jonathan Motl,[5] (Ex. 76: Eddleman Trial Tr. vol. 3, Doc. 237-7, at 490:19), I-118's campaign manager C.B. Pearson, (Ex. 77: Eddleman Trial Tr. vol. 4, Doc. 237-8, at 603:19), and other witnesses. (*See generally* Exs. 74-77: Eddleman Trial Tr. vols. 1-4, Docs. 237-5–237-8.)

---

[5] Mr. Motl is now the current Commissioner of Political Practices.

**32.**    In that case, the district court adopted the parties' stipulation that

"[t]he parties are unaware of any convictions of individuals or political action

committees for violating the law prohibiting the offering of a bribe to a Montana

public office holder in the form of a campaign contribution, during the 20 years

preceding November 1994." (Ex. 78: *Consolidated Final Pre-trial Order*, Doc.

237-9, at 13-14 ¶ 37.) The district court also adopted the parties stipulation that

> [t]he parties are unaware of any convictions of a Montana governor,
> lieutenant governor, state representative, state senator, or any other
> public official secured during the 20 years prior to November 1994, for
> accepting a campaign contribution in a quid pro quo exchange for voting
> contrary to his obligations of office.

(*Id.* at ¶ 40.)

**33.**    The district court adopted the parties' stipulation that "the intent of

the drafters of I-118 is reflected in its Preamble[6] . . . . and . . . the official 1994

_____

[6] The Preamble to I-118 states, in relevant part:

> WHEREAS, campaigns for political office in Montana have been
> funded by steadily increasing amounts of contributions from individuals
> and political committees, with much of those amounts coming from
> large contributions from a few individuals and political committees; and
> . . .
> WHEREAS, the average Montanan does not have the funds to make
> large contributions and is not necessarily represented by the individual
> or economic interest that does make a large contribution.
> THEREFORE, the people of the State of Montana find it appropriate to:
> (1) lessen the ability of special, monied interests to gain undue influence
> on public policy issues by making large contributions to candidate for
> political office; . . .

Voter Information Pamphlet," (Ex. 78: *Consolidated Final Pre-trial Order*, Eddleman Doc.159, Doc. 237-9, at 14, ¶ 43) and that any unequal or greater access MRLPAC might have to an officeholder "does not, of itself, constitute quid pro quo corruption," (*id*. at 14 ¶ 44).

34.    Mr. Motl stated in the Pamphlet that I-118 took "steps to solve the problem of too much money in Montana politics." (Ex. 80: *1994 Voter Information Pamphlet,* Eddleman Trial Ex. 23, Doc. 237-11, at 17; *see also id*. at 18, 19.) He also stated that "[m]oney from special interests and the wealthy is drowning out the voice of regular people in Montana politics." (*Id*. at 17.) And that "[m]uch of that increase comes from special interests (PACs) and the wealthy." (*Id*.)

35.    At trial, Mr. Motl explained his motivation for contribution limits was "to try to deal with the most egregious examples of unfairness, of corruption, and bring those back down to where the system becomes fairer because you have removed, you have removed an example of corruption or unfairness." (Ex. 76: Eddleman Trial Tr. vol. 3, Doc. 237-7, at 497:6-12.)

36.    For Mr. Motl, "another word for the unfairness is corruption . . . . The

---

(3) limit the amount of money that may be contributed by individuals and political committees to to [sic] candidates for public office in Montana; . . . .

(Ex. 71: *Preamble,* Eddleman Trial Ex. 22, Doc. 237-2.)

specific unfairness, the specific corruption was the introduction into Montana of very large amounts of political committee money going to specific legislative candidates." (*Id.* at 485:10-14, 485:22-25; *see also* 522:10-11 ("We have to concentrate on corruption. We have to concentrate on fairness, on unfairness.").) "The whole idea is that [lowering contribution limits] will increase the number of contributors, in other words, those who are buying into the democratic process . . . ." (*Id.* at 517:4-6.)

**37.** The trial court found that when Mr. Motl selected the new limits to be offered in I-118, he "looked at the historical data of what individuals gave to candidates for public office in the State of Montana and chose a limit that he defines as the 'largest contribution limit level for any of those offices.' The limits arrived at by Motl, and approved by Montana voters, were in the upper 10% of contributions for particular offices." (Ex. 79: *Findings of Fact and Conclusions of Law*, Eddleman Doc. 195, Doc. 237-10, at 7.)

**38.** Mr. Pearson testified as to the meaning of "way to much money" referenced in the I-118 pamphlet:

> 'Just the enormous sums of money that have been coming into the legislative processes for races. We've continued to see an escalating of the high end of what it takes to run for Senate, what it takes to run for the House of Representatives, seeing an overall trend in the increase of money that's needed, that's been raised, for an example. . . . So we've just seen a continual trend about the escalation of money in politics just, you know, enormous sums of money by Montana standards, enormous

sums of money.'

(Ex. 77: Eddleman Trial Tr. vol. 4, Doc. 237-8, 666:5-21.)

**39.**    I-118 sought to "'lower the amount of money that comes into a campaign but increase the number of contributors. And that was the goal, meaning that it would improve making the system more fair.'" (*Id*. at 667:12-24.) Mr. Pearson understood corruption to be "'at any point when the political system is no longer seen as being fair by the voters, that there isn't a fair debate, discussion about issues; that there is no chance for general citizenry to win over a special economic interest, for an example. The system is corrupted when people lose confidence in it, and that - - you know, I know that there is a more specific definition that people have of corruption, which is bribery, you know. I don't hold that view.'" (*Id*. at 668:10-18.)

**40.**    Studies were done to determine the effectiveness of I-118 in reaching its goals. (Ex. 81: *Three Studies on the Effects of I-118 on Campaign Funding in Montana,* Eddleman Trial Ex. 41, Doc. 237-12.) The preface to these three studies, written by Mssrs. Motl and Pearson, states that "I-118 met the promises of those who offered it to the public for a vote." (*Id*. at 5.) One study concluded that "[t]he passage of I-118 as well as many public opinion polls show that the citizens of Montana want less special interest influence in the political process. I-118 . . . has worked to accomplish that goal." (*Id*. at 58 (Germann\Langweil Study).) The

touted effect of I-118 was that "more money was contributed to political parties. . . . [PACs] gave more money to parties, which would in turn disperse the contributions in an equal fashion, lessening special interest." (*Id*. at 46-47.) Another study concluded that I-118 worked to effectuate its purpose "to level the campaign playing field between special interests, the wealthy, and the average citizen and to reduce the skyrocketing amount of money going into Montana's elections." (*Id*. at 19 (Garfield\Kraus Study).) "I-118 reformed Montana's campaign finance laws to reduce the influence of big money in politics and eliminate the unfair advantages that political committees (PACs) and the wealthy had in influencing elections." (*Id.* at 20 (Garfield\Kraus Study).) And a third study concluded that "I-118 was a success as it lessened the political influence of large contributors in campaigns, limited large monetary amounts in campaigns, and broadened the distribution of the financial influence in outcomes of political campaigns to the people of Montana." (*Id*. at 16 (Forte\Picard Study).)

41. "In early June of 1982, a random sample of 416 Montanans was asked by telephone interviewers about their opinion on public financing of legislative campaigns." (Ex. 82: *Motl "Fellow Montanan" Letter and Report,* Eddleman Plaintiffs' Ex. 75, Doc. 237-13, at 26 (cited in *Montana Right to Life v. Eddleman,* 343 F.3d 1085, 1093 (9th Cir. 2003)).) The survey addressed "the influence of special interests—such as labor unions and business corporations—over lawmak-

ing because of their members' campaign contributions to legislative candidates." It found that "29.9 percent 'strongly' subscribed to the sentiment that campaign contributions buy an inordinate amount of influence over legislators and 48.4 percent of those surveyed were in agreement with this position." (*Id*. at 27.)

