TIMOTHY C. FOX
Montana Attorney General
DALE SCHOWENGERDT
Solicitor General
MATTHEW T. COCHENOUR
PATRICK M. RISKEN
Assistant Attorneys General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: 406-444-2026
Fax: 406-444-3549
dales@mt.gov
mcochenour2@mt.gov
prisken@mt.gov

COUNSEL FOR DEFENDANTS

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| DOUG LAIR, STEVE DOGIAKOS, AMERICAN TRADITION PARTNERSHIP, AMERICAN TRADITION PARTNERSHIP PAC, MONTANA RIGHT TO LIFE ASSOCIATION PAC, SWEETGRASS COUNCIL FOR COMMUNITY INTEGRITY, LAKE COUNTY REPUBLICAN CENTRAL COMMITTEE, BEAVERHEAD COUNTY REPUBLICAN CENTRAL COMMITTEE, JAKE OIL, LLC, JL OIL, LLC, CHAMPION PAINTING, INC., and JOHN MILANOVICH, <br><br> Plaintiffs, <br><br>  v. <br><br> JONATHAN MOTL, in his official capacity as Commissioner of Political Practices; TIM FOX, in his official capacity as Attorney General of the State of Montana; and LEO GALLAGHER, in his official capacity as Lewis and Clark County Attorney, <br><br> Defendants. | CV 12-12-H-CCL <br><br><br> **FINDINGS OF FACT CONCLUSIONS OF LAW OPINION AND ORDER** <br><br> **(PROPOSED)** |

At issue in this case is the constitutionality of the State of Montana's contribution limits that apply to individuals, political committees, and political parties. On April 18, 2016, the parties appeared before this Court for a hearing on cross motions for summary judgment. The plaintiffs (collectively, Lair) were represented by James Bopp, Jr. and Anita Milanovich, and the defendants (collectively, Montana) were represented by Dale Schowengerdt, Matthew Cochenour, and Patrick Risken.

Based upon the evidence, the parties' arguments, and for the reasons set forth below, the Court upholds Montana's limits as constitutional.

## FINDINGS OF FACT

1.    Since 1975, the State of Montana has had contribution limits, which limit how much money individuals, political committees, and political parties may contribute to candidates for public office.

2.    In 1994, Montana enacted new contribution limits through citizens' initiative, I-118. Prior to I-118, the contribution limits for the election cycle were as follows:

**Contribution limits for individuals**

| Office | Contribution Limit - Election Cycle |
|---|---|
| Governor/Lieutenant Governor | $1,500 |
| Other Statewide offices | $750 |

| PSC, Senate, Dist. Ct. Judge | $400 |
|---|---|
| House | $250 |

**Aggregate limits for political committees, including parties**

| Office | Contribution Limit - Election cycle |
|---|---|
| Governor/Lieutenant Governor | $8,000 |
| Other Statewide offices | $2,000 |
| Public Service Commission | $1,000 |
| Senate | $600 |
| Other public office (House) | $300 |

These limits were set forth in statute. Mont. Code Ann. § 13-37-216.

3.      After the passage of I-118, the limits changed in a number of ways.

The limits for individuals and political committees were reduced, and the limits on

political parties were increased. Additionally, rather than applying to the election

cycle, the limits applied to each election. In 2003, the limits were increased.

4.      In 2007, the statute was amended to include an inflation factor to

increase limits using the consumer price index. Mont. Code Ann. § 13-37-216(3).

The current limits for 2016 are as follows:

**Contribution limits for individuals and political committees**

| Office | Contribution Limit/per election |
|---|---|
| Governor | $660 |
| Other Statewide offices | $330 |
| Other public offices (House / Senate) | $170 |

**Aggregate limits for political parties (ARM 44.11.227(2))**

| Office | **Contribution Limit/per election** |
|---|---|
| Governor | $23,850 |
| Other Statewide offices | $8,600 |
| Public Service Commission | $3,450 |
| Senate | $1,400 |
| Other public office (House) | $850 |

5.     In 2000, Montana's contribution limits were challenged in the Billings Division for the District of Montana, and upheld as constitutional. *See Montana Right to Life Assn. v. Eddleman*, 2000 U.S. Dist. LEXIS 23161 (D. Mont. Sept. 19, 2000). The Ninth Circuit affirmed and upheld Montana's limits in *Montana Right to Life Assn. v. Eddleman*, 343 F.3d 1085 (9th Cir. 2003).

