IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION



**FILED**

MAY 1 7 2016

Clerk, U.S. District Court
District Of Montana
Helena

| | |
|---|---|
| DOUG LAIR, STEVE DOGIAKOS, AMERICAN TRADITION PARTNERSHIP, AMERICAN TRADITION PARTNERSHIP PAC, MONTANA RIGHT TO LIFE ASSOCIATION PAC, SWEETGRASS COUNCIL FOR COMMUNITY INTEGRITY, LAKE COUNTY REPUBLICAN CENTRAL COMMITTEE, BEAVERHEAD COUNTY REPUBLICAN CENTRAL COMMITTEE, JAKE OIL LLC, JL OIL LLC, CHAMPION PAINTING INC, and JOHN MILANOVICH, | CV 12–12–H–CCL<br><br><br>ORDER |

          Plaintiffs,

and

RICK HILL,

          Plaintiff-Intervenor,

          vs.

JONATHAN MOTL, in his official capacity as Commissioner of Political Practices; TIM FOX, in his official capacity as Attorney General of the State of Montana; and LEO GALLAGHER, in his official capacity as Lewis and Clark County Attorney,

          Defendants.

Before the Court are cross-motions for summary judgment in this case involving Montana's 2011 political campaign contribution limits, codified at Montana Code Annotated § 13-37-216(1), (3), and (5).[1] For the reasons explained below, the Court grants Plaintiffs' motion for summary judgment, denies Defendants' motion for summary judgment, and again declares unconstitutional these three statutory subsections.

## BACKGROUND

Plaintiffs filed this lawsuit in the Billings Division for the District of Montana on September 6, 2011, alleging that the following Montana state statutes violate the First Amendment and are facially unconstitutional:

Montana Code Annotated § 13–35–225(3)(a), which requires authors of political election materials to disclose another candidate's voting record;

Montana Code Annotated § 13–37–131, which makes it unlawful for a person to misrepresent a candidate's public voting record or any other matter relevant to the issues of the campaign with knowledge that the assertion is false or with a reckless disregard of whether it is false;

Montana Code Annotated § 13–37–216(1), (5), which limits contributions that individuals and political committees may make to candidates;

Montana Code Annotated § 13–37–216(3), (5), which imposes an

---

1. The challenged provisions are currently found at Montana Code Annotated § 13-37-216(1), (2), and (4). In this order, all references to the campaign contribution limits are to the 2011 version of the statute.

aggregate contribution limit on all political parties; and

Montana Code Annotated § 13–35–227, which prevents corporations from making either direct contributions to candidates or independent expenditures on behalf of a candidate.

Plaintiffs moved for a preliminary injunction on September 7, 2011, seeking to enjoin enforcement of these statutes. However, before any action was taken on the motion, Defendants moved to change venue and the case was transferred to the undersigned.

On February 16, 2012, the Court held a hearing on the motion for a preliminary injunction and enjoined enforcement of Montana's vote-reporting requirement and political-civil libel statute, Montana Code Annotated §§ 13–35–225(3)(a), 13–37–131. The Court denied the motion as to the remaining statutes.

The Court issued its first scheduling order on March 9, 2012. The parties agreed that all of the issues regarding the contribution limits in Montana Code Annotated § 13–37–216(1), (3), and (5) would be resolved through a bench trial and that all other matters would be adjudicated by summary judgment.

The parties then cross-moved for summary judgment, and the Court held a hearing on May 12, 2012. The Court granted both motions in part and denied them in part. The Court permanently enjoined Montana's vote-reporting requirement, political-civil libel statute, and ban on corporate contributions to

-3-

political committees used by those committees for independent expenditures. *See* Mont. Code Ann. §§ 13–35–225(3)(a), 13–37–131, 13–35–227. However, the Court concluded that Montana's ban on direct and indirect corporate contributions to candidates and political parties was constitutional. *Id.* at § 13–35–227. The parties cross-appealed that order but then voluntarily dismissed the appeals on July 23, 2012.

The Court held a bench trial from September 12, 2012, to September 14, 2012, in order to resolve Plaintiffs' claims related to Montana's campaign contribution limits in Montana Code Annotated § 13–37–216(1), (3), and (5). On October 3, 2012, less than three weeks after the close of evidence, the Court issued an order declaring the contribution limits unconstitutional and permanently enjoining their enforcement. The order indicated that complete findings of fact and conclusions of law would follow, but that the Court wished to make its ultimate ruling known as far in advance of the pending November election as possible. That same day, Defendants filed a motion to stay the Court's ruling pending appeal to the Ninth Circuit Court of Appeals. The Court did not rule on the motion immediately, instead giving Plaintiffs five days to respond. The Court ultimately denied Defendants' motion to stay.