42.    The evidence of quid pro quo corruption cited in *Eddleman* occurred over a decade before the lower limits were adopted, when insurance salesman Senator Anderson sought to influence other senators to vote in favor of an annuity bill to retain financial support of an insurance PAC. (Ex. 83: *Proposed Findings of Fact and Conclusions of Law*, Eddleman Doc. 189, Doc. 237-14, at 9.)

43.    "The letters were attempts to buy votes. Given the clandestine nature of subjectivity, further evidenced by the 'destroy this letter after reading it' notation, this is as close to evidence of quid pro quo corruption any court is likely to get. In testimony about the letter, Anderson did admit he was trying to get a bill passed." (*Id*.) The letter read that the Senator has "been able to keep the contributions coming our way" and so encouraged republicans to vote for the bill. (Ex. 84: *Handwritten Correspondence*, Eddleman Def. Ex. 19, Doc. 237-15.) At trial, Senator Anderson was asked, "So am I to understand your testimony that you were investigated by . . . five separate governmental agencies or committees . . . and none of them found any problems with your conduct that merited disciplinary action?" (Ex. 76: Eddleman Trial Tr. vol. 3, Doc. 237-7, at 564:8-12.) He re-

sponded, "None of them." (*Id*. at 564:24.)

**44.**     Representative Grinde (an *Eddleman* witness for Plaintiffs) when asked whether the prior limits "would cause a legislator to be too compliant with the wishes of the contributor, giving at the maximum amount previously allowed," responded "No, I don't see that it had any effect on anybody, that it would buy a vote or anything like that, no." (*Id*. at 208:16-17.) Representative Harper (*Eddleman* witness for Defendants) admitted that he had never seen anyone ask for a vote in return for giving a contribution: "I don't believe I've ever seen that. I think had I seen that, I would have been wrestling whether I was breaking the law keeping that to myself." (*Id*. at 361:6-12.)

**45.**     The district court ruled that the limits were constitutional because they were closely tailored to prevent improper influence. (Ex. 79: *Findings of Fact and Conclusions of Law*, Eddleman Doc. 195, Doc. 237-10, at 10.) It found that the passage of I-118 by 61% of voters "confirms the belief of the majority of voters; [sic] that contribution limits were necessary to combat improper influence, or the appearance thereof, . . ." (*Id*. at 4.) The Ninth Circuit, affirmed. *Eddleman,* 343 F.3d 1085.

**46.**     In 2003, the limits were increased. 2003 Montana Laws Ch. 462 (S.B. 423). They are now codified in Mont. Code Ann. § 13-37-216. The "aggregate contributions for each election in a campaign by a political committee or by an

individual, other than the candidate, to a candidate" were limited as follows: $500 for governor and lieutenant governor, $250 for other statewide offices, $130 for all other candidates. Mont. Code Ann. § 13-37-216(1). Political party organizations were limited "to the following aggregate limitations": $18,000 for governor and lieutenant governor, $6,500 for other statewide offices, $2,600 for public service commissioner, $1,050 for senate, and $650 for all other offices. Mont. Code Ann. § 13-37-216(2).

47.    In 2007, the statute was revised to index the limits for inflation by using the Consumer Price Index. *See* Mont. Code Ann. § 13-37-216(3)(a).

48.    In 2011, this lawsuit challenged the base contribution limits as well as the political party contribution limits.[7] (Findings, Conclusions, and Order, Doc. 168, at 3-4.)

49.    Montana Code Chapters 35 and 37 impose certain contribution limits and bans on individuals and political parties. (Verified Compl., Doc. 1, at ¶ 24.)

50.    Mont. Code Ann. § 13-37-216(1) limits contributions individuals may make to candidates. (Findings, Conclusions, and Order, Doc. 168, at 17-18.) The contribution limits are to be adjusted for inflation. Mont. Code Ann. § 13-37-

---

[7] Plaintiffs challenged in part the prior law codified at Mont. Code Ann. § 13-37-216(1), (3), and (5), that law was amended to move the relevant provisions to § 13-37-216(1), (2), and (4). The law was changed in 2015. *See* SB 289, available at http://leg.mt.gov/bills/2015 /billpdf/SB0289.pdf, at 16-17.

216(3). (*Id*. at 17.) Currently, contributions are limited as follows: $660 for governor and lieutenant governor, $330 for other statewide offices, and $170 for all other public offices.[8]

**51.**     Mont. Code Ann. § 13-37-216(4) limits the amount of contributions candidates may accept from individuals to no more than those allowed under Mont. Code Ann. § 13-37-216(1)-(2). (Findings, Conclusions, and Order, Doc. 168, at 19.)

**52.**     Mont. Code Ann. § 13-37-216(2) limits contributions from political parties to their candidates by imposing an aggregate limit on the contributions all political parties may make to any candidate. (*Id*. at 18.) These limits are adjusted for inflation. Mont. Code Ann. § 13-37-216(3). (*Id*. at 17.) Currently, contributions are per-election aggregate limits of: $23,850 for governor or lieutenant governor, $8,600 for other statewide offices, $3,450 for public service commission, $1,400 for senate, and $850 all other public offices.[9]

**53.**     Mont. Code Ann. § 13-37-216(4) limits the amount of contributions

---

[8] Commissioner of Political Practices, *State of Montana Political Campaign Contribution Limits Summary, available at* http://politicalpractices.mt.gov/content /5campaignfinance/2016ContributionLimit (last visited April 22, 2016) (Ex. 85: Doc. 237-16.) Upon information and belief, these limits are the current ones.

[9] Ex. 85, *State of Montana Political Campaign Contribution Limits Summary*. Political Party Committees are prohibited from contributing to candidates for judicial offices. *Id.*

candidates may accept from political parties to no more than those allowed under

Mont. Code Ann. § 13-37-216(1)-(2). (*Id.* at 19.)

    **54.**    Montana Campaign Finance and Practices Laws establish that:

> [f]or the purposes of determining compliance with political party contribution limits established pursuant to 13-37-216, MCA, a 'contribution' does not include a coordinated expenditure made solely by a political party committee in the form of provision of personal services by paid staff of the political party that benefit the associational interest of the political party but also constitute reportable election activity benefitting a particular candidate of the same political party.

ARM 44.11.401(2).

    **55.**    Under the aggregate limits, two county political parties may not, for

example, both make an $850 contribution to the same candidate for the Montana

State House. Rather, if one has already made an $850 contribution, the other is

prohibited from making any contribution, unless the candidate first refunds the

contribution (or a part of it) that he received from the first contributor. This is

because, under the aggregate contribution limit imposed by Mont. Code Ann.

§§ 13-37-216(2) and (4), the sum total contribution from all political parties

together that a candidate for the State House may accept is $850. Mont. Code Ann.

§§ 13-37-216(2) and (4).

    **56.**    This Court held a three-day trial beginning on September 12, 2012,

where Plaintiffs presented evidence of Montana's contribution limits' effect on

candidates and contributors. (*See generally* Exs. 87-89: Lair Trial Tr. vols. 1-3,

Docs. 237-18–237-20.) Witnesses included then-Commissioner of Political Practices James Murry and Program Supervisor for the Office of Political Practices Mary Baker, experts Edwin Bender (for defendants) and Clark Bensen (for plaintiffs), political party chairmen, and a legislator. (*Id.*)

57.     The Court previously found Ms. Baker, Program Supervisor for the Office of Political Practices, had "a number of responsibilities with the Office, including ensuring that candidates comply Montana's laws and regulations." (Findings, Conclusions, and Order, Doc. 168, at 16-17.) The Court also found that Ms. Baker, did not believe that a contribution of up to $1,000 would have a corruptive effect. (*Id.* at 17.)