6.      Three years later, the United States Supreme Court decided *Randall v. Sorrell*, 548 U.S. 230 (2006), and, for the first time, struck down a State's contribution limit.

7.      This is the second time in this action that the Court has been required to rule on the constitutionality of Montana's contribution limits.  In October 2012, the Court determined that *Randall* had obviated *Eddleman*'s authority, determined that Montana's limits were unconstitutional, and permanently enjoined Montana from enforcing the limits.  *See* Docs. 157, 168.

8.      Montana appealed this Court's ruling and sought a stay pending appeal.  The Ninth Circuit granted the motion for a stay, stating "we believe that the state is likely to succeed on appeal."  *Lair v. Bullock*, 697 F.3d 1200, 1202 (9th Cir. 2012).

9.      In fact, Montana was successful in its appeal.  Following briefing and oral argument, the Ninth Circuit reversed and remanded the case to this Court. *Lair v. Bullock*, 798 F.3d 736 (9th Cir. 2015) (*Lair II*).  The Ninth Circuit taxed costs against Lair and issued its formal mandate on September 14, 2015.  Doc. 198.

10.     Contribution limits are constitutional if they further a sufficiently important interest and are closely drawn.  *See Buckley v. Valeo*, 424 U.S. 1, 25 (1976).  In its opinion, the Ninth Circuit determined that the meaning of corruption that had been held to be a sufficient interest in *Eddleman* had been

subsequently narrowed by *Citizens United v. Federal Election Commn.*, 558 U.S. 310 (2010). *Lair II*, 798 F.3d at 748. Following *Citizens United*, "'corruption' means only quid pro quo corruption, or its appearance." *Id.* at 746.

11. Because of the newly narrowed corruption interest and because this Court followed the plurality opinion in *Randall* rather than the test set forth in *Eddleman*, the Ninth Circuit remanded for Montana's contribution limits to be measured under the correct standard. *Lair II*, 798 F.3d at 748.

12. The Ninth Circuit provided instructions for remand. This Court is "either (1) to decide whether Montana has carried its burden in showing the contribution limits further a valid 'important state interest' or, if the district court again assumes the state has carried its burden, (2) to identify expressly what interest the district court assumes exists." *Lair II*, 798 F.3d at 748.

13. Additionally, the Ninth Circuit stated that "Montana should have an opportunity to develop a record aimed at the new 'important state interest' standard as well as the corresponding 'closely drawn' analysis." *Lair II*, 798 F.3d at 748 n.8.

14. On November 10, 2015, the Court and the parties met for a scheduling conference, and the parties stipulated to the admission of the *Eddleman* record and to a limited discovery period. Following the discovery period, the parties cross

moved for summary judgment, and on April 18, 2016, this Court conducted a hearing on the motions.

15. Montana presented evidence from the *Eddleman* trial as well as more recent evidence to support its interest in preventing quid pro quo corruption. From *Eddleman*, Montana presented testimony from Representative Hal Harper, who testified that that groups funneled money into campaigns before a vote "because it gets results."

16. Montana also presented evidence of a confidential letter written by Senator Mike Anderson to his colleagues, which stated:

> Dear Fellow Republicans. Please destroy this after reading. Why? Because the Life Underwriters Association in Montana is one of the larger Political Action Committees in the state, and I don't want the Demo's to know about it! In the last election they gave $8,000 to state candidates. . . . Of this $8,000--Republicans got $7,000--you probably got something from them. This bill is important to the underwriters and I have been able to keep the contributions coming our way. In 1983, the PAC will be $15,000. Let's keep it in our camp.

17. Montana presented evidence of the impact of that letter from the testimony of a fellow senator, who testified that the letter was "unconscionable":

> It was not the way to pass bills. You passed bills on their merit, on convincing your fellow Senators that there's a reason to pass it, and let it go at that. But to remind people that they received money and therefore should pass it, and even to suggest that if they vote for it they'll get more money, it just tainted the bill. It was totally unacceptable.