On October 4, 2012, Defendants filed a notice of appeal of the Court's October 3rd order and judgment. On October 10, 2012, the Ninth Circuit motions

panel assigned to the case temporarily stayed the Court's order and judgment

pending appeal, citing the fact that the Court had yet to issue its findings of fact

and conclusions of law.  That same afternoon, this Court issued its findings and

conclusions, relying primarily on the United States Supreme Court's plurality

opinion in *Randall v. Sorrell*, 548 U.S. 230 (2006), to find that Montana's

campaign contribution limits do not pass constitutional muster.

On October 16, 2012, the Ninth Circuit motions panel issued its full opinion

granting Defendants' motion to stay for the duration of the appeal.  In essence, the

motions panel concluded that Defendants were likely to succeed on appeal

because the Ninth Circuit's decision in *Montana Right to Life Association v.*

*Eddleman*, 343 F.3d 1085 (9th Cir. 2003) [hereinafter, *Eddleman*], likely remained

good law despite *Randall*.  *See Lair v. Bullock*, 697 F.3d 1200, 1202 (9th Cir.

2012) [hereinafter, *Lair I*].

On May 26, 2015, the Ninth Circuit <u>merits</u> panel assigned to the case issued

its opinion, which was subsequently amended and re-issued on September 1, 2015.

*See Lair v. Bullock*, 798 F.3d 736 (9th Cir. 2015) [hereinafter, *Lair II*].  The *Lair II*

court reversed and remanded, directing this Court to apply the following test from

*Eddleman* to the case at bar: "state campaign contribution limits will be upheld if

(1) there is adequate evidence that the limitation furthers a sufficiently important

state interest, and (2) if the limits are 'closely drawn'—i.e., if they (a) focus

narrowly on the state's interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign." 798 F.3d at 748. The *Lair II* court expressly held that *Randall* did not overrule the *Eddleman* closely-drawn analysis "because there simply was no binding . . . decision on that point." *Id.* at 747. However, the *Lair II* court did hold that the Supreme Court's decision in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), abrogated *Eddleman* to the extent the latter relied upon an impermissible notion of what constitutes an "important state interest" vis-á-vis contribution limits. *Id.* at 745–746. Thus, the litmus test for state campaign contribution limits in the Ninth Circuit—which is to be applied here on remand—is that articulated in *Eddleman*, except that the only state interest which contribution limits may permissibly combat is quid pro quo corruption or its appearance.

The *Lair II* court provided instructions to this Court on remand. First, having interpreted the Court's October 10, 2012 findings and conclusions as silent on the issue of whether Defendants established an important state interest underlying the statutes at issue, the *Lair II* court directed the Court "either (1) to decide whether Montana has carried its burden in showing the contribution limits further a valid 'important state interest' or, if the [Court] again assumes the state has carried its burden, (2) to identify expressly what interest the [Court] assumes

-6-

exists."[2] *Id.* at 748. Furthermore, if the Court either expressly finds or assumes that the contribution limits further a sufficiently important state interest, the *Lair II* court directed this Court to apply the three-part closely-drawn test from *Eddleman*. *Id.*

Following the *Lair II* court's remand, I ordered the parties to file status reports addressing the posture of the case, and set a status conference for October 20, 2015. The Court ultimately held the status conference on November 10, 2016, whereat the parties discussed: (a) the appropriate test to be applied to the contribution limits at issue, (b) the scope of discovery, if any, necessary to address the appropriate test, and (c) the scope and necessity of proceedings going forward. Relying on footnote 8 of the *Lair II* court's decision, at the status conference, the parties agreed to several additional months of discovery in the case. Plaintiffs stipulated to Defendants' requests to introduce portions of the district court record from *Eddleman* and "to supplement the existing record with witness testimony and documentary evidence such as court decisions, campaign finance decisions, and public campaign finance records." (Doc. 204 at 4.) The Court reluctantly agreed

---

2. The *Lair II* court noted that this Court "assumed Montana had shown an 'important state interest' but did not identify what that interest was." 798 F.3d at 748. In the October 10, 2012 findings and conclusions, this Court stated that "*[e]ven assuming* that the State of Montana has a 'sufficiently important interest' in setting contribution limits, the limits . . . are not 'closely drawn' to match that interest." (Doc. 168 at 27.) Thus, only in order to reach its analysis under the "closely drawn" prong did the Court assume an interest. And that limited assumption was based on this Court's misplaced confidence that *Randall* controlled even notwithstanding the admission.

to the proposed additional discovery.  The parties further represented at the status conference that the case could likely be resolved on motions for summary judgment.  Thereafter, the Court issued a scheduling order setting a discovery deadline of February 5, 2016, a motions deadline of March 4, 2016, a hearing on the motions for April 18, 2016, and a bench trial—to the extent necessary—on May 23, 2016.