58.     This Court found the contribution limits in Mont. Code Ann. § 13-37-216 unconstitutional. (*Id.* at 37-38.) It determined that "contribution limits prevent candidates from amassing the resources necessary for effective campaign advocacy." (*Id.*)

59.      This Court previously observed that the Commission's expert, Edwin Bender, offered analysis that, "unlike [Plaintiffs' expert] Bensen's, is based on all campaigns, not just 'competitive' campaigns, And, unlike Bensen, he analyzed campaigns for all statewide races, legislative races, and the gubernatorial race." (*Id.* at 14.)

60.     This Court previously concluded that "[g]enerally speaking, candi-

dates in Montana spend more money on their campaigns than they raise," and that "[t]he number of contributors making contributions at the maximum level is significant. And significantly greater funds would be available to candidates if the contribution limits are raised. The defendants do not dispute this proposition." (*Id.* at 29.) And so the Court concluded that "[t]he record shows that those additional funds are needed because most campaigns are insufficiently funded." (*Id.*)

61.    This Court previously found that Mr. Bensen's analysis demonstrated that competitive races are not adequate funded, (*id.*), and that both experts' analyses showed that almost half if not more than half of all contributions were maxed-out contributions. (*Id.* at 29-30.)

62.    This Court previously found that between 9% and 11% of legislative candidates received funds from political committees, and between 0% and 3% of state candidates received such funds (*Id.* at 30.)

63.    This Court previously found that 11% and 18% of contributions for legislative candidates were self-financed, and between 17% and 38% were self-financed for statewide candidates. (*Id.*)

64.    This Court previously found that for the 2004 and 2008 gubernatorial campaigns, only raised between 0% and 2% from political parties. (*Id.* at 14.) And that from 2000 to 2010, Montana candidates only "received an average for 3.8% of their contributions from political parties." (*Id.* at 15.)

**65.** This Court previously found that an average of only 22-32% of all Montana candidates accepted maxed-out aggregate political party contributions, 40% among competitive campaigns. (*Id*. at 30.)

**66.** This Court previously found that Representative Miller's district is primarily rural, with approximately 2,500 square miles and 9,500 people. (*Id*. at 12.)

**67.** This Court previously found that Representative Miller believes that he would need roughly $12,000 to reach potential voters through mailings. (*Id*.) It also found that Representative Miller was only able to raise roughly $8,000 to $9,000 and $5,000 to $6,000 in 2008 and 2010, respectively. (*Id*.)

**68.** The Court previously found that the inflation adjustments have not been sufficient to cover increased costs like gasoline. (*Id*.) And that, were it not for Montana's contribution limits, Representative Miller "believes he could raise the necessary funds to run an effective campaign." (*Id*.)

**69.** On October 3, 2012, this Court struck down Mont. Code Ann. § 13-37-216 as unconstitutional. (*Order*, Doc. 157.)

**70.** On October 4, 2012 date, the commission appealed. (*Notice of Appeal*, Doc. 161.) On May 26, 2015, the Ninth Circuit reversed and remanded, determining that "the district court applied the wrong legal standard prior to enjoining permanently the enforcement of Montana's restrictions on campaign

contributions by individuals, PACs, and political parties." *Lair v. Bullock*, 798 F.3d 736, 749 (9th Cir. 2015).

71.   The Ninth Circuit instructed the district court either " (1) to decide whether Montana has carried its burden in showing the contribution limits furthered a valid 'important state interest' or, if the district court again assumes the state has carried its burden (2) to identify expressly what interest the district court assumes exists." *Id*. at 748.

72.   On January 27, 2016, Defendants identified Commissioner Motl as an expert witness and furnished his report. (Motl Report, Doc. 243-8.)

73.   On January 29, 2016, Plaintiffs deposed Commissioner Jonathan Motl as a 30(b)(6) witness. (Ex 101: Motl Dep., Doc. 267-7, Jan. 29, 2016.) Commissioner substantively responded to certain requests for admissions. (*Id.* at 6:15-9:9, 54:1-60:17, Jan 29, 2016).

74.   Commissioner Motl admitted that he was not aware of any individual that had been convicted of offering a bribe to a Montana public officeholder in the form of a campaign contribution, since October 1994. (*Id*. at 54:1-3.)

75.   Commissioner Motl admitted that he was not aware of any political committee that had been convicted of offering a bribe to a Montana public officeholder in the form of a campaign contribution, since October 1994. (*Id*. at 55:14-15.)

**76.**    Commissioner Motl admitted that no Montana Governor or Lieutenant Governor had been convicted, since October 1994, of accepting a campaign contribution in a quid pro quo exchange for voting contrary to his obligations of office. (*Id*. at 59:3-4.)

**77.**    Commissioner Motl admitted that no Montana Governor or Lieutenant Governor has been convicted, since October 1994, of accepting a campaign contribution in a quid pro quo exchange for performing any official act or refusing to do any official act contrary to his obligations of office. (*Id*. at 59:17.)

**78.**    Commissioner Motl admitted that no Montana state Senator or House member had been convicted, since October 1994, of accepting a campaign contribution in a quid pro quo exchange for voting contrary to his obligations of office. (*Id*. at 59:23-25.)

**79.**    Commissioner Motl admitted that no Montana state Senator or House member had been convicted since, October 1994, of accepting a campaign contribution in a quid pro quo exchange for performing or refusing to perform any official act contrary to his obligations of office. (*Id*. at 60:10-13.)

**80.**    Commissioner Motl admitted that no Montana public office holder had been convicted, since October 1994, of accepting a campaign contribution in a quid pro quo exchange for voting contrary to their obligations of office. (*Id*. at 61:4.)

81.     Commissioner Motl admitted that no Montana public office holder had been convicted, since October 1994, of accepting a campaign contribution in a *quid pro quo* exchange for agreeing to perform or refusing to perform an official act contrary to their obligations of office. (*Id*. at 61:17.)

82.     Commissioner Motl testified that his "understanding of corruption is the standard defined in discussion by the Montana Supreme Court and in two decisions by State district courts." (*Id.* at 11:5-8.) "What corruption has been defined in discussion by the Montana Supreme Court is in a—a relationship between a third party and a candidate who is then an office holder which influences the way an office holder carries out their public duty in respect to their public trust obligation to the public." (*Id.* at 11:12-18.)

83.     Commissioner Motl testified that "[b]oth the failure to report and disclose and the provision of corporate value are not allowed by Montana law. That is part of corruption . . . I guess is what you would call the quid. That's what the court found." (*Id.* at 14:12-23.) "[T]he other half of it is the quo. The relationship between the quid and the act of the candidate is what produces corruption. The corruption comes when a candidate does something which violates the public trust, the quo, the something for something, what does the candidate do." (*Id.* at 15:1-7.)

84.     Commissioner Motl responded to the question "if it were an offer of

legal support for your candidate, then the commitment of supporting a hundred percent the labor agenda would not be a quid pro quo corruption, right? Is that your testimony?" with "There would be no quo" and so "Yes." (*Id.* at 31:6-15.)

85. Commissioner Motl responded to the question "if they were offering a lawful campaign contributions, would that be corruption?" with "Not by itself," that "[a] [sic] unlawful contribution tied to it" was needed. (*Id.* at 37:11-16.) He testified that "[i]f you have a lawful contribution made to a candidate, you don't have a quid; nor on the second part, if that's lawful, do you have a quid. You can't—you can't have the initiation of a quid pro quo if you've got a lawful contribution by itself . . . . I mean, you could have variations on that that could lead you to an unlawful situation. But if it's just as it says, a lawful contribution and a large lawful contribution, you can't have the beginning of a quid pro quo." (*Id.* at 64:14-65:2.) When asked "If a candidate would alter or reaffirm his own position on an issue in response to a lawful campaign contribution be an example of a quid pro quo corruption?" he responded "No. On the basis of the lawful campaign contribution." (*Id.* at 66:3-8.)