18. In addition to the *Eddleman* examples, Montana presented testimony from a current Montana state legislator. Senator Bruce Tutvedt testified that, in 2009, Republican senators were informed that if they introduced and voted on a right-to-work bill, then the National Right to Work group would make at least $100,000 available to elect Republican majorities.

19. Montana also provided evidence of state court decisions in which the courts had found examples of quid pro quo corruption. Specifically, Montana directed this Court to *Molnar v. Fox*, 301 P.3d 824, ¶ 30 (Mont. 2013), where the Montana Supreme Court held that a Public Service Commissioner unlawfully accepted financial gifts from power companies because the gifts "would tend to improperly influence a reasonable person in Molnar's position."

20. Montana also presented evidence in the form of two state district court default judgments, in which the courts determined that legislative candidates had engaged in quid pro quo corruption by accepting large corporate contributions in return for promising 100% support for the corporations' agenda: *Commissioner of Political Practices v. Boniek*, XADV-2014-202; *Commissioner of Political Practices v. Prouse*, DDV-2014-250.

21. Montana also presented the expert witness testimony of Commissioner of Political Practices Jonathan Motl, who offered the opinion that, as in the *Boniek* and *Prouse* cases, several 2010 candidates engaged in quid pro

quo arrangements by pledging "100% support" for particular corporate groups'

legislative agendas in exchange for the groups orchestrating large scale campaign

plans on the candidates' behalves.

22.     Additionally, Montana presented evidence that, on April 1, 2016, a

jury found that a Montana state legislator had taken illegal corporate contributions

(the quid in the *Boniek* and *Prouse* cases) and illegally coordinated his political

campaign with National Right to Work in the case *Commissioner of Political*

*Practices v. Wittich*, BDV-2014-251.

23.     Lair too relied on evidence such as the *Boniek* and *Prouse* decisions.

Additionally, Lair presented evidence in the form of the 1994 Voter Information

Pamphlet which addressed I-118, three studies which addressed I-118's effects on

campaign funding, *Eddleman* court filings, the transcript of Commissioner Motl's

deposition, newspaper articles on the Art Wittich trial, hearing transcripts from the

*Boniek* and *Prouse* cases, and briefings, filings, and exhibits from the Wittich trial,

and Commissioner decisions.

24.     To rebut Commissioner Motl's report, Lair also presented declarations

from the candidates identified in his report, with the exception of candidate

Boniek.  In those declarations, the candidates stated that they never made an

express or implied arrangement to act in an official capacity at a corporate group's

direction.

25.     Regarding the closely drawn tailoring, the parties relied on testimony presented in the *Eddleman* trial and the *Lair* trial.

26.     Additionally, Montana presented evidence in the form of expert witness testimony from Edwin Bender, who analyzed the average amounts raised in federal and state raises and also analyzed the contributions raised by Representative Mike Miller.  Lair presented evidence in the form of a declaration from Miller.

## CONCLUSIONS OF LAW

Based on the above findings of fact, the Court enters the following conclusions of law:

1.     To the extent that finding of fact is properly a conclusions of law, or vice versa, the label does not control.

2.     Lair's challenge to the Montana statutes arises under the First Amendment to the United States Constitution.  Jurisdiction is proper under 28 U.S.C. § 1331.  The defendants are State of Montana officials.  Venue is proper under 28 U.S.C. §1391(b).

3.     Summary judgment is proper if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it could "affect the outcome" of a lawsuit, and

an issue is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

4.     There are four options available to the Court.  First, the Court could grant summary judgment in favor of Montana, and uphold the contribution limits as constitutional.  Second, the Court could grant summary judgment in favor of Lair, the effect of which would be to reinstate the pre-I-118 limits set forth above.[1] *See e.g.*, *State ex rel. Woodahl v. District Court*, 511 P.2d 318, 322 (Mont. 1973) (unconstitutional amendment to a law "leaves the section intact as it had been before the attempted amendment."); *also Nixon v. Shrink Missouri Govt. PAC*, 528 U.S. 377, 381 (2000) (noting that the "upshot" of the 8th Circuit's ruling striking down Missouri's limits was that the previously enacted statute took effect).  Third, the Court could grant partial summary judgment to both parties; for example, by upholding the limits on political parties and striking limits on individuals or by upholding limits on statewide races, but striking down legislative limits.  Fourth, the Court could deny summary judgment for all parties and proceed to trial.