The parties filed cross-motions for summary judgment on March 4, 2016, and included with their opening and subsequent briefs numerous exhibits and affidavits.  The Court heard oral argument on the cross-motions on April 18, 2016, and the parties and Court generally agreed that this matter can be resolved at summary judgment.  Accordingly, the Court vacated all pending deadlines, with the exception of the bench trial date.

### LEGAL STANDARD

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986).  Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are

not considered. *Id.* at 248.  In ruling on a motion for summary judgment, a court

must view the evidence "in the light most favorable to the opposing party." *Tolan*

*v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 157 (1970)).  "[T]he evidence of the nonmovant is to be believed, and

all justifiable inferences are to be drawn in his favor." *Id.* at 1863 (quoting

*Anderson*, 477 U.S. at 255).

ANALYSIS

**I.    Montana's campaign contribution limits**

Montana Code Annotated § 13–37–216(1), (3), (5) provides:

(1)(a) Subject to adjustment as provided for in subsection (4),[3] aggregate contributions for each election in a campaign by a political committee or by an individual, other than the candidate, to a candidate are limited as follows:

> (i) for candidates filed jointly for the office of governor and lieutenant governor, not to exceed $500;

---

3.  Subsection 4 provides:

(a) The commissioner shall adjust the limitations in subsections (1) and (3) by multiplying each limit by an inflation factor, which is determined by dividing the consumer price index for June of the year prior to the year in which a general election is held by the consumer price index for June 2002.

(b) The resulting figure must be rounded up or down to the nearest:

> (i) $10 increment for the limits established in subsection (1); and

> (ii) $50 increment for the limits established in subsection (3).

(c) The commissioner shall publish the revised limitations as a rule.

(ii) for a candidate to be elected for state office in a statewide election, other than the candidates for governor and lieutenant governor, not to exceed $250;

(iii) for a candidate for any other public office, not to exceed $130.

(b) A contribution to a candidate includes contributions made to the candidate's committee and to any political committee organized on the candidate's behalf.

.    .    .

(3) All political committees except those of political party organizations are subject to the provisions of subsections (1) and (2). For purposes of this subsection, "political party organization" means any political organization that was represented on the official ballot at the most recent gubernatorial election.  Political party organizations may form political committees that are subject to the following aggregate limitations, adjusted as provided for in subsection (4), from all political party committees:

(a) for candidates filed jointly for the offices of governor and lieutenant governor, not to exceed $18,000;

(b) for a candidate to be elected for state office in a statewide election, other than the candidates for governor and lieutenant governor, not to exceed $6,500;

(c) for a candidate for public service commissioner, not to exceed $2,000;

(d) for a candidate for the state senate, not to exceed $1,050;

(e) for a candidate for any other public office, not to exceed $650.

.    .    .

(5) A candidate may not accept any contributions, including in-kind

contributions, in excess of the limits in this section.

After adjusting the limits above for inflation, *see* Mont. Code Ann. §

13–37–216(4), Montana's current contribution limits are:

**Contribution limits for individuals and political committees**
(Admin. R. Mont. 44.10.338(1))

| Governor | $650 |
|---|---|
| Other statewide offices | $320 |
| All other public offices | $170 |

**Aggregate contribution limits for political parties**
(Admin. R. Mont. 44.10.338(2))

| Governor | $23,350 |
|---|---|
| Other statewide offices | $8,450 |
| Public Service Commission | $3,350 |
| State Senate | $1,350 |
| All other public offices | $850 |

## II.     Governing law

While laws limiting campaign expenditures are subject to strict scrutiny,

restrictions on contributions are subject to a "lesser standard." *Thalheimer v. City*

*of San Diego*, 645 F.3d 1109, 1117 (9th Cir. 2011) (citing *Buckley v. Valeo*, 424

U.S. 1, 20 (1976)). "Contribution limits need only be 'closely drawn' to match a

sufficiently important interest to survive a constitutional challenge." *Id.* Under

this standard, a contribution limit is constitutional as long as the limit is "closely

-11-

drawn" to match "a sufficiently important interest." *See id.*; *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 387–388 (2000); *Buckley*, 424 U.S. at 25. However, while the government enjoys a lower evidentiary threshold in contribution limits cases, the Ninth Circuit has "never accepted mere conjecture as adequate to carry a [state's] First Amendment burden." *Citizens for Clean Gov't v. City of San Diego*, 474 F.3d 647, 653 (9th Cir. 2007). Nor has the Ninth Circuit credited "the argument that a state may limit contributions simply because they may sway the outcome of an election," instead requiring that "contribution limits . . . target some 'greater or more imminent danger to the public interest.'" *Id.* at 652 (citing *Mont. Chamber of Commerce v. Argenbright*, 226 F.3d 1049, 1057–1058 (9th Cir. 2000)).