86. Commissioner Motl testified that "[i]f there's an exchange between the parties. If the candidate says, In response for this contribution, I will be 100 percent in support of your agenda" is evidence of quid pro quo corruption. (*Id.* at 70:14-17.) To make an illegal contribution quid pro quo corruption, he testified

that the candidate only "would have to know he took an illegal contribution." (*Id.* at 71:16-21.)

87.    Commissioner Motl responded to the question "limiting large contributions, that itself is evidence of the public's view on the appearance of quid pro quo corruption?" with "Yes." (*Id.* at 42:5-9.)

88.    Commissioner Motl testified that "[t]here were 14 candidates in the 2010 Republican primary elections that received—that were listed as on board in one of the works. In my judgment, all 14 of those would have been involved in quid pro quo corruption activity." (*Id.* at 32:1-5.) "We were able to identify nine of them before we received a particular document which identified the whole 14." (*Id.* at 32:7-10.)

89.    Commissioner Motl investigated all nine candidates, issued findings of fact against them, filed civil lawsuits against them, and offered himself as an expert in those cases that have had court hearings. (Ex. 90: Boniek Judgement, Doc. 237-21, at 2, 3, 4; Ex. 91: Prouse Judgment, Doc. 237-22, at 2, 3, 4; Bannan Decl., Doc. 254-2, ¶ 16; Kennedy Decl., Doc. 253, ¶ 15; Miller Decl., Doc. 254, ¶ 23; Murray Decl., Doc. 255, ¶ 14; Prouse Decl., Doc. 256, ¶ 8; Sales Decl., Doc. 257, ¶ 7; Wittich Decl., Doc. 259, ¶ 13.) All nine candidates are Republicans. (*See, e.g.,* Wittich Decl., Doc. 259, ¶ 4; Bannan Decl., Doc. 252, ¶ 1; Wagman Decl., Doc. 258, ¶ 2; Sales Decl., Doc. 257, at ¶ 2; Ex. 90: Boniek Judgment, Doc. 237-

21, at 4.)

90.     Commissioner Motl testified that the surveys repeated "[t]he hundred percent support that was given to the National Right to Work group of corporations" which "came from a vetting by the National Right to Work field person, which occurred prior to the surveys" and was done by "Christian LeFer." (*Id.* at 25:2-10.) The fourteen candidates "would not have been on the ultimate document on board and wanting the works had not that conversation occurred." (*Id.* at 25:24-26:13.) "That works document itself reflects a pledge . . . . you wouldn't have that on board and wants the works had not there been a pledge—. . . A hundred percent support of the Right to Work agenda." (*Id.* at 27:19-25.)

91.     Discussing a report filed in the *Wittich* litigation, Commissioner Motl testified that "Boniek is one of a group of 14 candidates which also includes the person addressed by this first supplemental report. So it's the same fact pattern. They all were on board." (*Id.* at 110:12-15.) "They would all have different fact patterns, but they would all be offered the same basic package of paid personal services plus other items of value that weren't covered." (*Id.* at 111:9-12.) "They would have each pledged a hundred percent support for the corporate issues." (*Id.* at 11:16-18.) When asked if the works "was in exchange for agreement for a hundred percent support for certain issues that the corporate interests supported?" he responded "Certain agendas." (*Id.* at 113:5-14.)

92.     Commissioner Motl bases his opinion testimony regarding the existence of quid pro quo corruption for each of the nine candidates on "on board" and "the works" references a spreadsheet attached to an email from Christian LeFer to his wife Allison LeFer. (Motl Dep., Ex. 101, 123:8-9; *Motl Report,* Doc. 243-8, at 7 (citing Ex. 96: WITTCOPP 1472-1476, Doc. 250-6.).)

93.     Christian LeFer came to Montana in 2007 as a Montana Right to Work employee ("MRTW"). (LeFer Decl., Doc. 260, at ¶ 2.) He testifies that "MRTW is decades-old non-profit organization that is an independent from National Right to Work, with its own Montana directors." (*Id*.)

94.     Mr. LeFer testifies that his wife Allison "opened her own, independent, for-profit printing business. She is detailed-oriented, organized, and meticulous, and so it was a great fit for her." (*Id*. at ¶ 3.) He testifies that "[s]he hired her own staff and operated her business completely independent of MRTW and myself, and developed a national client base. In fact, during election season, I was not allowed to even enter the building." (*Id.* ¶ 4.)

95.     Mr. LeFer testifies that "[t]o help her get the business off the ground, I told legislators and candidates with known support for MRTW issues about her business and suggested that they use Direct Mail for their campaign literature needs." (*Id*. at ¶ 5.)

96.     Mr. LeFer testifies that "[t]hat a candidate was 'on board' meant that

a particular candidate had chosen to use Direct Mail for their campaign literature." (*Id*. at ¶ 7.)

98.     Mr. LeFer testifies that "I don't recall using the term 'the works,' but if I did, I would likely have used it to mean that the candidate had no objection to using any aspect of Allison's program." (*Id*. at ¶ 8.)

98.     Mr. LeFer testifies that "[a]t no time did I make an arrangement, explicit or implied, with a candidate that, in exchange for any efforts to get them elected, they would act in an official government capacity at my or MRTW's direction as a public official. Nor did I ever ask for a promise of pledge to any organization in exchange for Direct Mail's paid work or any third party efforts to get a candidate elected. In fact, there was no choice by the candidate whether MRTW decided to send mailing in any candidate's district." (*Id*. at ¶ 9.)

99.     Mr. LeFer testifies that "[n]o one from the Office of the Commissioner of Political Practices has ever attempted to contact me about the activities of any organization." (*Id*. at ¶ 13.)

100.    Since the Ninth Circuit's decision to remand this case in May 2015, two state court default judgments have been issued that conclude quid pro quo corruption occurred: *Comm'r of Political Practices for the State of Mont. v. Boniek*, XADV-2014-202 (Mont. D. Ct., Aug. 13, 2015) and *Comm'r of Political Practices for the State of Mont. v. Prouse*, DDV-2014-250 (Mont. D. Ct., Jan. 5,

2016). (Ex. 90: Boniek Judgment, Doc. 237-21; Ex. 91: Prouse Judgment, Doc. 237-22.).

**101.** In *Boniek*, the court held "that Candidate Boniek exhibited corruption, specifically quid pro quo corruption, in his 2010 HD 61 Republican Primary Election." (Ex. 90: Boniek Judgment, Doc. 237-21, at 22.)

**102.** Commissioner Motl testified at the *Boniek* hearing that candidate Boniek engaged in quid pro quo corruption by:

> accept[ing Direct Mail's] creation of a grassroots presence through their direct mail. And in return, on Exhibit 11, he gave them 100 percent support of the Western Tradition Partnership agenda. And those are Western Tradition Partnership own words. They're not mine. It's in Exhibit 11.

(Ex. 94: Boniek Tr., Doc. 250-4, 38:11-16.) (*See also id.* at 45:6-16 (same corruption theory as to attack letters sent by Western Tradition Partnership); *id.* at 47:25-48:10 (same corruption theory as to attack flyers.)

**103.** In *Prouse*, the court determined that "Prouse exhibited *quid pro quo* corruption in his 2010 SD 23 Republican primary election." (Ex. 91: Prouse Judgment, Doc. 237-22, at 14 (emphasis in original).)

**104.** Commissioner Motl testified that:

> Candidate Prouse's actions were quid pro quo corrupt because the expectation by the corporate entity—and in his case we have Right to Work, which sent out letters before and after an issue letter—the expectation that that corporation would be that the candidate they supported was 100 percent in support of their agenda. That's what they

expected for the resources they were expending on behalf of that candidate. . . . If they won, they had 100 percent loyalty to the corporate entities that put them in there. And in return for pledging 100 percent, they were given a shock and awe electoral direct-mail campaign, . . .