5.     For the reasons set forth below, the Court concludes that Montana's contribution limits pass constitutional muster, and the Court accordingly grants summary judgment in favor of Montana.

---

[1] Lair has not challenged the inflation factor contained in Mont. Code Ann. § 13-37-216(3), so the pre-I-118 limits would need to be adjusted for inflation.

6.     Under *Lair II*, Montana's contribution limits must be upheld if: "(1) there is adequate evidence that the limitation furthers a sufficiently important state interest, and (2) if the limits are 'closely drawn'--i.e., if they (a) focus narrowly on the state's interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign." *Lair II*, 798 F.3d at 748.

## I.     SUFFICIENTLY IMPORTANT STATE INTEREST

7.     In *Buckley*, the Supreme Court held that preventing corruption and the appearance of corruption constitute "constitutionally sufficient justification[s]" to uphold contribution limits. *Buckley*, 424 U.S. at 26. As the Ninth Circuit recognized, after *Citizens United*, the meaning of corruption has been narrowed to mean only quid pro quo corruption or its appearance. *Lair II*, 798 F.3d at 740. The Court in both *Citizens United* and *McCutcheon v. Federal Election Commn*, 134 S. Ct. 1434 (2014), drew its understanding of corruption from *Buckley*.

8.     In addition to actual quid pro quo corruption, *Buckley* recognized that preventing the appearance of corruption was a constitutionally sufficient justification for upholding contribution limits: "[o]f almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." *Id*. at 27.

9.     Thus, "corruption" includes actual quid pro quo arrangements, such as an exchange of "dollars for political favors," *McCutcheon*, 134 S. Ct. at 1450, and the appearance of corruption that comes from the public's awareness of the opportunities for this type of abuse, *Buckley*, 424 U.S. at 27.

10.     In support of its contribution limits, Montana has identified its interest as preventing quid pro quo corruption or its appearance and preventing circumvention.  Additionally, Lair agrees that Montana has an interest in preventing quid pro quo corruption, the appearance of quid pro quo corruption, and circumvention.  Notwithstanding this agreement, the parties dispute the contours of the meaning of quid pro quo corruption.  The most significant disagreement concerns whether actual corruption is required before there can be any appearance of corruption.  Lair argues that actual corruption must be shown.  Montana argues that actual corruption need not be shown for there to be an appearance of corruption.

11.     Under *Buckley*, actual corruption is not a prerequisite to apparent corruption.

12.     While *Buckley* was clearly concerned with the danger of actual corruption, the Court was separately concerned with the "impact of the appearance" of corruption arising from the inherent opportunities for abuse in a system of large contributions.

13.     *Buckley*'s concern is emphasized in the "deeply disturbing" examples that *Buckley* referred to.  *See Buckley*, 424 U.S. at 27 n.28.  The *Buckley* Court approvingly cited to the court of appeals decision which recounted that, before announcing an action the President had taken in favor of the dairy industry, the White House informed the industry that it wanted the group to reaffirm a $2 million pledge; the court found it immaterial "whether the President's decision was in fact, or was represented to be conditioned upon or 'linked' to, the reaffirmation of the pledge."  *Buckley v. Valeo*, 519 F.2d 821, 839-40 n.36 (D.C. Cir. 1975).

14.     The evidence provided by Montana meets the standard of quid pro quo corruption or its appearance.

15.     The amount of evidence required depends on the "novelty and plausibility of the justification raised."  *Citizens for Clean Government v. City of San Diego*, 474 F.3d 647, 652-53 (9th Cir. 2007) (citation omitted).