As mentioned above, the *Lair II* court determined that while *Citizens United* provides the standard for what constitutes an important state interest in this field of law, *Eddleman* nevertheless provides the overall analytical framework. Thus, the Court should uphold Montana's campaign contribution limits if: (1) there is adequate evidence that the limits further the sufficiently important state interest of combating quid pro quo corruption or its appearance, and (2) if the limits are closely drawn, meaning they (a) focus narrowly on the above interest, (b) leave the contributor free to affiliate with a candidate, and (c) allow the candidate to amass sufficient resources to wage an effective campaign. *Lair II*, 798 F.3d at 748.

-12-

## III. *Montana Chamber of Commerce v. Argenbright*, 28 F. Supp. 2d 593 (D. Mont. 1998), *aff'd*, 226 F.3d 1049 (9th Cir. 2000)

This Court has once before grappled with the issue of what constitutes quid pro quo corruption or its appearance in the election law context. In 1996, the people of the State of Montana passed Initiative 125, which banned direct and indirect corporate contributions and expenditures related to ballot issues. *Argenbright*, 28 F. Supp. 2d at 595. The Montana Chamber of Commerce and several other plaintiffs challenged the initiative as an abridgement of their First Amendment rights to free speech and association, with the undersigned presiding. *Id.* In declaring Initiative 125 unconstitutional, this Court held that the State of Montana failed to "demonstrate the existence or appearance of corruption, which the [C]ourt define[d] as real harm to the integrity of Montana's ballot initiative process." *Id.* at 600. The Ninth Circuit affirmed the Court's order, concluding that "a restriction so destructive of the right of public discussion as [Initiative] 125, *without greater or more imminent danger to the public interest than existed in this case*, is incompatible with the freedoms secured by the First Amendment." *Mont. Chamber of Commerce v. Argenbright*, 226 F.3d 1049, 1058 (9th Cir. 2000) (citations omitted) (emphasis added).

The Court therefore considers quid pro quo corruption or its appearance as those actual or apparent arrangements which pose a real harm to the election process or to the public's interest in the election process. *See* James J. Lopach,

-13-

*Montana's Role in the Free Speech vs. Equal Speech Debate*, 60 Mont. L. Rev. 475, 497 (1999) (providing excellent analysis of *Argenbright*, and positing that "[t]he critical issue at trial [in the case] was not unequal voices but degradation of . . . elections"). There is some distinction in the cases between ballot elections and candidate elections, the discussion of both of which seems useful in determining how the courts regard or define quid pro quo corruption or its appearance.

## IV.    The constitutionality of Montana's campaign contribution limits

### A.    Sufficiently important state interest

The parties devote the majority of their briefing and argument to the first question in the modified *Eddleman* test—whether Defendants have presented adequate evidence that Montana's campaign contribution limits further the sufficiently important state interest of combating quid pro quo corruption or its appearance.

Plaintiffs urge the Court to employ what they contend is the Supreme Court's established definition of quid pro quo corruption. Citing various cases—some construing criminal bribery statutes, some more germane to the issues at hand—Plaintiffs assert that quid pro quo corruption only occurs when there is "1) an explicit arrangement 2) for the direct exchange of something of value for 3) a public official's improper promise or commitment that is 4) contrary to the obligations of his or her office 5) in an effort to control a specific official,

-14-

sovereign act." (Doc. 237 at 9.) Moreover, as Defendants are quick to point out, Plaintiffs pay little attention to the disjunctive form corruption may take in the *Eddleman* test, i.e. quid pro quo corruption *or its appearance*.

Defendants, on the other hand, argue that the Supreme Court has never so formulaically mandated what is and is not quid pro quo corruption, instead contending that its presence, absence, or appearance is a sort of "know it when you see it" question of fact. Defendants cite to *McCutcheon v. Federal Election Commission*, 134 S. Ct. 1434, 1450–1451 (2014), wherein the Supreme Court affirmed its reliance on *Buckley* in stating that the First Amendment does not permit governmental regulation of the electoral process in order to level the playing field, level electoral opportunities, equalize the financial resources of candidates, or limit "the possibility that an individual who spends large sums may garner influence over or access to elected officials or political parties." While these examples leave lower courts and litigants knowing what is *not* quid pro quo corruption or its appearance, rather than knowing what is, Defendants argue that the inclusion of both actual and apparent corruption in the definition necessarily means that a sufficiently important state interest can be found with proof short of Plaintiffs' proposed evidentiary floor. Indeed, the *McCutcheon* court applied a "definition of corruption . . . [with] firm roots in *Buckley*"—"[t]he Court in that case upheld base contribution limits because they targeted 'the danger of actual

quid pro quo arrangements' and 'the impact of the appearance of corruption

stemming from public awareness' of such a system of unchecked direct

contributions[, and] simultaneously rejected limits on spending that was less likely

to 'be given as a quid pro quo for improper commitments from the candidate.'"