(Ex. 93: Prouse Tr., Doc. 250-3, at 93:6-94:17.)

**105.** Commissioner Motl testified that:

I know, from looking at these documents that 'the works' means that this candidate is agreeing to let the conglomeration of corporations that are supporting the one candidate or attacking another apply 'the works' to that Senate District 23 race. And 'the works' means that they are applying maximum support they can to Wesley Prouse and applying the maximum attack they can to the opposing candidate.

(*Id*. at 42:18-43:1.)

**106.** Commissioner testified and offered into evidence at the *Prouse*

hearing the following:

And what the letters uniformly do is—if you look at 26A, about one, two, three—four paragraphs down, they all say the same thing. One candidate's survey is 100 percent. In this case, in support of—or in opposition of forced unionism or in support of the Second Amendment, whatever the issue is.

(*Id*. at 65:11-17.)

The second page of the letter, your Honor, still sticking with 26A, again says, "100 percent opposition to forced unionism."

(*Id.* at 66:2-4.)

The good news is Republican Representative Joel Boniek responded 100 percent in favor of gun owners' rights.

(*Id*. at 68:14-17.)

And if you go to the second page of it, you can see that Joel Boniek is 100 percent pro-gun position.

(*Id.* at 68:19-21.)

"Joel Boniek has come up with 100 percent pro-life stance."

(*Id.* at 71:3-4.)

Ron Arthun, Tom Shellenberg, and John Esp need to be contacted today because they need to renounce forced unionism, unlike Joel Boniek who has pledged 100 percent in support for Right to Work.

(*Id.* at 72:3-8.)

The good news is Republican State Senate Campaign Wesley Prouse has returned his candidate survey in 100 percent opposition to forced unionism?

(*Id.* at 77:3-7.)

The good news is that Joel Boniek has answered the candidate survey in 100 percent opposition to the radical environmentalists' anti-jobs.

(*Id.* at 78:25-79:4.)

The good news is that Republican Representative Joel Boniek has responded 100 percent in favor of your gun rights.

(*Id.* at 79:11-14.)

**107.**   Quid pro quo corruption is not defined in either the *Boniek* or *Prouse*

decision. (Ex. 90: Boniek Judgment, Doc. 237-21, at 22; Ex. 91: Prouse Judgment,

Doc. 237-22, at 14.)

**108.**   None of the filings against Mssrs. Boniek and Prouse allege quid pro

quo corruption. (Motl Dep., Ex. 101, 169:20-25; *id.* at 173:22-174:4.)

**109.**   Quid pro quo contentions were struck from the *Wittich* pre-trial order. (Ex. 99: *Wittich Final Pretrial Order*, Doc. 267-4, at 9, 13, 16.) Commissioner Motl has stated in court filings that proof of quid pro quo corruption is not necessary to justify a penalty for campaign finance violations. (Ex. 98: *COPP Wittich SJ Response*, Doc. 267-3, at 15-16.)

**110.**   Commissioner Motl has sought quid pro quo corruption findings in state court because he "needs to show evidence of such corruption to defend Montana's campaign contribution limits in a separate federal lawsuit." *Jury: Wittich violated campaign finance laws*, Great Falls Tribune (April 1, 2016), *available at* http://www.greatfallstribune.com/story/news/local/2016/04/01/jury-deliberates-montana-lawmakers-dark-money-case/82536544/.

**111.**   To date, alleged quid pro quo corruption findings—against Mssrs. Boniek, Prouse, and Wittich—are for amounts between $9,000 and 20,000. (Ex. 90: Boniek Judgment, Doc. 237-21, at 24; Ex. 91: Prouse Judgment, Doc. 237-22, at 16; Ex. 92: Wittich Article, Doc. 250-2.)

**112.**   Eight of the candidates Motl alleges engaged in quid pro quo corruption ran for legislative office in 2010. (Kennedy Decl., Doc. 253, ¶ 2; Wittich Decl., Doc. 259, ¶ 2; Bannan Decl., Doc. 252, ¶ 1; Murray Decl., Doc. 255, ¶ 2; Wagman Decl., Doc. 258, ¶ 3; Prouse Decl., Doc. 256, ¶ 3; Miller Decl., Doc. 254,

¶ 2; Ex. 90: Boniek Judgment, Doc. 237-21, at 4.)

113.    The ninth candidate Motl alleges engaged in quid pro quo corruption

ran for county commissioner in 2010. (Sales Decl., Doc. 257, at ¶ 3.) Sen. Sales

testified that "[c]ounty commissioners are essentially county managers, addressing

issues such as fiscal matters, land transfers, zoning, and road plowing. They do not

deal with gun, abortion, or right-to-work issues." (*Id.* at ¶ 3.)

114.    Eight of the nine candidates that Commissioner Motl alleges engaged

in quid pro quo corruption testify that they did not authorize any National Right to

Work, American Tradition Partnership, or Western Tradition Partnership spending

to aid in their election.[10] (Bannan Decl., Doc. 254-2, ¶ 12; Kennedy Decl., Doc.

253, ¶ 10; Miller Decl., Doc. 254, ¶ 20; Murray Decl., Doc. 255, ¶ 10; Prouse

Decl., Doc. 256, ¶ 6; Sales Decl., Doc. 257, ¶ 8; Wittich Decl., Doc. 259, ¶ 9.)

115.    Eight of the candidates that Motl alleges engaged in quid pro quo

corruption testify that they never made an arrangement, explicit or implied, with

Western Tradition Partnership, American Tradition Partnership, National Right to

Work, or Direct Mail that, in exchange for any efforts to get them elected, they

would act in an official government capacity at their direction as a public official.

(Kennedy Decl., Doc. 253, ¶ 11; Miller Decl., Doc. 254, ¶ 21; Prouse Decl., Doc.

---

[10]Mr. Boniek initially planned to sign an affidavit but ultimately decided
against it. (Milanovich Decl., Doc. 271, ¶ 2.)

256, ¶ 6; Wittich Decl., Doc. 259, ¶ 10; Bannan Decl., Doc. 252, ¶ 13; Murray

Decl., Doc. 255, ¶ 12; Sales Decl., Doc. 257, ¶ 9; Wagman Decl., Doc. 258, ¶ 7.)

116.    None of the candidates are aware of any other legislator or candidate

entering into such an agreement. (Kennedy Decl., Doc. 253, ¶ 12; Wittich Decl.,

Doc. 259, ¶ 11; Bannan Decl., Doc. 252, ¶ 15; Murray Decl., Doc. 255, ¶ 13; Sales

Decl., Doc. 257, ¶ 10; Wagman Decl., Doc. 258, ¶ 8.)

117.    The candidates testify that they have never and would never enter into

such an agreement with anyone. (Kennedy Decl., Doc. 253, ¶ 13; Miller Decl.,

Doc. 254, ¶ 22; Wittich Decl., Doc. 259, ¶ 11; Bannan Decl., Doc. 252, ¶ 14;

Murray Decl., Doc. 255, ¶ 13; Sales Decl., Doc. 257, ¶ 10; Wagman Decl., Doc.

258, ¶ 8.)

118.    Dan Kennedy testifies that "there is no way that I can be bought. I am

my own person. I do not 'roll over' or get opinions from other people to tell me

what to say or do. For example, my brother was partnered in a medical marijuana

storefront here in Montana. Yet in the legislature, I voted against a marijuana bill.

In fact, during the 2011 legislative session, I made every effort to isolate myself

from lobbyists and other legislators and focused on reading each bill so I knew

what each bill said and could vote consistent with my constituents' interests."

(Kennedy Decl., Doc. 253, ¶ 13.)

119.    Rep. Miller testifies that "[n]o amount of money could make me

change my position on an issue." (Miller Decl., Doc. 254, ¶ 22.)