16.     Montana's burden is low because preventing corruption in the context of direct contributions to candidates is "neither novel nor implausible"; rather it is the "paradigmatic sufficient state interest . . . ."  *Id*.

17.     Montana's evidence shows that there are appearances of opportunities for quid pro quo exchanges.  For example, Senator Anderson's letter reminded legislators that they had received money from a PAC and should therefore vote for

a bill important to the PAC and he implied that, if they did, they would receive more money. In other words, the letter encouraged legislators to take an official action because of money they had received.

18.     Similarly, Senator Tutvedt's testimony that Republican legislators were offered $100,000 *if* they agreed to bring a right-to-work bill to a vote is a textbook example of the appearance of quid of quid pro quo corruption--this was an offer of dollars for political favors.

19.     These examples show the appearance of corruption that comes from the public's awareness of the opportunities for these types of abuses. *Buckley*, 424 U.S. at 27.

20.     Lair has presented no issue of genuine fact regarding this evidence. Rather, Lair argues that the fact that there was no acceptance of the offer shows that it cannot satisfy the corruption interest. This argument was rejected above because it ignores that preventing the "impact of the appearance of corruption stemming from public awareness of the opportunities for abuse in a regime of large individual financial contributions" constitutes a constitutionally sufficient justification for limits. *United States v. Whittemore*, 776 F.3d 1074, 1081 (9th Cir. 2015).

21.     Lair's argument also ignores that "restrictions on direct contributions are preventative, because few if any contributions to candidates will involve quid pro quo arrangements." *Citizens United*, 558 U.S. at 357.

22.     Montana's evidence in the form of the Montana Supreme Court's *Molnar v. Fox*, 301 P.3d 824 (Mont. 2013) decision also supports Montana's interest in preventing actual and apparent corruption.

23.     In *Molnar*, the Montana Supreme Court held a Public Service Commissioner unlawfully accepted financial gifts from NorthWestern Energy and PPL Montana because the gifts "would tend to improperly influence a reasonable person in Molnar's position." *Molnar*, ¶ 30.

24.     The *Molnar* Court noted that its inquiry was "not whether the gifts, in fact, influenced Molnar to depart from the faithful and impartial discharge of his public duties (a subjective standard) but, rather, whether the gifts would tend to improperly influence a 'reasonable person' in Molnar's position (an objective standard)." *Molnar*, ¶ 29.

25.     The state district court *Boniek* and *Prouse* decisions demonstrate actual corruption.  In *Boniek* and *Prouse*, the courts determined that the candidates exhibited actual quid pro quo corruption by accepting large corporate contributions in return for promising 100% support for the corporations' agenda.

26.     The quid in *Boniek* and *Prouse* was the appearance of a grass roots campaign created by direct mail for which the candidates did not pay, report or disclose.

27.     The courts in *Boniek* and *Prouse* determined that the "pro quo" was the candidates' promise of unswerving fealty to the corporations carrying out the campaign.

28.     Though Lair has challenged the evidence underlying the *Boniek* and *Prouse* judgments, this Court does not sit in review of state court decisions, and the fact remains that judges reached decisions in those cases and ruled that quid pro quo corruption occurred.

29.     While *Boniek* and *Prouse* are default judgments, they are judgments nonetheless and entitled to the weight of any other state court decision.

30.     Further, on April 1, 2016, when a Montana jury found that Representative Art Wittich had taken illegal corporate contributions, the jury necessarily found that the "quid" at issue in *Boniek* and *Prouse*--the corporate contributions in the form of orchestrating a large scale campaign plan--was present.

31.     The *Wittich* case provides further support for finding that Montana has a sufficiently important state interest.  The Supreme Court has recognized the difficulty in gathering evidence to support longstanding statutes and that "no data

can be marshaled to capture perfectly the counterfactual world in which" an existing campaign finance law does not exist. *McCutcheon*, 134 S. Ct. at 1457. Thus, the Court considers "whether experience under the present law confirms a serious threat of abuse." *Id*. The jury's finding that Wittich took illegal corporate contributions illustrates how, even under existing law, candidates try to get around existing campaign finance laws and contribution limits.