134 S. Ct. at 1451 (citing *Buckley*, 424 U.S. at 27, 47).  Citing *Citizens for Clean*

*Government*, Defendants contend that, because contribution limits of the sort at

issue in this case are common and most often enacted to combat a "neither novel

nor implausible" avenue for corruption, their evidentiary burden is relatively low.

474 F.3d at 652–653.

Nevertheless, Defendants rely on a host of examples of purported actual and

apparent quid pro quo corruption as justification for the contribution limits.  First,

they point to portions of the *Eddleman* district court record, including testimony

from Representative Hal Harper and evidence of a letter sent to Republican

senators in the early 1980's.  Harper, when asked about forces which influence

state legislators' behavior, testified that over the years he had "seen efforts put into

hiring more lobbyists and funneling more money into campaigns when certain

special interests [knew] an issue [was] coming up, because it gets results."  (Doc.

243-1 at 29).  He further testified as to his opinion that "the people that lobby the

Legislature and . . . make substantial donations to campaigns . . . know . . . that

there's a connection between support and between outcome and bills."  (*Id.*)  The

letter referenced in *Eddleman*, sent by a Republican senator to other senators of

the same party in advance of a bill affecting life insurance underwriters, stated the

following:

> Dear Fellow Republicans. Please destroy this after reading. Why?
> Because the Life Underwriters Association in Montana is one of the
> larger Political Action Committees in the state, and I don't want the
> Demo's to know about it! In the last election they gave $8,000 to
> state candidates . . . . Of this $8,000–Republicans got $7,000–you
> probably got something from them. This bill is important to the
> underwriters and I have been able to keep the contributions coming
> our way. In 1983, the PAC will be $15,000. Let's keep it in our
> camp.

(Doc. 241 at 17.) At the bench trial in March 2000, the *Eddleman* defendants

presented the testimony of another senator who rejected the implicit offer

contained in the letter, referring to it as "unconscionable" and "not the way to pass

bills." (Doc. 243-1 at 58.)

Defendants also cite more recent examples of what they deem actual or

apparent quid pro quo corruption. First, they reference the declaration of Senator

Bruce Tutvedt, who claims to have been among a group of Republican state

legislators offered $100,000 by National Right to Work in exchange for

introducing and bringing to a "vote of record" a right-to-work bill. (Doc. 244 at

2.) Tutvedt expressly declares that "[a]fter a brief discussion, the offer was

rejected." (*Id.*)

Second, Defendants cite Commissioner of Political Practices Jonathan

-17-

Motl's ("Motl") opinion "that several 2010 candidates engaged in quid pro quo

arrangements by pledging '100% support' for particular corporate groups'

legislative agendas in exchange for the corporate groups orchestrating a large

scale campaign plan on" behalf of those that made pledge. (Doc. 241 at 18.) This

opinion is similar to the circumstances underlying three other pieces of evidence

upon which Defendants rely—two state district court decisions wherein candidates

were "found" to have engaged in quid pro quo corruption, and a third wherein a

candidate was found to have accepted an illegal campaign contribution allegedly

as part of a quid pro quo.[4]  (*Id.* at 19; Doc. 263 at 8.)  In each of these instances,

the individuals either found to or alleged to have engaged in quid pro quo

corruption were identified by National Right to Work through surveys *prior* to

receiving any of the alleged illegal contributions. (*See e.g.* Doc. 267-7 at 122-

_____

4. Though the Court does not judge the weight of this evidence, the Court nevertheless notes the nature of the disposition of these cases. In the first two cases, Republican state legislators Wesley Prouse and Joel Boniek were found to have engaged in improper quid pro quo arrangements. In both cases, following complaints filed in early 2014 in state district court by Motl in his capacity as Commissioner of Political Practice, the defendants had defaults entered against them after failing to appear and answer the complaints. (*See* Docs. 243-6 at 2; 243-7 at 2.) In the third case, Republican state legislator Art Wittich was found to have accepted an illegal campaign contribution, and the issue of whether the contribution was part of a quid pro quo arrangement has yet to be tried. In all three cases, the allegations that the contributions at issue were in exchange for one or more official acts were not levied in the initial complaints—in Boniek's and Prouse's cases, the allegations surfaced at the default judgment hearings in the form of Motl's own testimony (*see* Docs. 243-6, passim; 243-7, passim), and in Wittich's case, the allegation was stricken from the court's final pretrial order and ordered to be tried before the court in a separate proceeding *because* it was not raised in the complaint (*see* Doc. 267-4 at 10, 14, 17.) (*See also* Doc. 267-7 at 170-171 (acknowledging that the complaints did not contain quid pro quo allegations).)