120.    Terry Bannan testifies that "[i]f someone attempted to make such an agreement with me, I would have, in cowboy terms, 'bowed up,' been very upset and prepared to 'take it outside'." (Bannan Decl., Doc. 252, ¶ 14.)

121.    Ron Murray testifies that "[i]f they would have asked me to enter into such an agreement, I would have laughed at them and would have explained that I do not falter on my principles. My mind can only be changed by facts, not money or support. . . . I will only vote for things that are in line with my views." (Murray Decl., Doc. 255, ¶ 13.)

122.    Pat Wagman testifies that "[i]f anyone had asked me to enter into such an agreement, I would have said there was no way that would happen and it would have meant the end of our friendship." (Wagman Decl., Doc. 258, ¶ 9.)

123.    Wesley Prouse testifies that "I was pro-life, pro-right to work, and pro-gun before running for election in 2010. This is further evidenced by the way I voted in 1996." (Prouse Decl., Doc. 256, ¶ 7.)

124.    Rep. Wittich testifies that "I have long been a supporter of the right-to-work issue, although that support is limited to public employment only. In the 2011 session, I put in a draft request on the issue of right-to-work. Because the draft ultimately prepared was a comprehensive right-to-work bill, beyond the scope of my position, and because of the encouragement of Senate leadership, I

withdrew the request. Thus, I acted consistent with the positions I had before."
(Wittich Decl., Doc. 259, ¶ 12.)

**125.**   Terry Bannan testifies that "I have been pro-life, pro-limited govern-
ment, and pro-gun my entire life." (Bannan Decl., Doc. 252, ¶ 2.)

**126.**   Sen. Sales testifies that "I have long been an advocate of right-to-
work, and voted in favor of it in an Idaho referendum in 1986." (Sales Decl., Doc.
257, ¶ 4.)

**127.**   The candidates did not know that third party mailers were sent out
until after the fact. (Bannan Decl., Doc. 252, ¶ 10; Kennedy Decl., Doc. 253, ¶ 13;
Murray Decl., Doc. 255, ¶ 11.)

**128.**   The candidates paid for Direct Mail's assistance. (Bannan Decl., Doc.
252, ¶ 5; Kennedy Decl., Doc. 253, ¶ 5; Miller Decl., Doc. 254, ¶ 16; Murray
Decl., Doc. 255, ¶¶ 7-8; Prouse Decl., Doc. 256, ¶ 4; Sales Decl., Doc. 257, ¶ 8;
Wagman Decl., Doc. 258, ¶ 5; Wittich Decl., Doc. 259, ¶ 7; Ex 90: Boniek
Judgment, Doc. 237-21, at 5.)

**129.**   Several of the candidates were disappointed with Direct Mail's
quality or effectiveness. (Bannan Decl., Doc. 252, ¶ 8; Kennedy Decl., Doc. 253,
¶ 7; Sales Decl., Doc. 257, ¶ 6.)

**130.**   None of the documents that have been filed against any of the
candidates allege quid pro quo corruption. (Kennedy Decl., Doc. 253, ¶ 14; Miller

Decl., Doc. 254, ¶ 23; Prouse Decl., Doc. 256, ¶ 8; Wittich Decl., Doc. 259, ¶ 13;

Bannan Decl., Doc. 252, ¶ 16; Murray Decl., Doc. 255, ¶ 14; Sales Decl., Doc.

257, ¶ 7; Wagman Decl., Doc. 258, ¶ 10; Motl Dep., Ex. 101, 173:22-174:4.)

**131.**   Commissioner Motl used the deposition testimony of Dennis Fasaro,

a former National Right to Work employee, to prepare his testimony in this case.

(Motl Decl., Doc. 265; *Motl Report,* Doc. 265-1, at 2.)

**132.**   Mr. Fusaro was not in Montana during the 2010 election cycle. (Ex.

95: Fusaro Aff., Doc. 250-5, ¶ 3.)

**133.**   Mr. Fusaro's familiarity with an exhibit outlining various elements of

a direct mail campaign plan was based on "his years of working for/with NRTWC,

what [NRTWC] did in Iowa in 2010, and what [he] learned at various training

seminars. . ." (*Id.* at ¶ 5.)

**134.**   Mr. Fusaro is only vaguely familiar with Direct Mail & Communica-

tions. (*Id*. at ¶ 6.)

**135.**   Mr. Fusaro did not see the actual letters sent out in Montana during

the 2010 primary elections. (*Id.* at ¶¶ 9-10.)

**136.**   On February 5, 2016, Defendants supplemented Edwin Bender's

expert testimony from 2012. (Bender Supp. Disclosure, Doc. 243-3.)

**137.**    The supplemental charts attached to Mr. Bender's expert testimony

shows that political committee contributions still remain at around 10% for

legislative races, between 0% and 4% for statewide races, and between 0% and 3% for gubernatorial candidates. (*Id.* at 9.)

**138.**   Mr. Bender's supplemental charts demonstrate a continued trend of maxed-out contributions comprising a substantial part of candidate contributions, (*id.* at 10), a continued trend of political committee donations comprising about 10% of contributions received, (*id.* at 9), and a decline in maxed-out aggregate political party contributions to between 4% and 9% since 2012, (*id.* at 13).

**139.**   Mr. Bender's supplemental charts show that political parties never contributed greater than 4% of a candidate's campaign in any legislative or statewide races between the years 2004-2014. (*Id.* at 9.)

**140.**   Mr. Bender's supplemental charts show that in the 2008 gubernatorial races, political parties contributions were 2% of all contributions. (*Id.* at 9.)

**141.**   Mr. Bender's supplemental charts show that in 2010, 22% of legislative candidates maxed out on political party contributions. (*Id.* at 13.)

**142.**   Mr. Benders' supplemental charts show that in 2008, 18% of statewide candidates maxed out on political party contributions. (*Id.* at 9.)

**143.**   Mr. Bender's supplemental charts show that in 2012, political party contribution rose to 11% because of a $500,000 political party contribution made when this court lifted the limits. (*Id.* at 9.)

**144.**   Mr. Bender incorrectly testifies that donors contributing under the

$35 threshold form a pool of donors from which Rep. Miller could secure additional funds, opining that this "is another indication that [Rep. Miller] had sufficient funds to get his message out to voters." (*Id.* at 7.)

**145.** Mr. Bender incorrectly testifies that Rep. Miller received few maxed-out base contributions: "none in 2008, 1 in 2010, 1 in 2014," which he opines is "an indication that he could perhaps have raised more money simply by asking known donors for more support." (*Id.* at 7.)

**146.** Mr. Bender testifies that Rep. Miller averaged 37 donors per election. (*Id.* at 7.)

**147.** The Commission had an opportunity to refute Rep. Miller's testimony through Mr. Bender's testimony in 2012. (Ex. 88: Lair Tr. Excerpts, vol. 2, Doc. 237-19, at 4 (showing Miller testified, then Bender); Ex. 89: Lair Tr. Excerpts, vol. 3, Doc. 237-20, at 4 (showing Bender's continued testimony)).

**148.** Rep. Mike Miller represents House District 80 in the Montana State Legislature. He served House District 84 since 2009, then in 2014, his district changed to House District 80. (Miller Decl., Doc. 254, at ¶ 2.)

**149.** During Rep. Miller's 2008 campaign, he had eight contributors hit the contribution limit. He received the maximum aggregate contribution limit from PACs. He had to return roughly $1,740 to PACs, while paying roughly $2,000 out of pocket to cover campaign expenses. (*Id.* at ¶ 3.)

**150.**    During Rep. Miller's 2010 campaign, he had eight contributors hit the contribution limit. He was $10 under the aggregate contribution limit from PACs but chose to not accept any other contributions so as to not have to return all but $10 of the contribution. (*Id.* at ¶ 4.)