32. The examples contained in Commissioner Motl's report constitute evidence of actual or apparent quid pro quo corruption. In his sworn report, Motl testified that several 2010 candidates engaged in quid pro quo arrangements, in which the candidates pledged "100% support" for particular corporate groups' legislative agendas in exchange for the corporate groups orchestrating a large scale campaign plan on behalf of the candidates.

33. Lair has presented declarations from some candidates, including Wittich, to rebut Motl's report, stating that they did not expressly or impliedly agree to act in an official capacity on behalf of a corporation. As to these candidates, these declarations could conceivably create an issue of fact if Montana's only interest were in preventing actual quid pro quo corruption, but that is not its only interest.

34. Further, there is no need for this Court to weigh the factual testimony between Motl and Wittich. A jury has already considered their testimony and

determined that Wittich took illegal corporate contributions, which is the "quid" identified in Motl's report and in the *Boniek* and *Prouse* decisions.

35.     Additionally, Lair did not submit a declaration from Boniek, but informed the Court that Boniek had declined to provide a declaration. Thus, the Commissioner's report pertaining to Boniek is unrebutted.

36.     Moreover, in light of the examples and other evidence cited above, the conflicting testimony does not present a genuine issue of material fact that would prevent this Court from deciding as a matter of law that Montana's contribution limits further the sufficiently important state interest in preventing corruption or the appearance of corruption.

37.     The Court concludes that Montana's contribution limits further the sufficiently important state interest in preventing corruption or the appearance of corruption.

## II.     CLOSELY DRAWN

38.     In considering tailoring under the *Lair II* test, the Court considers whether the limits focus narrowly on the State's interest, whether they allow a contributor to affiliate with a candidate, and whether they prevent candidates from amassing sufficient resources to run an effective campaign. *Lair II*, 798 F.3d at 748.

39.     The Court concludes that Montana's limits are closely drawn.

A. **Narrow Focus**

40. In upholding contribution limits, *Buckley* stated that the limits "focus[] precisely on the problem of large campaign contributions--the narrow aspect of political association where the actuality and potential for corruption have been identified . . . ." *Buckley*, 424 U.S. at 28.

41. *McCutcheon* similarly recognized the base limits were constitutional because "they targeted 'the danger of actual quid pro quo arrangements' and 'the impact of the appearance of corruption stemming from public awareness' of such a system of unchecked direct contributions." *McCutcheon*, 134 S. Ct. at 1451 (quoting *Buckley*, 424 U.S. at 27).

42. *McCutcheon* observed that "the risk of quid pro quo corruption is generally applicable only to 'the narrow category of money gifts that are directed, in some manner, to a candidate or officeholder.'" *McCutcheon*, 134 S. Ct. at 1452 (citation omitted).

43. The Court is deferential regarding dollar amounts and, if a limit is justified, the Court will not invalidate it for lack of "fine tuning[.]" *See Buckley*, 424 U.S. at 30.

44. The Court determines that Montana's contribution limits are narrowly focused because they limit only large, direct contributions to candidates. First, Montana's limits apply only to direct contributions to candidates. The limits do

not affect how much candidates can contribute to their own campaigns. They do not limit how much individuals or political committees can contribute to a political committee or to a political party. They do not limit independent spending.

45. Because there are no limits on contributions to political party committees, the limits on party contributions to a candidate also serve to prevent circumvention of individual contribution limits, which is a well-recognized type of corruption. *Federal Election Commn. v. Colorado Republican Federal Campaign Committee*, 533 U.S. 431, 456 (2001).

46. Second, the limits apply only to large contributions by Montana standards. Notably, the Ninth Circuit has already found that the limits reach only large contributions. *Eddleman*, 343 F.3d at 1094 (agreeing with district court that Montana's contribution limits affect only the largest contributions).

47. Additionally, Montana's expert witness Bender established that, percentage-wise, Montana's state limits are significantly larger than the corresponding federal limits.