123.) Only after National Right to Work identified the candidates' positions on various points of its own agenda did the group offer the alleged illegal support.

While the Court is not prepared to adopt verbatim Plaintiffs' definition of quid pro quo corruption, neither is the Court satisfied that the evidence presented by Defendants proves the existence of an important state interest here. The sticking point with respect to the evidence Defendants rely upon is that the quids in each one of the cited instances were either rejected by, or were unlikely to have any behavioral effect upon, the individuals toward whom they were directed. Certainly, that the offers were never accepted in exchange for certain acts means Defendants' evidence does not exemplify actual corruption. But, perhaps more importantly, Defendants' evidence cannot reasonably exemplify appearances of corruption because, if anything, the evidence shows that Montana politicians are relatively incorruptible. Legislators denounced the life insurance underwriters' offer in the 1980's, and Senator Tutvedt confirmed that National Right to Work's offer—to the extent it even represented a "favors-for-dollars" arrangement—was rejected. Moreover, each of the legislators whom Motl alleges accepted campaign services in exchange for allegiance to National Right to Work's agenda were highly likely to vote parallel to that agenda notwithstanding those services. National Right to Work promotes what are hot-button core issues for the majority of conservative legislators, including stances against abortion, in favor of

individual rights under the Second Amendment, and against forced unionism.

These legislators are dyed-in-the-wool when it comes to these issues, and their

positions are not, nor seemingly ever will be, for sale. Thus, the Court is simply

unable to conclude that receiving National Right to Work's assistance in any way

affected the candidates' voting. Viewing these circumstances, the public would

more reasonably conclude that corruption is nearly absent from Montana's

electoral system—the evidence shows that despite a hand-full of opportunities,

legislators chose to keep their noses clean. In short, none of Defendants'

examples demonstrate a real harm to the election process or to the public's interest

in that process, as is required by the Ninth Circuit.

Based on the foregoing, the Court finds that Defendants have failed to prove

that Montana's campaign contribution limits further the important state interest of

combating quid pro quo corruption or its appearance. On these grounds alone,

Montana Code Annotated § 13-137-216(1), (3), and (5) (2011) are in violation of

the First Amendment of the United States Constitution.

## B.    Closely drawn

Assuming for arguments sake that a sufficiently important anti-corruption

interest supports the contribution limits at issue here, those limits would

nevertheless fail to clear the "closely-drawn" hurdle of the modified *Eddleman*

test. The Court agrees with Defendants that the contribution limits "leave the

contributor free to affiliate with a candidate" in other ways, *Lair II*, 798 F.3d at

748, including through volunteering, knocking on doors, writing letters,

maintaining a blog, putting up signs and bumper stickers, holding fundraisers, and

placing ads in newspapers. (Doc. 241 at 23-24.) However, the Court concludes

that the limits neither "focus narrowly on [Montana's] interest," nor "allow [a]

candidate to amass sufficient resources to wage an effective campaign." *Lair II*,

798 F.3d at 748.

### 1. Narrow focus

Simply put, the contribution limits at issue here could never be said to focus

narrowly on a constitutionally-permissible anti-corruption interest because they

were expressly enacted to combat the *impermissible* interests of reducing influence

and leveling the playing field. *See McCutcheon*, 134 S. Ct. at 1450–1451. The

Court need look no further than the Montana Secretary of State's voter

information pamphlet describing Initiative 118, the successful ballot measure

which resulted in the reduced contribution limits at issue. In their argument for

the initiative, proponents of the measure—including Motl—stated the following:

> There is just way too much money in Montana politics. Passage of
> Initiative 188 works to solve this problem by: limiting campaign
> contributions from special interests and the wealthy; stopping
> incumbent politicians from building up carry-over campaign war
> chests; preventing special interests from evading current limits; and
> forbidding politicians from making personal use of campaign funds.
>
> *Money from special interests and the wealthy is drowning out the*

-21-

*voice of regular people in Montana politics.* The legislature has been
asked over the years to address these many problems but the very
interests that dominate the process have prevented any solutions. The
political system is a mess and needs to be rebuilt.

The growth of money in Montana politics is unprecedented. In 1992
candidates for governor raised $2.16 million; a 500% increase from
1976 when $437,000 was spent. Likewise in 1992, candidates for the
Montana legislature raised $1.1 million; a four fold increase since
1976.

Much of that increase comes from special interests (PACs) and the
wealthy. I-118 changes Montana's laws to *lower and standardize* the
maximum contribution that special interests and the wealthy can
make to a candidate in any one election.

.  .  .

The opponents argument against [I-118] are flawed because they are
part of the problem. They represent the very interests whose *money
and influence have drowned out citizen voices, caused government
gridlock and blocked political reform.*

(Doc. 237-11 at 3, 5 (emphasis added).) The reductions to contribution limits

embodied in this measure run contrary to the First Amendment and *McCutcheon.*

State governments may not restrict the political speech of one group in order to

elevate that of another group. Thus, even were we to assume a valid anti-

corruption interest at the first step in the modified *Eddleman* test, the contribution

limits at issue would have failed this conjunctive factor of the closely-drawn

analysis.