**151.**    During Rep. Miller's 2012 campaign, he had five contributors hit the contribution limit. He also received the maximum aggregate contribution limit from PACs. Because of this aggregate limit being reached, he had to return contributions from PACs. During that campaign, he did not have a primary opponent and his general election opponent did not live in the district, and was therefore ineligible. Because of the lack of a credible opponent, he chose to turn down many donations during the campaign. (*Id.* at ¶ 5.)

**152.**    During Rep. Miller's 2014 campaign, he had nine contributors hit the contribution limit and received the maximum aggregate contribution limit from PACs. Because of this aggregate limit being reached, he had to return contributions from PACs. He raised roughly $6,350 for this campaign. (*Id.* at ¶ 6.)

**153.**    In all his campaigns, he was able to raise $2,612 in unitemized contributions, representing 112 donors. (*Id.* at ¶ 7.)

**154.**    Rep. Miller testifies that, to his knowledge, the Montana State Republican Party does not frequently contribute directly to a legislative candidate. Most political party contributions to candidates come from county-level Republi-

can Central Committees or Republican Women Clubs. In a district that contains parts of four counties, a Central Committee is likely to limit its contribution to one-fourth of the contribution limit to that candidate, expecting other Central Committees will want to give as well. When all counties do the same, a candidate maxes out. (*Id.* at ¶ 8.)

155.   Rep. Miller did not feel like he could go back to prior donors from a particular campaign to ask for more money. He believed that individuals gave what they could afford, and he did not want to ask them to give more. Additionally, most small donors want to remain anonymous so going back and asking for more money would push this over the $35 threshold. (*Id.* at ¶ 9.)

156.   Rep. Miller did not self-finance my campaigns, with the exception of my 2008 primary campaign, where he ended his campaign over $2,000 in the red. (*Id.* at ¶ 10.)

157.   At no time during Rep. Miller's campaigns did he ever carry forward a balance from a previous election cycle since it is not permissible under Montana law. Instead, he treated all prior campaign materials (including yard signs and office supplies) as in-kind contributions from myself to my campaign. (*Id.* at ¶ 11.)

158.   Campaign mailers were a big part of Rep. Miller's campaigns due to the size of his district. While going door-to-door may be a reasonable alternative in a district that is only a couple square miles, it is impossible in his rural district.

Rep. Miller testifies that "[n]o two districts in Montana are the same so it is nearly impossible to compare campaign strategies and costs among them."(*Id.* at ¶ 12.)

159.   In order to reach all voters five times in Rep. Miller's district, he believes he would need to raise at least $12,000, plus money for signs and gas/mileage. (*Id.* at ¶ 13.)

160.   The Commission also offers to this Court the testimony of Sen. Bruce Tutvedt. (Doc. 245.)

161.   Sen. Tutvedt testifies that "if Republican legislators promised to introduce a right-to-work bill and get a vote of record in both houses, then the Republican Legislative Campaign Committee would receive in exchange $100,000 with more available if needed to elect Republican majorities to the Montana House and Senate." (Tutvedt Decl., Doc. 245, at ¶ 5.)

162.   National Right to Work's $100,000 offer to the Republican Legislative Campaign Committee was rejected. (*Id.* at ¶ 6.)

163.   The Plaintiffs have no adequate remedy at law. (Verified Compl. Doc. 1, at ¶ 102.)

## Conclusions of Law

164.   Contribution limits implicate fundamental First Amendment freedoms of political speech and political association. *McCutcheon v. FEC*, 134 S.Ct. 1434,

1441 (2014). The right to participate in democracy through political contributions is protected by the First Amendment, but may be regulated to protect against corruption or the appearance of corruption. *Id*. at 1441 (2010), *see also Randall v. Sorrell*, 548 U.S. 230, 246 (2006).

165.   Contribution limits will be upheld if:

> (1) there is adequate evidence that the limitation furthers a sufficiently important state interest, and (2) if the limits are "closely drawn"– i.e., if they (a) focus narrowly on the state's interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign.

*Lair v. Bullock*, 798 F.3d 736, 748 (9th Cir. 2015). *See also Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1092 (9th Cir. 2003).

166.   The Commission's burden applies both to proof of a cognizable interest, *see McCutcheon*, 134 S. Ct. at 1452-53, as well to prove the limits are closely drawn, *see id.* at 1457. Its evidence cannot be speculative, *id.* at 1452, "mere conjecture," *id.* at 1452, "highly implausible," *id.* at 1453, irrational, *id.* at 1454, premised on illegal conduct, *id.* at 1455, largely inapplicable, *id.* at 1455, or "divorced from reality," *id.* at 1456.

167.   When *Buckley* identified a sufficiently important state governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption. *Citizens United v. FEC*, 558 U.S. 310, 359 (2010). To be upheld, contribution limits must be closely drawn to serve a cogni-

zable interest in preventing either quid pro quo corruption or circumvention of laws targeting quid pro quo corruption. *McCutcheon,* 134 S. Ct. at 1434, 1450. "The Latin phrase [quid pro quo] captures the notion of an official act for money." *Id.* (*citing McCormick v. United States,* 500 U.S. at 266).

**168.**   Montana has an interest in preventing quid pro quo corruption.

**169.**   In order to pass constitutional muster, the contribution limits must not simply target "the largest contributions," *Eddleman*, 343 F.3d at 1092, but instead must be *large contributions targeting quid pro quo corruption. Buckley*, 424 U.S. 1, 25-27 (1976).

**170.**   Quid pro quo corruption has an established meaning under U.S. Supreme Court precedent. Quid pro quo corruption is: **1)** an explicit arrangement **2)** for the direct exchange of something of value for **3)** a public official's improper promise or commitment that is **4)** contrary to the obligations of his or her office **5)** in an effort to control a specific official, sovereign act. *See McCormick v. U.S.*, 500 U.S. 257, 273 (1991); *McCutcheon*, 134 S.Ct. at 1441 (citing *McCormick,* 500 U.S. at 266); *Colorado Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 615 (1996) (quoting *Buckley*, 424 U.S. at 47); FEC *v. Nat'l Conservative Political Action Committee*, 470 U.S. 480, 497 (1985); *U.S. v. Sun-Diamond Growers of California*, 526 U.S. 398, 404-05 (1999).

**171.**   Quid pro quo corruption relates the corruption of a public official, not

the intentions of the offeror.

172.   Quid pro quo corruption is not preventing ingratiation, *McCutcheon*, 134 S. Ct. at 1441, preventing access, *id.* at 1441, "ad hoc balancing of relative social costs and benefits," *id.* at 1449, leveling the playing field, *id.* at 1450, leveling electoral opportunities, *id.* at 1450, equalizing campaign financial resources, *id.* at 1451, or garnering influence, *id.* at 1451.

173.   Mont. Code Ann. § 13-37-216(1) and (4) ("base contribution limits") together prohibit individuals from making, and candidates from soliciting or accepting, contributions above set limits.

174.   The base contribution limits burden and chill the Plaintiffs' political speech and association. (Verified Compl., Doc. 1, at 45.) They are unconstitutional because they are not tailored to a quid pro quo interest, are not closely drawn to a sufficiently important state interest, prevent contributors from affiliating with candidates, and restrict a candidate's ability to run an effective campaign. *See Lair*, 798 F.3d at 748; *Eddleman*, 343 F.3d at 1092. *See also Randall*, 548 U.S. at 248 and 262.

175.   The base contribution limits are not narrowly tailored to the state's important interest. All of the alleged incidences of quid pro quo corruption that Defendants offer are legally insufficient.

176.   The Anderson letter is not quid pro quo corruption as a matter of law.

This is not evidence for quid pro quo corruption for at least two reasons: (1) no legislator agreed to take the offer and (2) there was no evidence of an improper promise or commitment contrary to the obligations of office.