48. Significantly, the parties do not dispute that the limits target only large contributions.

49. Though not disputing that Montana's limits target "large contributions," Lair nonetheless contends that limits cannot just aim at large contributions; rather, they must target "large contributions that could

result or appear to result in quid pro quo corruption." The Court rejects this argument as it runs counter to *Buckley*, which determined that the appearance of corruption stemmed from the awareness of "the opportunities for abuse *inherent* in a regime of large individual financial contributions." *Buckley*, 424 U.S. at 27 (emphasis added).

50.     Requiring corruption to only be present in large contributions that were corrupting would make *Buckley*'s formulation redundant and wholly eliminate the appearance of corruption as a sufficient state interest.

### B.     Limits Do Not Prevent Contributors from Associating

51.     Under this factor, the Court must consider whether the limits allow a maxed-out contributor to associate with a candidate. *Buckley* recognized that contribution limits focused on the problem of large contributions but left "persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources." *Buckley*, 424 U.S. at 28.

52.     *Eddleman* similarly recognized that Montana's limits "in no way prevents PACs from affiliating with their chosen candidates in ways other than direct contributions, such as donating money to a candidate's political party, volunteering individual members' services, sending direct mail to their supporters,

or taking out independent newspaper, radio, or television ads to convey their support." *Eddleman*, 343 F.3d at 1094.

53.     The testimony presented in this case establishes that the contribution limits do not prevent individuals or parties from affiliating with candidates.  For example, Doug Lair testified that, in addition to contributing, he volunteered, wrote letters to the editor, helped others write letters, reviewed candidates' letters, maintained a blog, put up signs, went door to door, held fundraisers, placed newspaper ads, and participated in strategy meetings.

54.     Political parties can engage in the same activities.  Further, parties can affiliate by providing paid staff that is not subject to contribution limits.  *See* Mont. Admin. R. 44.11.401.  The testimony presented established that political parties also affiliate through trainings, developing campaign messages, organizing volunteers, scheduling events, and identifying known donors for fundraising.

55.     Montana's limits do not prevent contributors from affiliating with candidates in numerous ways other than direct contributions.

56.     While there was testimony from political party representatives that their desired means of associating with a candidate was through contributions and that they did not wish to provide staff or associate in other ways, this does not raise a genuine issue of material fact.  The question under *Buckley* is whether the limits prevent association with a candidate.  Clearly they do not.  In addition to making

contributions, contributors have significant other ways to engage in speech and association.

### C.    Limits Do Not Prevent Candidates from Amassing Resources

57.    *Buckley* observed that contribution limits could severely impact political discourse if they prevented a candidate from "amassing the resources necessary for effective advocacy." *Buckley*, 424 U.S. at 21; *accord Eddleman*, 343 F.3d at 1091.

58.    Requiring candidates to raise funds from more sources, however, does not violate the First Amendment. *Eddleman*, 343 F.3d at 1091 (quoting *Buckley*, 424 U.S. at 21-22) ("If a candidate is merely required 'to raise funds from a greater number of persons and to compel people who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression,' the candidate's freedom of speech is not impugned by limits on contributions.")

59.    Under this factor, the Court does not consider contributions in isolation, but must consider all the dollars that are forthcoming and whether candidates can look to other sources for money. *Eddleman*, 343 F.3d at 1094.

60.    The undisputed facts show that candidates may have to raise money from more sources than if no limits existed but that candidates can nonetheless run effective campaigns.

61.     For example, in *Eddleman*, Mike Cooney, who campaigned for the offices of secretary of state and governor, testified that the "biggest impact" of contribution limits was that he had "to go out and talk to a lot more people," and that he had turned that into an advantage as a way to meet more people. Cooney testified that he didn't feel the contribution limits had harmed his candidacy.

62.     Lair did not present the any testimony from a candidate for statewide office to rebut Cooney's testimony.

63.     Representative Hal Harper also testified in *Eddleman* that the contribution limits had "negligible effects" on the ability to raise money, but just required talking "to more people to raise the same amount of money."

64.     Notably, in *Eddleman*, the Ninth Circuit agreed with the district court's finding that candidates were able to mount effective campaigns, notwithstanding the limits. *Eddleman*, 343 F.3d at 1095.

65.     Montana's expert witness Bender compared current data with that presented in *Eddleman* and determined that no significant changes had occurred.