### 2.    Amassing sufficient resources to effectively campaign

Though in the context of its significant-restriction-of-funds analysis under

-22-

*Randall*, this Court addressed the spirit of this *Eddleman* closely-drawn factor in its October 2012 findings of fact and conclusions of law. For the same reasons explained in that order, and repeated below, the Court finds that Montana's campaign contribution limits prevent candidates from amassing sufficient resources to wage effective campaigns.

Generally speaking, candidates in Montana spend more money on their campaigns than they raise. According to Clark Bensen, who testified at the September 2012 bench trial as an expert witness on Plaintiffs' behalf, the average competitive campaign spends 7% more money than it raises. This suggests that most competitive campaigns are not adequately funded. The record shows, though, that more funding would be available to candidates if Montana's contribution limits were raised. Bensen testified that, on average, 29% of the contributors in the competitive campaigns that he analyzed had donated at the maximum level permitted by Montana law. The contributions that candidates receive from maxed-out contributors are substantial, constituting approximately 44% of the funds raised through itemized contributions.

The analysis from Edwin Bender, Defendants' expert witness at trial, was largely consistent with these statistics. Bender additionally determined that across all Montana races (excluding the gubernatorial races) between 45% and 58% of contributing political committees make the maximum contribution permitted by

Montana law. But only 9% to 11% of legislative candidates' funds come from political committees, and only 0% to 3% of statewide candidates' funds come from political committees.

Consistent with the testimony of Plaintiffs Doug Lair and Steve Dogiakos, many, if not most, of these maxed out contributors might have donated beyond the contribution limit if Montana law had permitted them to do so. Moreover, Bender determined that between 22% and 32% of all Montana candidates accepted the maximum aggregate contribution from their political party. According to Bensen, this percentage is higher—at 40%—for candidates in competitive campaigns.

The number of contributors making contributions at the maximum level is significant, and significantly greater funds would be available to candidates if the contribution limits are raised. Defendants do not dispute these propositions, instead arguing that "candidates may have to raise money from more sources than if no limits existed[,] but that candidates can nonetheless run effective campaigns." (Doc. 241 at 25.) The Court disagrees, and finds that the record shows that those additional funds are needed because most campaigns are insufficiently funded. Of primary concern with regard to the adequacy of funding is the threat that "too low a limit [may] magnify the reputation-related or media-related advantages of incumbency and thereby insulate legislators from effective electoral challenge." *Randall*, 548 U.S. at 248 (citations and internal

quotation marks omitted). The "free discussion of governmental affairs" requires

that the voices of all those who would represent the public as legislators are heard

by voters. *Mills v. Ala.*, 384 U.S. 214, 218 (1966); *see also Ariz. Right to Life*

*PAC v. Bayless*, 320 F.3d 1002, (9th Cir. 2007) ("political speech . . . operates at

the core of the First Amendment," and "[t]he First Amendment reflects a profound

national commitment to the principle that debate on public issues should be

uninhibited, robust, and wide-open") (citations omitted).

Based on the foregoing, even if Defendants had adequately proven the

existence of an anti-corruption interest underlying the limits, the limits would have

failed this conjunctive factor of the *Eddleman* closely-drawn analysis.

## V.    Motl's expert witness testimony

The Court is called upon to determine whether Commissioner Motl's

testimony as an expert witness should be considered in this case. As mentioned

above, Motl was the driving force behind the initiative which resulted in the

current unconstitutional contribution limits. Before his appointment as

Commissioner, he shepherded several other initiatives through the validation and

ballot election process, including the measures found unconstitutional in

*Argenbright* and, more recently, an initiative directing Montana's state and federal

legislators to further a policy declaring that corporations do not have constitutional

rights. He attempted unsuccessfully to overturn the circuit opinion in *Argenbright*

-25-

by initiative.  Motl has also called for a national constitutional convention to change the First Amendment of the Bill of Rights.  Plaintiffs object to Motl's lack of impartiality to testify as an expert witness.  There is no question that he has strong views as to what the law is and what it should be.

As Commissioner of Political Practices, Motl possesses broad investigational powers, *see* Mont. Code Ann. §§ 13–37–111(2), 13–37–116, and is charged with promulgating the very rules he is to enforce, *Id.*, § 13–37–114.  He is granted the power to initiate civil or criminal actions, at his discretion, for violation of state campaign finance law, as well as the power to prosecute those same actions in the venue of his choosing.  *Id.*, §§ 13–37–124, 13–37–128.  Finally, as is the case here, Motl often serves as a dual-role witness in the cases which he initiates, testifying to both facts and opinions.