177.   The Harper example is not quid pro quo corruption as a matter of law because funneling money into campaigns and lobbying to influence candidate—"gets results"—is not a quid pro quo exchange.

178.   Commissioner Motl's alleged incidences of quid pro quo corruption by nine Republican candidates in 2010 are not evidence of quid pro quo corruption as a matter of law. Commissioner Motl's "expert" testimony regarding these candidates that allegedly engaged in quid pro quo corruption is not credible. Commissioner Motl was a drafter and proponent for the initiative that lowered the base contribution limits and so has an interest in preserving these limits. All nine of the candidates he alleges engaged in quid pro quo corruption were investigated by him, had findings made against them by him, had civil suits filed against them by him, and for the two that have culminated in default judgments, he served as the primary, expert witness. Commissioner Motl's testimony demonstrates that he does not define quid pro quo corruption consistent with federal law, and no evidence exists that the courts that entered the default judgments adopted a definition consistent with federal law.  No notice of quid pro quo corruption charges was provided to the candidates against whom default judgment was

entered—indeed, it was struck for that reason from litigation proceedings against a third candidate. By all accounts, quid pro quo corruption was added to these state proceedings beginning in June 2015 in an effort to save the limits challenged here. Eight of the nine candidates testify that they did not engage in quid pro quo corruption, properly defined—indeed, the alleged offeror testifies that he didn't even ask for such an agreement—and were not even aware such a charge was lodged against them.

179.    Even if they were examples of quid pro quo corruption, the default judgments and judgment against candidate Wittich involved amounts between $9,000 and $20,000, substantially exceeding not only the current limits but the prior limits, as well. They therefore do not justify the lowered base contribution limits.

180.    The Commission's alleged incident of quid pro quo corruption in 2009, where Republican senators were offered $100,000 to the Republican Legislative Campaign Committee if they voted on a bill, is not evidence of quid pro quo corruption as a matter of law. No one agreed to take the offer, so the necessary exchange did not occur.

181.    The base contribution limits prevent candidates from amassing sufficient resources to mount an effective campaign. (Findings, Conclusions, and Order, Doc. 168, at 37-38.)

**182.**   Representative Miller needs $12,000 to reach all potential voters in his district by mail but was never able to raise more than $8000 or $9000. (Findings, Conclusions, and Order, Doc. 168, at 13; Miller Decl., Doc. 254, at ¶ 13.)

**183.**   Were it not for the base contribution limits, Representative Miller would have been about to raise the additional funds necessary to mount an effective campaign. (Findings, Conclusions, and Order, Doc. 168, at 13.)

**184.**   Candidates in Montana spend more on their campaigns than they raise. (*Id.* at 8.)

**185.**   A significant number of contributors give at the maximum level and significantly greater funds would be available if the limits were raised. (*Id*. at 29.)

**186.**   Donors under the $35 reporting requirement are not a good source for repeat donations and so do not provide additional assistance candidates in amass the necessary resources for their campaigns. (Miller Decl., Doc. 254, at ¶ 9.)

**187.**   Mont. Code Ann. § 13-37-216(2) (the "aggregate political party contribution limits") limits contributions from political parties to their candidates by imposing an aggregate limit on the contributions all political parties may make to any candidate.

**188.**   Political parties occupy a unique place in the American Republic. They exist to allow citizens to band together to elect candidates. *Randall*, 548 U.S. at 258; *California Democratic Party v. Jones*, 530 U.S. 567, 574 (2000). They

must be allowed to make contributions that are sufficiently robust to ensure that the right to political association within political parties and the special role of the political party in American society is not threatened. *Randall*, 548 U.S. at 256-59.

**189.**   The aggregate political party contribution limits burden and chill First Amendment political speech and association freedoms without constitutional justification. (Verified Compl., Doc. 1, ¶ 89.)

**190.**   The aggregate political party contribution limits are not sufficiently robust to avoid impermissibly "reduc[ing] the voice of political parties . . . to a whisper." *Randall*, 548 U.S. at 259.

**191.**   Because they are an aggregate limit on contributions from *all* political parties, the aggregate political party contribution limits further reduce if not precludes the contribution any one political party can make to a candidate. (Verified Compl., Doc. 1, ¶ 89.)

**192.**   The aggregate political party contribution limits fail any scrutiny review because they do not serve any constitutionally cognizable interest. *See McCutcheon*, 134 S. Ct. at 1441.

**193.**   The aggregate political party contribution limits do not serve a cognizable anti-corruption interest because a circumvention interest requires that the law being circumvented be an otherwise constitutional law. *See McCutcheon*, 134 S.Ct. at 1452-60.

**194.**   Montana has no circumvention interest because it permits political parties to pay for candidate's staff without such payment amounting to a contribution. *See* ARM 44.11.401(2). Contributors can circumvent the law by simply contributing funds to a political party that in turns uses their contributions to pay for staff. *Id*.

**195.**   The aggregate political party contribution limits are not closely drawn because Montana's contribution limits interfere with political committees' and political parties' ability to associate with candidates—having reduced the voice of political committees to a whisper. (Findings, Conclusions, and Order, Doc. 168, at 39.)

**196.**   The aggregate political party contribution limits prevent political parties from associating with an candidate once that candidate has reached the maximum contribution from all political parties.

**197.**   The aggregate political party contribution limits are not closely drawn because they prevent candidates from amassing sufficient resources to mount an effective campaign. In fact, competitive races in Montana are not adequately funded. (Findings, Conclusions, and Order, Doc. 168, at 29-30.)

**WHEREFORE,** the Plaintiffs request the following relief:

1.      Declare Mont. Code Ann. §§ 13-37-216(1) and (4), which together limit the amount of contributions individuals may make to candidates, and candidates may accept from individuals, unconstitutional both facially and as applied to the Plaintiffs and enjoin their enforcement.

2.      Declare Mont. Code Ann. §§ 13-37-216(2) and (4), which together limit contributions political parties may make to their candidates, and candidates may accept from political parties, unconstitutional both facially and as applied to the Plaintiffs and enjoin their enforcement.

3.      Grant the Plaintiffs their costs and attorneys fees under 42 U.S.C. § 1988 and any other applicable authority, and

4.      Grant any and all other relief this Court deems just and equitable.

Dated: April 22, 2016

Respectfully Submitted,

/s/ Anita Y. Milanovich

James Bopp, Jr. (Ind. No. 2838-84)*
Jeffrey Gallant (Va. No. 46876)**
Courtney E. Turner (Ind. No. 32178-29)***
THE BOPP LAW FIRM, PC
The National Building
1 South Sixth Street
Terre Haute, Ind. 47807
Phone: (812) 232-2434
Fax: (812) 235-3685
Email: jboppjr@aol.com
jgallant@bopplaw.com
cturner@bopplaw.com
*Counsel for Plaintiffs*

Anita Y. Milanovich (Mt. No. 12176)
THE BOPP LAW FIRM, PC
1627 West Main Street, Suite 294
Bozeman, MT 59715
Phone: (406) 589-6856
Email: aymilanovich@bopplaw.com
*Local Counsel for Plaintiffs*

*Motion pro hac vice granted 9/9/11.
**Motion pro hac vice granted 6/11/12.
***Motion pro hac vice granted 2/1/16.

## Certificate of Service

I hereby certify that the foregoing document was served on April 22, 2016,

upon the following counsel via the United States District Court for the District of

Montana, Helena Division, electronic filing system:

TIMOTHY C. FOX
Montana Attorney General
DALE SCHOWENGERDT
State Solicitor
MATTHEW T. COCHENOUR
PATRICK RISKEN
Assistants Attorney General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: 406-444-2026
Fax: 406-444-3549
dales@mt.gov
mcochenour2@mt.gov
prisken@mt.gov
*Attorneys for Defendants*

/s/ Anita Y. Milanovich
Anita Y. Milanovich