66.     Lair presented no testimony from candidates for senate, governor, or any other statewide office that would rebut Montana's evidence.

67.     Lair relied on testimony from Representative Mike Miller for the claim that candidates could not raise the necessary resources. Miller testified that contribution limits had stayed the same while the costs of pencils, postage stamps,

yard signs, and gasoline had increased. Additionally, Miller testified that he could not send out as many mailers as he felt were necessary.

68.     Under this factor, however, the question is not whether the limits make a campaign different than the candidate would like, but whether they make the candidate's campaign ineffective. *Eddleman*, 343 F.3d at 1095.

69.     Miller won all four of his races and in all of his races combined, only seven individuals maxed out, while 140 gave below the limit and above the reporting threshold. Additionally, Miller received thousands in contributions below the reporting threshold of $35. Assuming a $20 average contribution, Miller had approximately 110 additional donors. Notably, when Miller's contributors are tallied, they represent only about half of one percent of the voting age population in Miller's district.

70.     The contributors who gave below the limit and who gave unitemized contributions were sources that Miller could look to for addition contributions if necessary.

71.     Additionally, Miller testified that he never received the maximum contribution from a political party, and he never requested paid staffers. Thus, the political party was another source Miller could have looked to for contributions.

72.     Additionally, Miller received less than the maximum aggregate PAC contributions allowable under Mont. Code Ann. § 13-37-218 (a statute Plaintiffs

have not challenged) in his 2010 and 2014 campaigns. *Id*. at 17. Thus, in these elections, PACs were another source for contributions.

73.     Montana's expert witness Bender reviewed Miller's testimony and data, and Bender opined that the "contribution limits did not prevent Rep. Miller from raising additional funds from individual donors who had not already given the maximum, or from hundreds, if not thousands, of other voters in his district." Bender further opined that the limits "did not prevent Rep. Miller from raising sufficient funds to mount an effective campaign."

74.     Miller testified that Montana's numbers are wrong and that more donors maxed out, but his numbers appear to be inflated because he failed to double the limits for his contested races. He also testified that he didn't feel like he could ask contributors who had already donated to his campaign, notwithstanding that the testimony from both Montana's and Lair's expert witnesses indicated that a person who has donated once is a likely source for additional donations.

75.     There is no need for this Court to weigh in on these factual questions because they do not amount to a genuine issue of material fact.

76.     In analyzing tailoring, courts must consider "all dollars likely to be forthcoming in a campaign" and whether a "candidate can look elsewhere for money[.]" *Eddleman*, 343 F.3d at 1094 (citing *Buckley*, 424 U.S. at 21-22).

77.     Given all of the untapped resources--the below-max donors, the
unitemized donations, and the political parties--Miller's testimony does not create
a genuine issue of material fact regarding whether the limits prevent candidates
from amassing the resources necessary to engage in effective advocacy.

78.     Montana's contribution limits are closely drawn.

79.     Montana's contribution limits serve the sufficiently important state
interest of preventing quid pro quo corruption and the appearance of corruption
and they are appropriately tailored under the Ninth Circuit's *Lair II* framework.


## ORDER

Based on the above findings of fact and conclusions of law, this Court
hereby GRANTS Montana's motion for summary judgment and DENIES Lair's
motion for summary judgment.

Dated this _____ day of April 2016.


_____
CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE

Respectfully submitted this 22nd day of April 2016.

TIMOTHY C. FOX
Montana Attorney General
DALE SCHOWENGERDT
Solicitor General
MATTHEW T. COCHENOUR
PATRICK M. RISKEN
Assistant Attorneys General
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401

By:    */s/ Matthew T. Cochenour*
       MATTHEW T. COCHENOUR
       Assistant Attorney General
       Counsel for Defendants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing document with the

clerk of the court for the United States District Court for the District of Montana by

using cm/ecf system.  Participants in the case who are registered cm/ecf users will

be served by the appellate cm/ecf system.


Dated: April 22, 2016            */s/ Matthew T. Cochenour*
       MATTHEW T. COCHENOUR
       Assistant Attorney General
       Counsel for Defendants