In declaring the contribution limits at issue in this case unconstitutional, the Court has considered Motl's testimony for what it is worth.

## VI.   *Randall v. Sorrell*, 548 U.S. 230 (2006)

Although the *Randall* decision is not binding on this Court, it is persuasive in a number of respects.  It identifies Montana as one of a number of states with low contribution limits—lower than those found to be too low.  It alerts Montana to a potential problem and motivates the analysis which resulted in this case.  Of course Montana presents a unique and different situation from Vermont by virtue

of its huge size and sparse population.  Campaigning for statewide office is

obviously more costly in both time and money when it takes a full day to drive

across our state.  Low contribution limits unduly empower incumbency.  Limits

that are too low violate the First Amendment.  *Randall* is useful in this analysis.

## CONCLUSION

Defendants have not proven that the campaign contribution limits codified

at Montana Code Annotated § 13-37-216(1), (3), and (5) (2011) further the

important state interest of combating quid pro quo corruption or its appearance.

Regardless, had they met their burden, the limits are neither narrowly focused on

an anti-corruption interest, nor do they allow candidates in Montana to amass

sufficient resources to wage effective political campaigns.  Therefore, according to

*McCutcheon* and other controlling Supreme Court and Ninth Circuit law, they are

unconstitutional and must be enjoined.

Defendants have suggested that the contribution limits pre-dating Initiative

118—which the Court notes were significantly higher for individuals and political

committees, but quite a bit lower for political parties—should spring into effect in

the event the Court declares the 2011 contribution limits unconstitutional.  The

Court expresses no opinion on this point, as it was neither a subject at trial nor in

the briefing submitted on summary judgment.  The Court leaves this question for

the Montana Attorney General to consider.

Now, this decision directly disposes of this case with respect to all but Plaintiff-Intervenor Rick Hill ("Hill"). Hill accepted a $500,000 donation from the Montana Republican Party two days after this Court originally declared the statutes at issue here unconstitutional in October 2012, an act for which Commissioner Motl has threatened but not yet filed an enforcement action against Hill seeking treble damages. The Ninth Circuit granted Hill intervenor status in this case. This Court, however, has held Hill's motion to file a supplemental complaint in abeyance pending the outcome of the instant motions for summary judgment. By his proposed complaint, Hill seeks a declaration that the enforcement action—which is predicated on Montana Code Annotated § 13–37–216—violates his constitutional rights, and he seeks restraint of that enforcement action.

The Court remains at a loss as to how Commissioner Motl will prove that Hill could be liable for accepting the alleged illegal contribution *after* the duly appointed and acting United States District Court, with unchallenged jurisdiction in the case, declared the contribution limits unconstitutional and unenforceable *before* the Ninth Circuit motions panel stayed this Court's order. In that short window in early October 2012, seemingly there were no campaign contribution limits in effect for Hill to violate. The Commissioner's prosecutorial grounds in that matter appear shaky at best, and, more likely, non-existent.

Both publicly[5] and before this Court at the November 2015 status conference (*see* Doc. 226 at 12–14), Defendants have represented that the Commissioner will defer to the Court's ruling in this case, a stance which can only be interpreted to mean that Montana will relent against Hill in the event the contribution limits are declared unconstitutional. Though Hill apparently remains on alert that the enforcement action against him will be resuscitated, in reality that has not occurred and, apparently, will not occur. On that premise, Hill's motion for leave to file a supplemental complaint should now be denied as moot.

As was the case in 2012, the Montana Legislature convenes next year and will have the opportunity to revisit campaign contribution limits once again, in a manner which comports with the protections afforded by the First Amendment. As the limits currently stand, those protections are not honored.

Accordingly, IT IS ORDERED that:

(1)   Plaintiffs' motion for summary judgment (Doc. 236) is GRANTED.

(2)   Defendants' motion for summary judgment (Doc. 240) is DENIED.

(3)   Plaintiff-Intervenor's motion for leave to file a supplemental complaint (Doc. 212) is DENIED AS MOOT.

---

5. The Commissioner's official website indicates that "[w]hatever action that is taken [on the Hill complaint] will defer to the eventual Federal Court Decision on the constitutionality of Montana's 2012 contribution limits." *See* http://politicalpractices.mt.gov/2recentdecisions/docket.mcpx.

(4)     The contribution limits codified at Montana Code Annotated

§ 13–37–216(1), (3), and (5) (2011) are hereby declared

unconstitutional.  Defendants are PERMANENTLY ENJOINED from

enforcing these limits.

(5)     The Clerk of Court is directed to enter judgment in favor of Plaintiffs

and against Defendants.

DATED this _17th_ day of May, 2016.


Charles C. Lovell
Senior United States District Judge